















KAJ    3/17/03    14:06
3:02-CV-00870    PEREGINE SYSTEMS INC V.
*217*
*AMDCMP.*

GOLD BENNETT CERA & SIDENER LLP
PAUL F. BENNETT (State Bar No. 63318)
SOLOMON B. CERA (State Bar No. 99467)
GWENDOLYN R. GIBLIN (State Bar No. 181973)
C. ANDREW DIRKSEN (State Bar No. 197378)
595 Market Street, Suite 2300
San Francisco, California 94105-2835
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Section 10(b) Lead Plaintiff
The Loran Group

STULL, STULL & BRODY
JULES BRODY
HOWARD T. LONGMAN
PATRICK SLYNE
6 East 45th Street, 4th Floor
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

ABRAHAM & ASSOCIATES
JEFFREY ABRAHAM
LAWRENCE D. LEVIT
One Penn Plaza, Suite 1910
New York, NY 10119-0165
Tel: (212) 714-2444
Fax: (212) 279-3655

Attorneys for Section 11 Lead Plaintiff
Heywood Waga

**FILED**

MAR 1 7 2003

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE PEREGRINE SYSTEMS, INC. SECURITIES LITIGATION | Case No. 02-CV-0870 J(RBB)  **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates to:  ALL ACTIONS. | **DEMAND FOR JURY TRIAL** |

217

0903
CR

**TABLE OF CONTENTS**

**Page**

NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . 16

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Unnamed Participant . . . . . . . . . . . . . . . . . . . . . . 18

    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 25

PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET . . . . . . . . . . . . . . . . 27

THE PEREGRINE DEFENDANTS' PARTICIPATION IN THE FRAUD . . . . . . . . . . . . . . 29

    The Management Defendants . . . . . . . . . . . . . . . . . . . . . 29

    The Board Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 37

PEREGRINE'S FRAUDULENT ACCOUNTING SCHEME . . . . . . . . . . . . . . . . . . . . . 47

    Improper Revenue Recognition . . . . . . . . . . . . . . . . . . . 54

        KPMG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        IBM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        Accenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        Tivoli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        CI Software Solution . . . . . . . . . . . . . . . . . . . . 61

        O-E Systems, Inc. . . . . . . . . . . . . . . . . . . . . . . 62

        Barnhill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        ICL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        Critical Path . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        Edwards Jones . . . . . . . . . . . . . . . . . . . . . . . . 64

        Corporate Software . . . . . . . . . . . . . . . . . . . . . 65

        Citigroup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

        Systematics AG . . . . . . . . . . . . . . . . . . . . . . . . 65

**TABLE OF CONTENTS**
**(Continued)**

**Page**

      Action Computer Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

      Prokom Software . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

      eXchangeBridge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      MGX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

      RTG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      FM International . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

      Fujitsu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      British Telecom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    Quarters Were Kept Open . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    Improper Balance Sheet Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    Concealment Of The Write-Off Of Receivables . . . . . . . . . . . . . . . . . . . . . 78

    Understatement Of Stock Option Compensation . . . . . . . . . . . . . . . . . . . . 78

PEREGRINE'S FAILURE TO IMPLEMENT AND MAINTAIN ADEQUATE INTERNAL
    ACCOUNTING CONTROLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD . . . . . . . . . . . . . . . . 81

ARTHUR ANDERSEN'S FAILURE TO REQUIRE REVISIONS OF PEREGRINE'S
    INTERIM FINANCIAL RESULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

GAAP VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

THE FALSE STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    Q1 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    Q2 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    Q3 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    Q4 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

    Q1 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    Q2 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    Q3 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    Q4 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

0903

**TABLE OF CONTENTS**

**(Continued)**

|  |  | **Page** |
|---|---|---|
| Q1 2002 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
| Q2 2002 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 126 |
| Q3 2002 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |

INSIDER STOCK TRADING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

THE TRUTH BEGINS TO EMERGE . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

BASIS OF FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 143

DEFENDANTS' CONCEALMENT OF WRONGDOING . . . . . . . . . . . . . . . . . . . . . 143

NO SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

COUNT I
  (Violations Of Section 10(b) Of The Exchange Act) . . . . . . . . . . . . . . . . . . . . . . 144

COUNT II
  (Violations Of Section 14(a) Of The Exchange Act -
  The Harbinger Proxy Solicitation) . . . . . . . . . . . . . . . . . . . . . . . . . 147

COUNT III
  (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9
  Promulgated Thereunder - Harbinger Acquisition - Arthur Andersen) . . . . . . . . . . . 149

COUNT IV
  (Violations Of Section 14(a) Of The Exchange Act And
  Rule 14a-9 Promulgated Thereunder - Remedy Acquisition) . . . . . . . . . . . . . . . . 151

COUNT V
  (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9
  Promulgated Thereunder - Remedy Acquisition - Arthur Andersen) . . . . . . . . . . . . 153

COUNT VI
  (Violations Of Section 20(a) Of The Exchange Act) . . . . . . . . . . . . . . . . . . . . . 154

COUNT VII
  (Violations Of Sections 11 And 15 Of The Securities Act -
  The Harbinger Acquisition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

COUNT VIII
  (Violations Of Sections 12(2) And 15 Of The Securities Act -
  The Harbinger Acquisition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

COUNT IX
  (Violations Of Sections 11 And 15 Of The Securities Act -
  The Remedy Acquisition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

**TABLE OF CONTENTS**
**(Continued)**

**Page**

COUNT X
    (Violations Of Sections 12(2) And 15 Of The Securities Act -
    Remedy Acquisition) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

JURY DEMAND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Plaintiffs, on behalf of themselves and all others similarly situated, allege as follows:

## NATURE OF ACTION

1.    (a)  This action is brought on behalf of plaintiffs and other persons and entities who purchased or otherwise acquired the securities of Peregrine Systems, Inc. ("Peregrine" or the "Company") from July 22, 1999 through May 3, 2002, inclusive (the "Class Period").

(b)  This action is also brought on behalf of all persons and entities who held Harbinger Corporation common stock or Remedy Corporation common stock and received Peregrine common stock in connection with mergers between each of those companies and Peregrine.

2.    At all times relevant hereto, Peregrine sold software and related services.  By the beginning of the Class Period, Peregrine had adopted a business model of aggressively growing its business through acquisitions and other strategic alliances.  That business model required Peregrine to report ever increasing revenue so as to increase its share price.  Peregrine planned on using its stock as the primary currency to pay for acquisitions and strategic alliances.  With an increasing share price, Peregrine was able to complete, at least, thirteen (13) acquisitions or strategic alliances during the first eleven (11) quarters of the Class Period with an announced value exceeding $3.4 billion.

3.    During the Class Period, Peregrine reported quarterly increases in revenue in each of the eleven (11) quarters as follows:

| Announcement Date | Reporting Period | Reported Revenue | Reported Growth Compared With Prior Year Results |
|---|---|---|---|
| 7/21/99 | Q1 00 (6/30/99) | $51.6 million | 137% |
| 10/20/99 | Q2 00 (9/30/99) | $57.8 million | 95% |
| 1/20/00 | Q3 (12/31/99) | $67.5 million | 67% |
| 4/26/00 | Q4 00 (3/31/00) | $76.3 million | 66% |
| 7/19/00 | Q1 01 (6/30/00) | $94.3 million | 83% |
| 10/24/00 | Q2 01 (9/30/00) | $142.7 million | 147% |
| 1/24/01 | Q3 01 (12/31/00) | $156.6 million | 132% |

| Announcement Date | Reporting Period | Reported Revenue | Reported Growth Compared With Prior Year Results |
|---|---|---|---|
| 4/26/01 | Q4 01 (3/31/01) | $171 million | 124% |
| 7/24/01 | Q1 02 (6/30/01) | $172 million | 82% |
| 10/24/01 | Q2 02 (9/30/01) | $175 million | 23% |
| 1/24/02 | Q3 02 (12/31/01) | $175.2 million | 12% |

4.       During the Class Period, Peregrine also reported dramatic annual increases in revenue as follows:

| Announcement Date | Reporting Period | Reported Revenue | Reported Growth Compared With Prior Year Results |
|---|---|---|---|
| 4/26/00 | 2000 YE | $253.3 million | 83% |
| 4/26/01 | 2001 YE | $564.7 million | 123% |

5.       Peregrine's reported revenues were generated primarily from two sources: (1) product licensing revenues to resellers, distributors and end-users, and (2) service and support revenues.  Under Generally Accepted Accounting Principles ("GAAP"), and as represented in its own filings with the Securities And Exchange Commission ("SEC"), Peregrine could not recognize revenue from the sale of software licenses to resellers, distributors or end-users unless (1) an unconditional contract had been signed; (2) the product had been delivered; (3) the fee was "fixed and determinable;" (4) the risk of concession was deemed remote; (5) no significant vendor obligations remained; and (6) the risk of collecting the receivable was probable.  More than $500 million of Peregrine's reported revenue, however, was improperly recognized by Peregrine on "deals" where the required criteria had not been met.

6.       For example, revenue was recognized by Peregrine despite the existence of both oral and written side letters with resellers under which they had no obligation to pay Peregrine for product until it was sold-through to the end-user.  This practice was known throughout the Company.  The amount of a resellers' "commitment" which had not sold-through to the end-user was closely monitored by Peregrine and was referred to as the "burn."  As one former regional sales director was quoted as saying:

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

2

1      [Burn] was common and openly discussed in the management ranks
2      . . . This was a house of cards waiting to blow up.

3   Peregrine also improperly recognized revenue on transactions which were nothing more than

4   product swaps or barter transactions with third parties in order to meet publicly announced

5   revenue goals.

6          7.      Peregrine has now admitted that it improperly recognized over $500 million in

7   revenue during Fiscal Year 2000, Fiscal Year 2001 and the first three quarters of Fiscal Year

8   2002.

9          8.      Peregrine has also now admitted that during the Class Period it materially

10  misrepresented its balance sheet and statement of liabilities by failing to include significant

11  obligations to financial institutions.  These obligations arose out of Peregrine's undisclosed

12  business practice of factoring substantial portions of its accounts receivables and treating those

13  borrowings as sales of receivables in violation of GAAP.  During the Class Period, the amount of

14  debt not reflected on Peregrine's financial statements reached as high as $180 million and, by

15  August 29, 2002, equaled approximately $103 million.

16         9.      Since Peregrine improperly treated the foregoing factoring transactions as "sales"

17  of accounts receivable, it also understated its accounts receivables reflected on its balance sheet

18  by as much as $180 million during the Class Period.  This massive understatement of accounts

19  receivable caused Peregrine to materially misrepresent and falsify its actual Days Sales

20  Outstanding ("DSO").  DSO is the average number of days it takes a company to collect its

21  accounts receivable.  DSO is a key financial metric used by investors and securities analysts to

22  gauge the quality of a company's reported revenue and the collectibility of its accounts receivable.

23         10.     Peregrine has also admitted that, during the Class Period, it understated option

24  compensation expense by approximately $100 million.

25         11.     Peregrine, as well as its former auditor, Arthur Andersen LLP ("Arthur

26  Andersen"), have warned the investing public that the audited financial statements of Peregrine

27  for Fiscal Year 2000 and Fiscal Year 2001 and the unaudited financial statements of Peregrine for

28  the first three quarters of Fiscal Year 2002 cannot be relied upon.  In May, 2002, Peregrine stated

1  its intention to restate its publicly issued financial statements commencing at the beginning of

2  Fiscal 2000 (as of June 30, 1999) through the third quarter of Fiscal 2002 (as of December 31,

3  2001).

4        12.     On February 28, 2003, Peregrine filed with the SEC its audited financial

5  statements for the fiscal year ending March 31, 2002 which contains a restatement of Peregrine's

6  audited financial statements for fiscal years ending March 31, 2000 and 2001.

7        13.     The business practices of Peregrine and its employees, executives and directors

8  which gave rise to the false financial statements now admitted to by the Company were pervasive

9  within the Company.  They occurred with the knowledge and/or acquiescence of Peregrine's

10  senior management, the members of its board of directors who are sued herein and the Arthur

11  Andersen Defendants.  As particularized below, the accounting irregularities admitted to by

12  Peregrine were orchestrated, approved and/or ratified by defendants and each of them.

13        14.     Despite its rapid growth, the Company failed to maintain adequate systems of

14  internal accounting and financial controls throughout the Class Period.  The lack of an effective

15  internal control function was a "red flag" to Peregrine board members and to the Arthur Andersen

16  Defendants that Peregrine's senior management could not -- and did not -- accurately report the

17  Company's revenues and earnings in compliance with GAAP.

18        15.     For example, KPMG LLP ("KPMG"), which was retained by Peregrine to succeed

19  Arthur Andersen as Peregrine's independent auditor, identified, in a June 4, 2002 letter to the

20  SEC, several factors existing at Peregrine.  They included the following:

21          a.     The absence of any minutes of the Audit Committee;

22          b.     The existence of numerous significant manual adjustments to software

23  license and maintenance revenue;

24          c.     The failure to record the deferred tax effects for accruals recorded in

25  Peregrine's various business combinations;

26          d.     The inability to quantify the amount of sales to resellers (and their identity)

27  during particular accounting periods; and

28  //

e.   Substantial delays in providing, or an inability to provide, information such as trial balances, general ledgers and subledgers that would customarily be readily available from a company's accounting systems.

16.   The existence of these conditions at Peregrine are strong evidence of material weaknesses in Peregrine's internal accounting controls.

17.   Peregrine's senior management knowingly took advantage of the absence of adequate internal accounting controls in order to engage in improper accounting practices, primarily overstating revenues and understating expenses, as further alleged herein, for the purpose of materially improving the Company's reported financial results.  The failure of the Company's internal accounting controls to work properly led to a complete break-down in the Company's ability to report accurately its financial results in compliance with GAAP, a fact that was known to or recklessly disregarded by all defendants.

18.   The massive accounting fraud alleged herein was nurtured and condoned by the Arthur Andersen Defendants which completely abrogated their duties and responsibilities as Peregrine's purportedly "independent" outside accountant.  As alleged in greater detail herein, prior to the public revelation of the accounting fraud, the Arthur Andersen Defendants knew about the accounting irregularities at Peregrine, but chose to look the other way.  The lack of independence between the Arthur Andersen Defendants and Peregrine was a major contributing factor in the perpetuation -- and concealment -- of the accounting fraud alleged herein.  Among other things, Arthur Andersen provided the Company with unqualified annual audit opinions, and reviewed and approved throughout the Class Period, the Company's quarterly financial reports, even though it knew (i) that the Company's internal accounting and financial controls were grossly deficient, (ii) that the Company was recognizing revenue prematurely in violation of GAAP, (iii) that the Company was classifying loans as sales in violation of applicable accounting standards and principles, and (iv) that Peregrine otherwise was actively manipulating the Company's accounts at quarter-end and year-end in order to meet pre-established revenue targets.

19.   By restating its financial results, Peregrine has admitted that its publicly issued financial statements for each of the periods restated were not prepared in conformity with GAAP

1  and that Peregrine materially misrepresented its financial condition and results of operations

2  therein.  Under GAAP, the restatement of previously issued financial statements is reserved for

3  circumstances where no lesser remedy is available.  Under Accounting Principle Board Opinion

4  No. 20, Accounting Changes, restatements are only permitted and are required to correct material

5  accounting errors or irregularities that existed at the time the financial statements were prepared

6  and issued.

7       20.     By restating its financial statements commencing in Fiscal Year 2000, Peregrine

8  has admitted that each document publishing the original financial results contained an untrue

9  statement of material fact.  Thus, Peregrine has admitted that each of the press releases and the

10  annual or quarterly reports filed on Forms 10K and 10Q with the SEC (and all other SEC filings

11  incorporating or including such financial information) for the periods ending June 30, 1999

12  through and including December 31, 2001, contained untrue statements of material fact.

13       21.     The public dissemination of admittedly materially false and misleading financial

14  statements caused Peregrine's share price to trade at artificially inflated prices throughout the

15  Class Period.  As the false financial results were reported throughout the Class Period, Peregrine's

16  stock price increased from approximately $13.125 per share at the beginning of the Class Period

17  to a Class Period high of over $78.00 per share (adjusted for stock splits).  As the fraud was

18  revealed and assimilated by the market, the price of Peregrine common stock declined to $0.89

19  per share on the trading day after the close of the Class Period.

20       22.     Before the market opened on May 6, 2002, Peregrine issued a press release

21  announcing an internal accounting investigation and the resignation of defendants Stephen P.

22  Gardner and Matthew C. Gless.  It stated that:

23             [T]he board of directors has authorized the audit committee of the
              board to conduct an internal investigation into potential accounting
24             inaccuracies brought to the attention of the audit committee by
              KPMG, the company's independent auditors. . . .
25
              The scope and magnitude of these matters have not been
26             determined.  Based on the preliminary information reviewed to
              date, certain transactions involving revenue recognition
27             irregularities, totaling as much as $100 million, have been called
              into question and may have been recorded during periods in fiscal
28             2001 and 2002. These transactions were recorded initially as

revenue from the company's indirect channels and may have been
written off in later quarters. These channel transactions and other
accounting matters to be investigated may impact financial results
for periods in fiscal 2002 and prior. . .

Additionally, the board announced the resignations of Steve
Gardner, chairman of the board and chief executive officer, and
Matt Gless, chief financial officer, executive vice president of
finance and also a director on the board.

23.     Peregrine also announced that Fred Gerson, who was then the chief financial

officer of the San Diego Padres (a professional baseball team which is controlled by defendant

John J. Moores), would become Peregrine's interim chief financial officer and that Moores had

been reappointed Chairman of the Board.

24.     On May 28, 2002, Peregrine filed a Form 8-K with the SEC stating that its Board

of Directors had terminated its engagement of KPMG as its auditor. Approximately $35 million

of the then estimated $100 million in improperly recognized revenue came from questionable

transactions with KPMG and KPMG's consulting arm. It also announced that the attorneys

representing the Audit Committee of Peregrine's Board of Directors had retained

PricewaterhouseCoopers LLP to complete the internal investigation.

25.     In a Form 8-K filed with the SEC on June 3, 2002 (which was dated May 24,

2002), Peregrine stated that, in the course of its engagement, KPMG had informed the Company's

Audit Committee and other Board members that:

a.      Information had come to the attention of KPMG that had
led it to no longer be able to rely on representations by some
members of management. This information consisted principally of
customer documentation and accounting information provided by
personnel within the company's sales and finance organizations
which, when taken together, pointed out accounting
inconsistencies, errors and irregularities, principally in the
company's indirect channel sales; and

b.      KPMG had concluded the information provided to it during
the course of its audit activities would impact the fairness and
reliability of the company's audited financial statements for fiscal
2000 and 2001 and for each of the three subsequent unaudited
quarterly periods reported by the company for fiscal 2002. On May
23, 2002, the Company announced that it would be restating its
financial statements for fiscal 2000 and 2001 and each of the first
three quarters of fiscal 2002.

//

26. In the Form 8-K, Peregrine stated that the "questions and issues" raised about Peregrine's financial statements by KPMG fell into four categories:

a. Revenue recognition irregularities, principally arising in the company's indirect channel sales and, to a lesser extent, arising in connection with commercial transactions involving contemporaneous product purchase activities and investments or acquisitions. KPMG has advised that correcting these irregularities would have the effect generally of delaying to later periods, or nullifying, revenue recognized from product sales;

b. Accounting and transparency-of-presentation issues associated with the accounting treatment for impaired accounts receivable. KPMG has advised that some write-offs of impaired accounts receivable should have been accounted for as errors in the previous recognition of revenue. KPMG also advised that where write-offs of impaired accounts receivable were appropriately made, reclassification of those adjustments as bad debt or as a reversal of revenue would be appropriate;

c. The appropriateness, from an accounting perspective, of the manner in which the company recorded on its balance sheet the financing of some of its accounts receivable with three banks; and

d. KPMG has advised that the financing of some of these accounts receivable should be recorded for balance sheet purposes as loan transactions and not as sales of accounts receivable.

27. On June 5, 2002, Peregrine filed a Form 8-K/A for the purpose of filing a letter from KPMG to the SEC. In its letter, KPMG noted that the prior statements made by Peregrine in the June 3, 2002 Form 8-K were inaccurate or incomplete in that KPMG had determined that it was necessary to significantly expand the scope of the fiscal 2002 audit, and recommended an internal investigation by forensic auditing experts "into the various indicators of possible fraud." KPMG had identified the following additional factors not mentioned in the prior 8-K filed by Peregrine:

- Inconsistent representations regarding Peregrine's consultations with external corporate counsel regarding the existence of oral and written "side agreements" providing for nonpayment by customers;

- Representations by management that Peregrine had issued earnings releases and filed quarterly reports with the Securities and Exchange Commission

//

without determining the extent and nature of oral and written "side agreements" providing for nonpayment by customers;

- Misrepresentations by management of the number and extent of contemporaneous sale and purchase transactions with customers;

- Inconsistencies between representations received from management and those received from the predecessor auditors regarding the predecessor auditors' conclusions related to the accounting for a contemporaneous sale and purchase transaction under investigation by the Division of Enforcement of the Securities and Exchange Commission;

- The absence of formal minutes from any meetings of the audit committee and the refusal by the Corporate Secretary to allow KPMG to review manually prepared notes in the absence of formal minutes from meetings of the board of directors and the audit committee;

- Substantial delays in providing, or an inability to provide, information such as trial balances, general ledgers and subledgers that would customarily be readily available from a company's accounting systems or the presentation to KPMG of manually prepared schedules when such information would customarily be readily available from accounting systems;

- Inconsistent representations by management regarding the estimated effect of Peregrine's proposed change in accounting for sales to resellers, as well as Peregrine's inability to quantify the amount of sales to resellers during particular accounting periods, to determine the amount of software licenses held by resellers that had not been sold to end users, and to provide KPMG with a list of resellers; and

- The nature and extent of redirection of audit inquiries to certain key management members as a result of the apparent unwillingness of finance personnel to respond directly to our inquiries and information requests.

//

28.     The letter from KPMG further noted that the prior Form 8-K also was inaccurate or incomplete in that KPMG had also told Peregrine that the Company's classification of write-offs of accounts receivable or revenue reversals recorded as "Acquisition costs and other" expense in Peregrine's statement of operations was not in accordance with generally accepted accounting principles.

29.     Among other things, KPMG stated that the Peregrine financial reports do or may not accurately reflect the following:

- The existence of concessions offered to customers on extended payment term software sales which impact Peregrine's ability to overcome the presumption in American Institute of Certified Public Accountants Statement of Position No. 97-2 that software license revenue for such transactions is not fixed and determinable;

- The existence of numerous, significant manual adjustments to software license and maintenance revenue;

- That the preparation of Peregrine's fiscal 2001 tax information was based upon pro forma earnings rather than earnings computed in accordance with generally accepted accounting principles;

- The failure to record the deferred tax effects for accruals recorded in Peregrine's various business combinations accounted under the purchase method;

- The inappropriate nature of Peregrine's conclusions regarding the measurement date and impairment recognition for its discontinued operations announced in the fourth quarter of fiscal 2002;

- An understatement of the purchase price for Remedy Corporation attributable to the value of options assumed in the business combination;

- Peregrine's failure to amortize amounts assigned to certain intangible assets from the Remedy Corporation acquisition in disregard of Statement of Financial Accounting Standards ("SFAS") No. 142;

- The appropriate measurement date for options granted to employees where such options are generally granted with an exercise price that is the lowest price at which Peregrine's common stock traded between meetings of the board of directors;

- The effect of Peregrine's accounting for a receivable as a sale, under SFAS Nos. 125 and 140, of a removal-of-accounts provision in one of the Peregrine's accounts receivable factoring agreements and the absence of "true-sale" opinions for all of Peregrine's factoring agreements; and

- The appropriateness under generally accepted accounting principles of Peregrine's possible reallocation of previously established reserves from discontinued operations to continuing operations.

30.     On June 27, 2002, Peregrine issued a press release announcing that the NASDAQ Stock Market had notified the Company of its intention to delist the Company at the opening of trading on August 30, 2002 because it had not filed periodic reports with the SEC.  On August 16, 2002, Peregrine announced in a press release that it had been given further notification of noncompliance by the NASDAQ based on the stock's failure to maintain a bid price over $1.00 per share.

31.     On August 29, 2002 Peregrine issued a press release announcing that it was "restructuring" its accounts receivable, and that management now estimated the overstatement of revenue during the eleven quarter period (ending the third quarter of fiscal 2002) to be $250 million.  In this release, Peregrine also quantified the amount of debt not reflected on its financial statements (up to $180 million) and the amount by which it had understated stock option compensation ($100 million).  The August 29, 2002 press release stated:

> Peregrine Systems, Inc. (NASDAQ: PRGNE) announced today that the company has restructured approximately $103 million in accounts receivable financing arrangements through a forbearance agreement with three major U.S. financial institutions.  The obligations resulted from Peregrine's past practice of financing its accounts receivable. . .

//

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                                     11

**Restructuring of Accounts Receivable Financing**

Peregrine management believes that the company should have accounted for its accounts receivable factoring arrangements as loans instead of sales of receivables without recourse. As a result, previously reported balance sheets will be restated to reflect the loan balances, which were as high as $180 million in past periods.

Under the forbearance agreement, a portion of Peregrine's $103 million obligation is secured by collectible receivables, and the remainder will be secured by company assets but will be junior to certain existing and future borrowings. In many instances, Peregrine's obligations to the banks under the factoring arrangements are not supported by collectible receivables.

\*   \*   \*

**Progress Toward Restatement**

Previously, Peregrine announced an independent investigation into accounting irregularities in the company's financial statements for fiscal years 2000, 2001 and the first three quarters of fiscal year 2002. This investigation, which was conducted with forensic accountants and legal advisors retained by Peregrine's audit committee, is now complete, and the results of the investigation have been communicated to the staff of the Securities and Exchange Commission (SEC).

The company is in the process of completing the financial restatement for fiscal years 2000, 2001 and the first nine months of fiscal year 2002. Peregrine management believes that the company will reduce previously recorded revenue by approximately $250 million during the 11-quarter restatement period. In connection with the review of the company's past revenue recognition accounting practices, certain amounts of revenue may be reported in different quarters than originally reported. In addition, the company will record a non-cash charge of approximately $100 million related to stock option compensation during the restatement period.

32.     On September 22, 2002, Peregrine filed a voluntary Chapter 11 Petition and is currently acting as a debtor-in-possession.

33.     On February 28, 2003, Peregrine filed with the SEC its audited financial results for fiscal year ending March 31, 2002 and its restatement of Peregrine's audited financial results for the fiscal years ending March 31, 2000 and 2001. In a press release issued on February 28, 2003, Peregrine admitted that the restatement reduced previously reported revenue by approximately $509 million – more than double the amount of improperly recorded revenue estimated by Peregrine on August 29, 2002.

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

12

1       34.     In its restatement, Peregrine described the nature of restatement adjustments as

2   follows:

3           The accounting restatement adjustments related primarily to
            revenue recognition, accounting for business combinations, balance
4           sheet presentation of factored accounts receivable and accounting
            for stock options and the related income tax effects. Generally,
5           these adjustments corrected previously reported overstated revenue
            and previously understated total liabilities and operating expenses
6           of the Company.

7           Revenue Recognition

8           Revenues for the fiscal years ended March 31, 2001 and 2000 were
            overstated $254.1 million and $121.7 million, respectively. . .There
9           were several categories of revenue recognition irregularities:

10          *Payment Conditions and Contingencies* — In addition to selling
            directly to end-users, Peregrine sells products and services through
11          third party resellers. During fiscal years 2002, 2001 and 2000,
            Peregrine recognized revenue when it "sold in" to a third party
12          reseller, regardless of whether the reseller had a firm commitment
            from an end-user to purchase the software. In many cases, revenue
13          was recognized despite the fact that the purchase commitments
            with resellers were not fixed, but were subject to conditions and
14          contingencies. As a result, revenue has been restated to reflect
            revenue only upon completion of the ultimate sale to an end-user
15          customer.

16          *Reciprocal Transactions* — Peregrine engaged in a number of
            reciprocal transactions related to acquisitions, investments, and
17          sales to customers. In certain instances, Peregrine purchased
            product lines from or made investments in customers who agreed to
18          license Peregrine products. In such instances, Peregrine generally
            recognized revenue for the product licensed and capitalized the
19          acquired product received from or investment made in the licensee.
            In other instances, Peregrine engaged in non-monetary exchanges,
20          trading Peregrine software or services for a customer's product. In
            these instances, Peregrine recorded the product or services received
21          as either inventory or prepaid expenses and recognized license
            revenue for the Peregrine product licensed. Accounting for these
22          transactions has been restated as appropriate, to reduce the original
            cost of the acquisition or investment or reflect the exchange at
23          historical cost when either (i) the value of the exchange could not
            be objectively measured or (ii) the exchange was for product to be
24          sold in the ordinary course of business.

25          *Timing Issues* — Peregrine used long-term installment contracts as
            a standard business practice during the restatement period. The
26          contract fee was generally recognized as revenue at the time the
            installment contract was signed. However, based on the Company's
27          review of the collection history of these contracts, along with the
            Company's history of providing concessions to customers, the
28          Company restated results to reflect revenue upon collection of the

extended payment. In addition, Peregrine previously recorded numerous transactions as revenue in a given period, although the sales order was not completed until after the end of the fiscal period. Revenue has been restated to record these transactions in the proper periods.

*Improper Write-offs* — Many accounts receivable balances arising from improperly recorded revenue transactions, as described above, were inappropriately charged to bad debt expense, cost of acquisitions, or accrued liabilities. The restated results reflect these transactions as reductions in previously reported revenue.

Accounts Receivable Factoring

Peregrine sold, or factored, receivables to multiple financial institutions over the past three years. Peregrine recorded these factoring transactions as true sales of receivables recording the cash received and removing the related receivables from the balance sheet, as if the risk of collection loss had passed to the buyer without recourse. However, based on the terms of the factoring agreements and based on past servicing practices of the Company, these accounts receivable factoring arrangements should have been recorded as loans instead of sales of receivables. As a result, the balance sheets have been restated to reflect the accounts receivable and related bank loans.

Business Combinations Accounting

During the restatement period, Peregrine made several business acquisitions, some of which were not properly recorded. In certain cases, reciprocal licensing transactions were recorded as revenue from customers, instead of reducing acquisition cost. In other instances, the value of in-the-money stock options was not included as a cost of the acquisition. In many transactions, acquisition liability accruals were overstated and operating expenses (such as bad debts or revenue reversals) were improperly offset against the accrual. The consolidated financial statements have been restated for these matters.

Long-lived Assets Impairments

The Company previously recorded charges to reflect the impairment of goodwill and other intangibles, strategic investments and other long-term assets. The Company has determined that charges originally booked were understated. The restated consolidated financial statements reflect the proper amount of charges to reduce these assets to the appropriate carrying values.

Stock Options Accounting

Based on Peregrine's past practice, many employee stock options contained exercise prices that were below the common stock market values on the dates the options were granted. Under APB Opinion No. 25, the Company should have recorded compensation cost equal to the aggregate difference between the fair value of the

stock and the exercise price of the options granted. The Company also accelerated the vesting periods for certain options which had previously been granted to employees. Under FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation, an Interpretation of APB Opinion No. 25" ("FIN 44"), the acceleration of vesting of stock options after June 30, 2000 could cause an accounting charge for the affected options. The consolidated financial statements, as restated, now reflect the appropriate accounting for stock options.

35.    The devastating impact of the accounting restatement is reflected by looking at a relatively few line items of the restatement and comparing the original reported results with actual results.  Set forth below is a chart derived from Peregrine's accounting restatement which demonstrates the magnitude of Peregrine's restatement.

**March 31, 2000**
**($000 omitted)**

| Income Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Revenue | $253,300 | ($121,668) | $131,632 |
| Net Loss | ($25,070) | ($192,348) | ($217,418) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Cash Flow Provided By Operations | $57,611 | ($92,373) | ($34,762) |
| Advances From Factored Receivables | ----- | ($90,885) | ($90,885) |

**March 31, 2001**
**($000 omitted)**

| Income Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Revenue | $564,683 | ($254,105) | $213,353 |
| Net Loss | ($852,241) | ($922,276) | ($1,844,517) |

| Cash Flow Statement | As Reported | Restatement Adjustment | Restatement Amount |
|---|---|---|---|
| Cash Flow Provided By Operations | ($10,171) | ($113,618) | ($97,316) |
| Advances From Factored Receivables | ----- | ($180,372) | ($180,372) |

## JURISDICTION AND VENUE

36.     Counts I through VI arise under Sections 10(b), 14(a) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), §78n(a) and §78t(a) respectively, and the rules and regulations promulgated thereunder, including SEC Rule l0b-5 (17 C.F.R. §240.l0b-5) and SEC Rule 14(a)-9 (17 C.F.R. §240.14(a)-9).  This Court therefore has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.  Counts VII through X arise under §§11, 12(2) and/or 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k and 77o).  This Court therefore has jurisdiction over this action under §22(a) of the Securities Act (15 U.S.C. §77v(a)).  This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337.

37.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), §22(a) of the Securities Act (15 U.S.C. §77v(a)) and 28 U.S.C. §1391(b).  The wrongs alleged herein occurred, in substantial part, in this District.  At all relevant times, Peregrine conducted, and still conducts, significant business in this District and maintains its principal place of business in this District.  At all relevant times, the defendants named herein conducted substantial business and/or resided in this District, or committed violations of United States law by acts committed in this District.

38.     In connection with the facts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

**Plaintiffs**

39.     (a)  Lead Plaintiff David Levy purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

(b)  Lead Plaintiff Leighton Powell purchased or otherwise acquired Peregrine securities during the Class Period and was damaged thereby.

1          (c) Lead Plaintiff David Schenkel purchased or otherwise acquired Peregrine

2   securities during the Class Period and was damaged thereby.

3          (d) Lead Plaintiff John Virden purchased or otherwise acquired Peregrine

4   securities during the Class Period and was damaged thereby.

5          (e) Lead Plaintiff Conrad Willemse purchased or otherwise acquired Peregrine

6   securities during the Class Period and was damaged thereby.

7          (f) Lead Plaintiff Bill Holman purchased or otherwise acquired Peregrine

8   securities during the Class Period and was damaged thereby.

9          (g) Lead Plaintiff Bob Benesko purchased or otherwise acquired Peregrine

10   securities during the Class Period and was damaged thereby.

11          (h) Lead Plaintiff Michael Slavitch purchased or otherwise acquired Peregrine

12   securities during the Class Period and was damaged thereby.

13          (i) Lead Plaintiff Richard Maheu purchased or otherwise acquired Peregrine

14   securities during the Class Period and was damaged thereby.

15          (j) Lead Plaintiff Mark Rollins purchased or otherwise acquired Peregrine

16   securities during the Class Period and was damaged thereby.

17          (k) The Lead Plaintiffs identified in subparagraphs (a)-(j) above are sometimes

18   collectively referred to as to the Loran Group.

19          (l) Lead Plaintiff Heywood Waga held Harbinger Corporation shares and acquired

20   Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger

21   Corporation which was consummated on or about June 16, 2000 and was damaged thereby.

22          (m) Plaintiff John Sutliff ("Sutliff") held Harbinger Corporation shares and

23   acquired Peregrine registered common stock in connection with Peregrine's acquisition of

24   Harbinger Corporation which was consummated on or about June 16, 2000 and was damaged

25   thereby.

26          (n) Plaintiff M. Clifford Balch, Jr., Trustee of the Balch Family Trust ("Balch"),

27   held Remedy Corporation shares and acquired Peregrine registered common stock in connection

28   with Peregrine's acquisition of Remedy Corporation and was damaged thereby.

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

(o)  Plaintiff Alan Hylton ("Hylton") held Remedy Corporation shares and acquired Peregrine registered common stock in connection with Peregrine's acquisition of Remedy Corporation and was damaged thereby.

**Unnamed Participant**

40.    Peregrine is a Delaware corporation which maintains its principal place of business at 35611 Valley Centre Drive, San Diego, CA 92130.

41.    On February 10, 1997, Peregrine filed its Registration Statement on Form S-1 covering 3,450,000 shares of its common stock, including 450,000 shares subject to an over-allotment option to be granted to the Underwriters upon the effectiveness of the Registration Statement.

42.    On April 7, 1997, Peregrine filed Amendment No. 5 to the Registration Statement reducing the number of shares to be registered thereunder to 2,760,000, including 2,400,000 shares to be purchased and sold by the Underwriters and 360,000 shares subject to an over-allotment option to be granted to the Underwriters upon the effectiveness of the Registration Statement.

43.    On April 8, 1997, the SEC declared the Registration Statement effective.

44.    Pursuant to the Underwriting Agreement dated April 8, 1997, the Underwriters agreed to purchase from Peregrine 2,300,000 shares of its common stock, and Peregrine granted the Underwriters an over-allotment option to acquire 345,000 shares of common stock.

45.    The Underwriter's over-allotment option expired unexercised on May 8, 1997.

46.    On September 22, 2002, Peregrine filed a voluntary Chapter 11 Petition. Peregrine cannot be named as a defendant in this action because of the automatic stay under 11 U.S.C. §362.

47.    On or about July 5, 2002, Peregrine was put on notice that it was being investigated and subpoenaed by the United States House of Representative's Committee on Energy and Commerce which was undertaking "a comprehensive review of corporate governance in light of the alarming number of recent business accounting scandals and failures . . . [to determine] the extent and quality of management oversight by boards of directors."  In addition to

1  Peregrine, the other companies which are the subject of that investigation include: Rite Aid,

2  Adelphia, Waste Management, Kmart, Sunbeam, Enron, Microstrategy, WorldCom, Tyco, Global

3  Crossing, Xerox and Qwest.

4        48.    Peregrine is now the subject of formal investigations being conducted by the SEC

5  and the U.S. Department of Justice.

6  **Defendants**

7        49.    (a) The defendants named in this Complaint from Peregrine are: Stephen P.

8  Gardner ("Gardner"); Matthew C. Gless ("Gless"); Ilse Cappel ("Cappel"); Douglas S. Powanda

9  ("Powanda"); Steven S. Spitzer ("Spitzer"); Richard T. Nelson ("Nelson"); Frederick B. Luddy

10  ("Luddy"); John J. Moores ("Moores"); Charles E. Noell, III ("Noell"); Norris van den Berg

11  ("van den Berg"); Thomas G. Watrous ("Watrous"); Richard A. Hosley, II ("Hosley"); William

12  D. Savoy ("Savoy"). These defendants are sometimes referred to collectively as the "Peregrine

13  Defendants." Defendants Gardner, Gless, Cappel, Nelson, Spitzer, Powanda and Luddy are

14  sometimes referred to as the "Management Defendants." In addition, Christopher A. Cole

15  ("Cole") is sued herein as a defendant based on his status as a Peregrine board member who

16  signed the registration statements in connection with Peregrine's acquisitions of Harbinger

17  Corporation and Remedy Corporation.

18        (b) The Arthur Andersen Defendants named in this Complaint are: Arthur

19  Andersen, LLP ("Arthur Andersen"); Andersen Worldwide, S.C. ("Andersen Worldwide"); and

20  Daniel Stulac ("Stulac"). These defendants are sometimes referred to collectively as the "Arthur

21  Andersen Defendants."

22        (c) Defendant Gardner became the chairman of the board of directors of Peregrine

23  in July 2000 and served as its Chief Executive Officer from 1998 until May 6, 2002. Gardner

24  served as Peregrine's President and as a Director from April 1998 to July 2000. From January

25  1998 until April 1998, Gardner served as Peregrine's Executive Vice President and Principal

26  Executive Officer. During the Class Period, Gardner sold 352,512 shares of Peregrine common

27  stock and received gross proceeds of approximately $14,030,526.

28  //

(d) Defendant Gless became Peregrine's executive Vice President, Finance in May 2001 and served as its Chief Financial Officer and a member of its board of directors from October 2000 until May 6, 2002. Gless served as Peregrine's Vice President, Finance and Chief Accounting Officer from October 1998. From April 1996 until October 1998, Gless served as Peregrine's corporate controller. From 1990 until April 1996, Gless held various accounting and financial management positions at BMC Software, Inc. ("BMC Software") – a company, founded by defendant Moores, which is headquartered in Houston, Texas. During the Class Period, Gless sold 93,625 shares of Peregrine common stock and received gross proceeds of approximately $4,083,188.

(e) Defendant Cappel was employed at Peregrine from 1993 until she left the Company in June 2002. Cappel held various positions at Peregrine including Senior Treasury Manager. Cappel's primary responsibilities included financing accounts receivables, international collections and forecasting cash and Days Sales Outstanding ("DSO"). During the Class Period, Cappel sold approximately 16,249 shares of Peregrine common stock and received gross proceeds of approximately $334,287. On or about November 22, 2002, Cappel plead guilty to securities law violations arising out of her activities while at Peregrine.

(f) Defendant Powanda held various executive sales and operating positions at Peregrine from 1992 through 2001. From January 1998 until he resigned from the Company in 2001, Powanda held the positions of Vice President, Worldwide Sales and subsequently Executive Vice President, Worldwide Operations. After his official resignation, Powanda continued to work as a paid consultant to Peregrine until the end of 2001. During the Class Period, Powanda sold approximately 616,250 shares of Peregrine common stock and received gross proceeds of approximately $20,518,810.00.

(g) Defendant Nelson served as Peregrine's Vice President and General Counsel from November 1995 to March 2000. Nelson was Peregrine's Vice President, Corporate Development from March 2000 to April 2001. Nelson thereafter served as Vice President, IMG Operations until on or about May 6, 2002 when he was appointed interim Chief Executive Officer. Starting in February 1997, defendant Nelson also served as Peregrine's Corporate

1  Secretary. During the Class Period, Nelson sold 287,500 shares of Peregrine common stock and

2  received gross proceeds of approximately $8,845,870.

3  (h) Defendant Spitzer served as either Vice President, Channel Sales or Vice

4  President, Alliances of Peregrine from August 1997 until mid-2000. Spitzer thereafter continued

5  to be involved in sales to Peregrine's Alliance Partners. During the Class Period, Spitzer sold

6  47,500 shares of Peregrine common stock and received gross proceeds of approximately

7  $1,914,650.00.

8  (i) Defendant Luddy served as Peregrine's Vice President, Research and

9  Development and Chief Technology Officer since January 1998. From October 1995 until

10  January 1998, defendant Luddy served as product architect for Peregrine's SERVICE CENTER

11  product suite. During the Class Period, defendant Luddy sold 368,789 shares of Peregrine

12  common stock and received gross proceeds of approximately $11,823,660.

13  (j) Defendant Moores has served as a member of Peregrine's board of directors

14  since March 1989 and as Chairman of its Board of Directors from March 1990 until July 2000.

15  During the Class Period, Moores headed Peregrine's Compensation Committee. In 1980, Moores

16  founded BMC Software and served as its President and Chief Executive Officer from 1980 until

17  1986 and as Chairman of its Board of Directors from 1980 until 1992. Since September 1991,

18  Moores has served as Chairman of the Board of JMI Services, Inc. ("JMI Services"), a private

19  investment company which Moores controls. JMI Services, Inc. and its affiliate, JMI Equity

20  Fund, L.P. ("JMI Equity Fund"), have offices in the same complex as Peregrine's office. JMI

21  Services leases office space from Peregrine. Since June 2001, Moores has served as the interim

22  Chief Executive Officer of Neon Systems, Inc. Moores is also a Director and member of the

23  Compensation Committee of Neon Systems, a company which he controls. During the Class

24  Period, Moores sold 10,930,051 shares of Peregrine common stock and received approximately

25  $401,640,096 in gross proceeds.

26  (k) Defendant Noell has served as a member of Peregrine's Board of Directors

27  since January 1992. During the Class Period, Noell was also a member of Peregrine's Audit and

28  Compensation Committees. Since January 1992, Noell has served as President and Chief

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                          21

Executive Officer of JMI Services, a private investment company, and as a general partner of JMI Equity, companies controlled by defendant Moores. Defendant Moores hired defendant Noell to manage JMI Equity. Noell also serves as a Director and member of the Compensation Committee of Neon Systems, Inc., a company controlled by Moores. Defendants Moores and Noell became acquainted at BMC Software in connection with BMC Software's initial public offering in 1988. At the time, Noell was employed by Alex Brown & Sons, which was an underwriter of BMC Software's initial public offering. During the Class Period, Noell sold 174,375 shares of Peregrine common stock and received gross proceeds of approximately $6,395,812.

(l) Defendant van den Berg served as a member of the Board of Directors of Peregrine from January 1992 until he resigned in October 2000. He was a member of the Audit Committee during the Class Period up until his resignation in October 2000. van den Berg also served as a General Partner of JMI Equity, a company controlled by Moores, from July 1991 onward, and served as a Director of Neon Systems, Inc., a company controlled by Moores. During the Class Period, van den Berg sold 40,000 shares of Peregrine common stock for gross proceeds of $1,728,000.

(m) Defendant Hosley served as a member of Peregrine's Board of Directors from January 1992 until his resignation in June 2000. Hosley was a member of the Audit Committee during the Class Period up until his resignation from the board in June 2000. Hosley had previously served as President and Chief Executive Officer of BMC Software – a company founded by defendant Moores.

(n) Defendant Watrous has served as a member of the Board of Directors of Peregrine since January 1999. Watrous was a senior partner with the management consulting firm of Andersen Consulting (k/n/a Accenture) – previously an affiliate of Arthur Andersen and Andersen Worldwide. He became a member of Peregrine's Audit Committee following Peregrine's Fiscal Year 2000.

(o) Defendant Savoy has served on the Board of Directors of Peregrine since June 2000. He has served as a member of its Audit Committee since Peregrine's Fiscal Year 2001. Since 1988, Savoy has served as President of Vulcan Northwest, Inc. ("Vulcan"), a privately held

1  venture capital and investment firm based in Seattle, Washington. Savoy also served as a director

2  of Telescan, TicketMaster Online City Search, USA Networks, Metricom, Charter

3  Communications, Drugstore.com, Go2Net, Value America and High Speed Access Corporation

4  while sitting on Peregrine's Board and its Audit Committee.

5          (p) Defendant Cole served on Peregrine's board since its founding in 1981.

6  Defendant Cole was a Director of Peregrine at the time of the mergers with Harbinger and with

7  Remedy. He was President and Chief Executive Officer of Peregrine from 1986 until 1989. Since

8  1992, Cole has been President and Chief Executive Officer of Questrel, Inc., UrStudios, Inc. and

9  Headlamp, Inc., each a software development company.

10         (q) Defendant Arthur Andersen was a firm of certified public accountants. Arthur

11 Andersen was engaged by Peregrine to provide independent accounting and auditing services, as

12 well as consulting services, and to give Peregrine accounting advice and consultation regarding its

13 annual and quarterly reports filed with the SEC. Arthur Andersen falsely represented, in its audit

14 opinions on Peregrine's Fiscal Years 2000 and 2001 financial statements incorporated in SEC

15 Forms 10-K filed for those years, that the Company's financial statements fairly presented the

16 Company's financial condition and results of operations in conformity with Generally Accepted

17 Accounting Principles ("GAAP") and had been audited by Arthur Andersen in accordance with

18 Generally Accepted Auditing Standards ("GAAS"). In addition, Arthur Andersen reviewed and

19 approved of the materially false and misleading quarterly financial statements published by

20 Peregrine for each of the quarters of fiscal 2000 and 2001 and the first, second and third quarters

21 of fiscal 2002. On or about April 5, 2002, Arthur Andersen was replaced by KPMG as

22 Peregrine's independent auditor. Arthur Andersen was paid approximately $4 million in fees for

23 its auditing, accounting, and consulting work for Peregrine since being retained in July 1996.

24         (r) Defendant Andersen Worldwide S.C. ("Andersen Worldwide") is a partnership

25 organized under the Swiss Federal Code of Obligations. During the Class Period, Andersen

26 Worldwide was comprised of the Andersen Worldwide member firms and their respective

27 partners. During the Class Period, Andersen Worldwide partners include more than 4,800

28 individuals from 390 offices in 84 countries. Defendant Arthur Andersen is a member of

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

23

Andersen Worldwide.  Andersen Worldwide serves as the coordinating entity for the international network of Arthur Andersen firms.  Andersen Worldwide and Arthur Andersen dictate the policies and procedures to be used by Andersen Worldwide members throughout the world.

(s)  Defendant Stulac is, and at all times herein mentioned was, an individual who worked and resided in San Diego, California and who at all times material hereto was a partner in Arthur Andersen, and performed accounting and audit services for Peregrine.  Stulac was, at all times herein mentioned, either Arthur Andersen's audit engagement partner or concurring partner in performing accounting and auditing services for Peregrine.  Stulac, in the course of his duties relating to Peregrine, regularly coordinated with Andersen Worldwide.

50.     The Peregrine Defendants were each provided with copies of Peregrine's press releases and SEC filings containing materially false and misleading financial information prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  The Peregrine Defendants had a duty to promptly disseminate accurate and truthful information with respect to Peregrine's operations, financial condition and future business prospects or to cause and direct that such information be disseminated so that the market price of Peregrine's securities would be based on truthful and accurate information.

51.     Each of the Peregrine Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the financial reporting and results of operations of Peregrine.  To discharge their duties, the Peregrine Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the business, operations and financial reporting of Peregrine.  By virtue of such duties, these officers and directors were required, *inter alia*:

a.     To conduct and supervise the business of Peregrine in accordance with federal law;

b.     To supervise the preparation of Peregrine's SEC filings and to approve any reports concerning the financial reporting and results of operations of Peregrine;

c.     To ensure that Peregrine established and implemented adequate internal controls;

1           d.    To create, enforce and comply with a corporate policy prohibiting misuse

2 of proprietary corporate information by corporate officers and directors by trading in Peregrine

3 stock based on material non-public information; and

4           e.    To refrain from obtaining personal benefit, at the expense of the public

5 purchasers of Peregrine securities by misusing proprietary non-public information.

6     52.    The Peregrine Defendants, by reason of their executive positions with Peregrine,

7 board membership and/or shareholdings, were controlling persons of the Company and had the

8 power and influence, and exercised the same, to cause Peregrine to engage in the conduct

9 complained of herein. The Peregrine Defendants were in a position to control or influence the

10 contents of, or otherwise cause corrective disclosures to have been made in the public

11 dissemination of the false and misleading information and failed to do so in order to protect

12 Peregrine's desire to grow through acquisition and in order to allow certain of the Peregrine

13 Defendants to sell substantial amounts – more than $450,000,000.00 – of Peregrine common

14 stock while its share price was artificially inflated.

15     53.    Defendants Stulac and Andersen Worldwide, by reason of their positions and/or

16 relationship to Arthur Andersen, were controlling persons of Arthur Andersen with respect to the

17 Peregrine engagements and had the power and influence, and exercised the same, to cause Arthur

18 Andersen to engage in the wrongful conduct alleged herein. Defendants Stulac and Andersen

19 Worldwide were in a position to control or influence the wrongful conduct of Arthur Andersen as

20 alleged herein.

21               **CLASS ALLEGATIONS**

22     54.    Plaintiffs bring this action on their own behalf and on behalf of a class consisting of

23 all other similarly situated persons or entities who purchased or otherwise acquired Peregrine

24 securities from July 22, 1999 through May 3, 2002 (the "Class"). This action is also brought on

25 behalf of two Subclasses. The first Subclass consists of all persons and entities who held shares of

26 Harbinger Corporation and who acquired Peregrine registered common stock in connection with

27 Peregrine's acquisition of Harbinger Corporation which was consummated on or about June 16,

28 2000 (the "Harbinger Acquisition"). The second Subclass consists of all persons and entities who

---

1  held shares of Remedy Corporation and who acquired Peregrine registered common stock in

2  connection with Peregrine's acquisition of Remedy Corporation which was consummated on or

3  about August 27, 2001 (the "Remedy Acquisition"). Excluded from the Class and Subclasses are

4  any defendants, any officers and directors of Peregrine, members of their families, Peregrine and

5  any of its parents, subsidiaries, officers, directors, or affiliates, any entity in which any excluded

6  person has a controlling interest, directly or indirectly, and each of their respective legal

7  representatives, heirs, successors, and assigns.

8       55.    Class Members are so numerous that joinder of all members is impracticable.

9  Peregrine common stock was actively traded on the NASDAQ throughout the Class Period. As

10  of March 31, 2001, Peregrine had more than 160 million shares issued and outstanding and

11  approximately 85,000 beneficial holders of its shares. Plaintiffs believe that there are tens of

12  thousands of Class Members who are geographically dispersed throughout the United States.

13      56.    Plaintiffs' claims are typical of those of the other Class Members. Plaintiffs and the

14  Class sustained damages due to the defendants' common course of wrongful conduct.

15      57.    Plaintiffs will fairly and adequately protect the interests of the Class Members.

16  They have retained counsel who are competent and experienced in securities litigation. Plaintiffs

17  have no interests that conflict with those of other Class Members.

18      58.    Common questions of law or fact exist as to all Class Members. Those common

19  questions predominate over any potential individual issues. Among the common questions of law

20  or fact are the following:

21          a.    whether the public statements issued by Peregrine and defendants,

22  including Peregrine's financial statements and filings with the SEC contained material

23  misrepresentations and/or omitted to state material facts;

24          b.    whether the market price of Peregrine securities during the Class Period

25  was manipulated or artificially inflated due to the activities complained of herein;

26          c.    whether the federal securities laws were violated by defendants' acts as

27  alleged herein;

28  //

---

1           d.     whether defendants acted negligently, knowingly or with deliberate

2   recklessness;

3           e.     whether statements by defendants to the investing public during the Class

4   Period misrepresented material facts about the business, operations and finances of Peregrine;

5           f.     whether defendants pursued the fraudulent scheme and common course of

6   wrongdoing as alleged herein; and

7           g.     whether members of the Class have sustained damages and, if so, the

8   proper measure of damages.

9       59.    A class action is superior to other methods for the fair and efficient litigation of

10  this controversy because joinder of all members is impracticable.  Because the damages suffered

11  by individual Class Members may be relatively small, the expense and burden of individual

12  litigation makes it virtually impossible for them to individually seek redress for defendants'

13  wrongful conduct.

14      60.    Plaintiffs know of no difficulty in the management of this litigation that would

15  preclude its maintenance as a class action.  The names and addresses of Class Members are

16  available from the Company or its transfer agents.  Notice can be provided to Class Members by

17  first class mail and publication.

18  **PEREGRINE SECURITIES TRADED ON AN EFFICIENT MARKET**

19      61.    As to the claims asserted under the Exchange Act, plaintiffs rely, in part, upon the

20  presumption of reliance established by the fraud-on-the-market doctrine.  The market for

21  Peregrine securities was, at all relevant times, an efficient market for the following reasons,

22  among others:

23          a.     Peregrine's common stock was listed on the NASDAQ, a highly efficient

24  market that quickly reflects all publicly available information concerning a listed company;

25          b.     As a regulated issuer, Peregrine filed periodic public reports with the SEC,

26  including Forms 10-K for fiscal years 2000 and 2001 and other financial statements that contained

27  material misrepresentations and/or omitted material facts during the Class Period, as alleged

28  herein, causing the price of Peregrine's stock to trade at artificially inflated prices;

c.  Peregrine's senior management regularly met with and provided Company-related information to stock market analysts, institutional investors, fund managers and other market professionals;

d.  Peregrine was followed by several securities analysts employed by major brokerage firms who wrote research reports, which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

e.  The brokerage firms following Peregrine during the Class Period included First Union Capital Markets; CIBC World Markets Corp.; U.S. Bancorp Piper Jaffray, Inc.; Thomas Weisel Partners; and Bear Stearns & Co., Inc.  Each of these companies relied upon Peregrine's financial statements, as well as statements made by senior management during conference calls and meetings with analysts, in compiling their reports and making their recommendations.  First Union, CIBC, Piper Jaffray and Bear Stearns each rated Peregrine a "strong buy," "buy," or "attractive" in their research reports disseminated immediately following Peregrine's announcement of its quarterly financial results and conference calls during the Class Period.  The analysts' assessments of Peregrine's stock was based, in material part, upon the honesty and accuracy of Peregrine's reported financial results.

f.  The trading volume of Peregrine's common stock during the Class Period shows that there was a liquid market for Peregrine stock during the Class Period;

g.  Peregrine disseminated information on a market-wide basis through various electronic media services, including issuing press releases through PR Newswire, Business Wire and through the Internet; and

h.  The market price of Peregrine's securities reacted efficiently to new information entering the market.

//

//

//

//

## THE PEREGRINE DEFENDANTS' PARTICIPATION IN THE FRAUD

### The Management Defendants

62.     Defendant Gardner served as President, Chief Executive Officer and a Director of Peregrine until May 6, 2002.  In July 2000, Gardner assumed the position of Chairman of the Board which position he held until May 6, 2002.

63.     By virtue of his positions with Peregrine as CEO, his position on the Peregrine board and the size of his share holdings of Peregrine common stock, Gardner was a controlling person of the Company and exercised his power and influence to cause Peregrine to engage in the wrongful conduct complained of herein.

64.     Gardner, along with (now deceased) CFO Farley and defendant Gless, was responsible for and created Peregrine's communications to securities analysts and investors during the Class Period.  For example, Gardner reviewed and authorized the release of Peregrine's publicly reported quarterly and annual financial statements for fiscal years 2000 and 2001 and for the first three quarters of fiscal year 2002 and the Company's reports on Forms 10-K and 10-Q filed with the SEC for each of those periods, Peregrine's registration statements filed with the SEC and its financial press releases and other financial corporate reports.

65.     Gardner knew or was deliberately reckless in disregarding the fact that the Company's internal controls, designed to ensure accurate financial reporting by Peregrine, were weak or nonexistent as alleged herein.

66.     Gardner knew that Peregrine set unrealistically aggressive growth targets and pressured its sales personnel each quarter to make the numbers.  Gardner presided over periodic sales meetings in Peregrine's headquarters which were also attended by CFO Farley (until his death) and/or CFO Gless and its top sales executives including defendant Powanda and his direct reports and subsequently Joseph G. Reichner, Vice President, Alliances and his direct reports. The primary purpose of these meetings was to update and discuss the financial outlook for the current quarter and to review large license agreements anticipated to close during the quarter. Through these meetings and computerized reports received from defendant Gless which tracked the Company's "burn," *i.e.*, commitments from resellers not yet sold through to the end-user,

1   Gardner closely monitored the progress of these anticipated deals, as well as Peregrine's progress

2   towards meeting revenue targets in each quarter during the Class Period.

3       67.    From these executive management meetings and his own direct involvement in the

4   Company's sales activities as particularized herein, Gardner knew that resellers were unwilling to

5   commit to large license agreements unless an end-user committed to purchase the product from

6   the reseller.  Gardner also knew that, to induce resellers to issue purchase orders without

7   contingencies for these products, Peregrine typically made written or oral side agreements which

8   made payment contingent upon sale of the product to the intended end-user.  Notwithstanding the

9   foregoing, Gardner authorized Peregrine to recognize revenue derived from contingent sales to

10  these resellers in violation of GAAP thereby artificially inflating the Company's revenues.

11      68.    Gardner also directly participated in the negotiations of certain bogus swap

12  transactions that succeeded in artificially inflating the Company's revenues during the Class

13  Period.  For example, as detailed in below, Gardner was directly involved in the negotiation of a

14  transaction with end-user Critical Path, Inc. ("Critical Path") pursuant to which Peregrine booked

15  several millions of dollars in revenue despite the fact that Critical Path's payment obligation was

16  contingent upon Peregrine's purchase of an equal and off-setting amount of product from Critical

17  Path.  Indeed, Gardner was instrumental in negotiating the terms of this agreement with Critical

18  Path's CEO.  The deal required the simultaneous execution of two separate contracts, neither of

19  which referred to the other, in an effort to hide the contingent nature of either transaction.

20      69.    Gardner also met with Gless on a quarterly basis to arrive at the DSO which the

21  Company was prepared to represent to the investing public.  Once the number was agreed upon,

22  Gardner, through Gless, would have defendant Cappel "sell" the necessary receivables to banks in

23  order to reduce the Company's stated accounts receivable and increase the Company reported

24  cash.  As set forth below, these "sales" were illusory.  They actually were borrowings as Peregrine

25  has now admitted.

26      70.    Gardner participated in the dissemination of Peregrine's financial results

27  throughout the Class Period and Gardner signed Peregrine's reports on Form 10-K for the Fiscal

28  Years ending March 31, 2000 and March 31, 2001.  Gardner signed all of the registration

statements (on Forms S-3, S-4 and S-8) filed by Peregrine during the Class Period. Gardner approved of the filing with the SEC of Peregrine's reports on Form 10-Q throughout the Class Period. Gardner did so although he knew that the financial statements contained therein were materially false.

71.     Defendant Gless served as the Company's Chief Accounting Officer during the Class Period and acted as its Chief Financial Officer and a member of its board of directors from October 24, 2000 until May 6, 2002. Gless participated in the day-to-day control of the Company and orchestrated and controlled the preparation of Peregrine's false financial statements. By reason of his positions as CFO, Director and Chief Accounting Officer, Gless was a controlling person of Peregrine and used his power and influence to cause Peregrine to engage in the unlawful conduct alleged herein.

72.     As particularized below, Gless orchestrated the scheme alleged herein to inflate Peregrine's reported revenues throughout the Class Period. During the Class Period, Gless authorized the booking of revenue on contingent transactions with resellers even though he knew that revenue recognition on such transactions was improper under GAAP and violated the Company's publicly stated revenue recognition policies.

73.     Gless actively participated in sales meetings with defendant Gardner and top sales executives, including defendant Powanda and his direct reports and subsequently Joseph G. Reichner, Vice President, Alliances and his direct reports. Gless monitored Peregrine's total dollar exposure on contingent reseller transactions. Gless did so by creating a computerized report which tracked the dollar amount of "commitment" by reseller and how much of that "commitment" had not yet sold-through to the end-user. This was referred to within the Company as the "burn." Gless also tracked the dollar exposure to financial institutions on account of borrowings Peregrine had made when factoring account receivables. Gless, at all times, kept Gardner informed of the total exposure from such improperly recorded transactions.

74.     Gless was also responsible for reviewing and approving the terms of all licensing agreements whose terms varied from standard terms provided to customers along with all large transactions. For example, Gless knew that Peregrine maintained a stated policy of only selling

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                          31

1   products to resellers who had already designated an end-user to purchase the product.  Despite

2   this policy, Gless knew that he and Gardner had authorized sales personnel to tell resellers

3   throughout the Class Period that they could return product which was not ultimately purchased by

4   end-users and that payment to Peregrine was not due until the product had sold-through to the

5   end-user.  Among other things, Gless authorized the use of side agreements to memorialize such

6   terms.  Gless knew that the side agreements disguised the contingent nature of the contracts and

7   that revenue recognition on such transactions violated GAAP.  Nevertheless, Gless knowingly

8   allowed material amounts of such transactions to be booked in each quarter during the Class

9   Period.  In addition, Gless instructed any returned product or bad debts not to be charged against

10  revenue accounts but instead instructed that they be improperly included on Peregrine's financial

11  statements under the line item "Acquisition costs and other."  Gless did so in order to not

12  decrease the amount of Peregrine's reported revenue.

13       75.   Gless actively participated in negotiating the terms of and/or the accounting for the

14  bogus swap transaction with Critical Path described below.

15       76.   Gless also caused the Company to improperly recognize revenue on other

16  contingent transactions or product license agreements in which resellers retained the right to

17  return the product during the Class Period and/or were not obligated to pay for the product until

18  it sold-through to the end-user as detailed below.

19       77.   At the end of each quarter during the Class Period, Gardner and Gless discussed

20  the level of DSO that Peregrine was willing to report publicly to investors.  After reaching

21  agreement on the DSO figure to be publicly reported, Gless, with Gardner's authorization,

22  instructed Cappel to "sell" sufficient receivables to banks so as to meet the desired DSO number.

23  As more fully alleged below, Cappel "sold" Peregrine receivables to banks and reduced

24  Peregrine's receivable by the amount of the "sale."  However, there was no sale.  The transactions

25  were actually borrowings from the banks which were based on specific receivables.  Accordingly,

26  Gardner and Gless, with the participation of Cappel, materially understated Peregrine's DSO, its

27  accounts receivable and its liabilities to the banks which reached up to $180

28  //

1   million during the Class Period and materially overstated Peregrine's true cash position during the

2   Class Period.

3        78.    Gless participated in the dissemination of Peregrine's financial results throughout

4   the Class Period and signed Peregrine's reports on Forms 10-K or 10-Q filed with the SEC for all

5   quarters during the Class Period and for Fiscal Years ending March 31, 2000 and March 31, 2001

6   and for the first three quarters of Fiscal 2002.  Gless also signed all the registration statements (on

7   Forms S-3, S-4 and S-8) filed with the SEC by Peregrine during the Class Period.  Gless did so

8   although he knew that the financial statements contained therein were materially false.

9        79.    Defendant Powanda served as either Vice President of Worldwide Sales or

10  Executive Vice President, Worldwide Operation of Peregrine from January 1998 until February

11  2001.

12       80.    By virtue of his positions with Peregrine and the size of his share holdings of

13  Peregrine common stock, Powanda was a controlling person of the Company and exercised his

14  power and influence to cause Peregrine to engage in the wrongful conduct complained of herein.

15       81.    Powanda knew that Peregrine set unrealistically aggressive growth targets and

16  pressured its sales personnel each quarter to make the numbers.  Powanda attended periodic sales

17  meetings in Peregrine's headquarters which were also attended by Gardner, CFO Farley (until his

18  death) and/or CFO Gless and Peregrine's top sales executives including defendant Powanda's

19  direct reports.  The primary purpose of these meetings was to update and discuss the financial

20  outlook for the current quarter and to review large license agreements anticipated to close during

21  the quarter.  Through these meetings and computerized reports received from defendant Gless

22  which tracked the Company's "burn," *i.e.*, commitments from resellers not yet sold through to the

23  end-user, Powanda closely monitored the progress of these anticipated deals, as well as

24  Peregrine's progress towards meeting quarterly revenue targets.

25       82.    From these executive management meetings and his own direct involvement in the

26  Company's sales activities as particularized herein, Powanda knew that resellers were unwilling to

27  commit to large license agreements unless an end-user committed to purchase the product from

28  the reseller.  Powanda also knew that, to induce resellers to issue purchase orders without

---

1   contingencies for these products, Peregrine typically made written or oral side agreements which
2   made payment contingent upon sale of the product to the end-user.

3       83.   Powanda participated in the creation and eventual dissemination of Peregrine's
4   false financial results throughout the Class Period until he resigned. Powanda did so by
5   authorizing sales personnel to enter into sales transactions, which included written and oral side
6   agreements, whereby resellers were not obligated to pay Peregrine until they sold the product
7   through to the end-user. Powanda knew through discussions with defendants Gardner, Gless,
8   Nelson and Spitzer that Peregrine improperly recognized revenue on such transactions.

9       84.   Defendant Spitzer served as either Vice President, Channel Sales or Vice
10  President, Alliances of Peregrine from August 1997 until mid-2000 and continued to work with
11  Peregrine's Alliance partners thereafter.

12      85.   By virtue of his positions with Peregrine and the size of his share holdings of
13  Peregrine common stock, Spitzer was a controlling person of the Company and exercised his
14  power and influence to cause Peregrine to engage in the wrongful conduct complained of herein.

15      86.   Spitzer knew that Peregrine set unrealistically aggressive growth targets and
16  pressured its sales personnel each quarter to make the numbers. Spitzer attended periodic sales
17  meetings in Peregrine's headquarters which were also attended by defendants Gardner, Powanda,
18  CFO Farley (until his death) and/or CFO Gless and Peregrine's top sales executives including
19  defendant Powanda's direct reports and subsequently Reichner's direct reports. The primary
20  purpose of these meetings was to update and discuss the financial outlook for the current quarter
21  and to review large license agreements anticipated to close during the quarter. Through these
22  meetings and computerized reports received from defendant Gless which tracked the Company's
23  "burn," *i.e.*, commitments from resellers not yet sold through to the end-user, Spitzer closely
24  monitored the progress of these anticipated deals, as well as Peregrine's progress towards
25  meeting quarterly revenue targets.

26      87.   From these executive management meetings and his own direct involvement in the
27  Company's sales activities as particularized herein, Spitzer knew that resellers were unwilling to
28  commit to large license agreements unless an end-user committed to purchase the product from

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                    34

the reseller. Spitzer also knew that, to induce resellers to issue purchase orders without contingencies for these products, Peregrine typically made written or oral side agreements which made payment contingent upon sale of the product to the end-user.

88.   Spitzer participated in the creation and eventual dissemination of Peregrine's false financial results throughout the Class Period. Spitzer did so by authorizing sales personnel to enter into sales transactions, which included written and oral side agreements, whereby resellers were not obligated to pay Peregrine until they sold the product through to the end-user. Spitzer knew through discussions with defendants Gardner, Gless, Powanda and Nelson that Peregrine improperly recognized revenue on such transactions.

89.   Defendant Nelson served as Vice President and General Counsel from November 1995 to March 2000, as Vice President, Corporate Development from March 2000 to April 2001, as Vice President, IMG Operations and as Corporate Secretary from February 1997.

90.   By virtue of his positions with Peregrine, the size of his share holdings of Peregrine common stock and his close working relationship with defendant Moores, Nelson was a controlling person of the Company and exercised his power and influence to cause Peregrine to engage in the wrongful conduct complained of herein.

91.   Nelson knew that Peregrine set unrealistically aggressive revenue growth targets and pressured its sales personnel each quarter to make the numbers. Nelson was involved, along with defendants Gardner, Gless and Powanda, in the decision by the Company to recognize revenue on commitments from resellers in circumstances where the reseller did not have a firm commitment from an end-user.

92.   From his meetings with defendants Gardner and Powanda and his own direct involvement in the Company's revenue generating activities as particularized herein, Nelson knew that resellers were unwilling to commit to large license agreements unless an end-user committed to purchase the product from the reseller. Nelson also knew that, to induce resellers to issue purchase orders without contingencies for these products, Peregrine typically made written or oral side agreements which made payment contingent upon sale of the product to the end-user.

//

93.     Nelson participated in the creation and eventual dissemination of Peregrine's false financial results throughout the Class Period.  Nelson did so by authorizing sales personnel to enter into sales transactions, which included written and oral side agreements, whereby resellers were not obligated to pay Peregrine until they sold the product through to the end-user.  Nelson knew through discussions with defendants Gardner, Powanda and Gless that Peregrine improperly recognized revenue on such transactions.

94.     Defendant Luddy served as Vice President, Research & Development and Chief Technology Officer of Peregrine commencing in January 1998 and throughout the Class Period.

95.     By virtue of his positions with Peregrine, the size of his share holdings of Peregrine common stock and his close working relationship with defendant Moores, Luddy was a controlling person of the Company and exercised his power and influence to cause Peregrine to engage in the wrongful conduct complained of herein.

96.     Luddy knew that Peregrine set unrealistically aggressive revenue growth targets and pressured its sales personnel each quarter to make the numbers.  Luddy knew of the decision by the Company to recognize revenue on commitments from resellers in circumstances where the reseller did not have a firm commitment from an end-user.

97.     From his meetings with defendants Gardner and Gless and his own direct involvement in the Company's revenue generating activities as particularized herein, Luddy knew that Peregrine was improperly recognizing material amounts of revenue.  Luddy also knew that, to induce resellers to issue purchase orders without contingencies for these products, Peregrine typically made written or oral side agreements which made payment contingent upon sale of the product to the end-user.

98.     Luddy was intimately involved with defendants' Gardner and Moores in evaluating companies for potential acquisition.  Luddy participated in the creation and eventual dissemination of Peregrine's false financial results throughout the Class Period.  Luddy did so by selling almost $12 million in Peregrine common stock for his personal benefit at a time when Luddy knew, but did not publicly disclose, the financial irregularities ongoing at Peregrine.

//

99.     Cappel participated in the falsification of Peregrine's DSO and its understatement of accounts receivable and of its liabilities to the banks which reached up to $180 million during the Class Period.  Through these devices, Cappel also participated in the overstatement of Peregrine's true cash accounts receivable and liability position reflected on Peregrine's publicly released financial statements.  For her conduct as alleged herein, Cappel has plead guilty to criminally violating the federal securities laws.

**The Board Defendants**

100.    Peregrine's Board of Directors actively oversaw the Company and set aggressive financial goals for the Company to meet.  The active oversight of the Company by the Peregrine directors is demonstrated by, among other things, the number of meetings held and attendance at such meetings by Peregrine directors.  According to Peregrine's Proxy Statements for the fiscal years 1999, 2000 and 2001, Peregrine directors attended, at least, 75% of the board meetings held.  As the Company grew, Peregrine increased the number of its board meetings dramatically so as to be able to monitor closely the activities of the Company and its management.  The increase in the number of the Company's board meetings is shown below:

| Fiscal Year | Number of Board Meetings | Percentage Increase |
|---|---|---|
| 1999 | 6 | -------- |
| 2000 | 9 | 50% |
| 2001 | 19 | 111% |

101.    The Peregrine Board also set aggressive revenue targets for its management to reach.  In the Fiscal 2000 Proxy Statement, for example, Peregrine describes a Restricted Stock Agreement between it and defendant Gardner as follows:

> In November 1997, we issued Mr. Gardener 200,000 shares of common stock pursuant to a Restricted Stock Agreement.  The closing sale price of our common stock on the NASDAQ national market on October 31, 1997, the last trading price prior to the date of issuance was $3.875 (as adjusted for subsequent stock splits).  Such shares vest incrementally over ten years, subject to earlier vesting over six years if we achieve certain financial milestones.

102.    In describing the "financial milestones" in Mr. Gardner's Restricted Stock Agreement, the Peregrine 2000 Proxy Statement states:

> The targeted milestones, however, were adjusted upward to reflect our improved financial performance but were again set at levels the board determined to be aggressive yet realizable based upon information available concerning our prospects at the time of grant.

[Emphasis added.]

103.    The Board analyzed the Company's past results and its future prospects and proceeded to increase the target milestones to "aggressive" levels "again" in order for Gardner to receive the benefit of the accelerated vesting under his Restricted Stock Agreement. The members of the Board did so at a time when they knew that the Company was growing rapidly and was without adequate internal accounting controls. These ever more aggressive revenue targets set by Peregrine's Board was a powerful economic incentive to Gardner (and therefore the rest of Peregrine's management team) to engage in the illegal accounting practices alleged herein.

104.    The cash bonuses paid to top Peregrine executives and approved by the Peregrine Board also increased dramatically as Peregrine reported "record" revenue through-out the Class Period.  The following chart shows the dramatic increase in cash bonuses as approved by Peregrine's Board and Compensation Committee.

| Employee | Fiscal Year | Bonus | Percentage Increase |
|---|---|---|---|
| Stephen P. Gardner | 1999 | $43,750 | ------ |
| | 2000 | $137,500 | 214% |
| | 2001 | $  400,000 | 191% |
| Richard T. Nelson | 1999 | $83,790 | ------ |
| | 2000 | $213,037 | 154% |
| | 2001 | $670,352 | 214% |
| Douglas S. Powanda | 1999 | $259,991 | ------ |
| | 2000 | $326,250 | 25% |
| | 2001 | $1,167,628 | 257% |

105.    At all relevant times, Peregrine and its Board was controlled and dominated by defendant Moores.  Moores first became involved with Peregrine in 1989 when it was struggling to sell its first software product.  By 1990, Moores became Peregrine's Chairman of the Board and took on the responsibility of raising financing for the Company during its developmental stage.  By early 1997, Moores arranged for Peregrine to commence its initial public offering ("IPO").  By that time, total annual revenues of the Company were still less than $24 million.  At

---

the time of the IPO, Moores and his business partners (*i.e.*, defendants Noell, Hosley and van den Berg) owned or had an interest in more than 11 million shares or in excess of 83% of the issued and outstanding shares of Peregrine common stock.

106.     In addition, there were substantial related party transactions between Moores and Peregrine. The IPO prospectus disclosed these relationships and transactions as follows:

> John J. Moores, the Chairman of the Company's Board of Directors and the majority stockholder of the Company, is party to a Continuing and Unconditional Guaranty dated November 13, 1995 (as subsequently amended) with NationsBank of Texas, N.A. ("NationsBank"), pursuant to which Mr. Moores guaranteed the Company's obligations under its bank line of credit agreement and term loan with NationsBank. As of December 31, 1996, the Company's outstanding obligations under such credit line and term loan were $4.3 million and $1.7 million, respectively. The Company intends to repay the outstanding balance of the revolving line of credit with a portion of the proceeds from this offering . . .

> From time to time since becoming a stockholder of the Company, JMI Equity Fund, L.P. ("JMI") has made working capital loans to the Company on an as-needed basis in amounts up to $250,000, typically bearing interest at the prime rate announced by major commercial banks. At December 31, 1996, the Company owed JMI approximately $250,000 in connection with such advances. Mr. Moores is a limited partner of JMI and Charles E. Noell III, a director of the Company, is General Partner of JMI. JMI holds, prior to this offering, more than 10% of the Company's outstanding Common Stock.

> The Company and JMI are parties to a sublease pursuant to which the Company subleases approximately 13,310 square feet of office space at its San Diego headquarters to JMI Services, Inc., an investment management company ("JMI Services"). The term of the sublease is from June 1, 1996 through October 21, 2003. The sublease provides for initial monthly rental payments of $16,638 to increase by $666 per month on each anniversary of the sublease. Mr. Moores serves as Chairman of the Board of JMI Services, and Mr. Noell serves as President and Chief Executive Officer . . .

> Pursuant to an Acquisition Agreement dated November 29, 1995 among the Company, Skunkware, Inc. ("Skunkware") and Peregrine/Bridge Transfer Corporation, a database software subsidiary of the Company ("PBTC"), the Company sold all the outstanding shares of PBTC to Skunkware for an aggregate purchase price of approximately $559,000. In addition, under the Acquisition Agreement, the Company receives a royalty on certain license sales of PBTC. The royalty payments to the Company are limited to an aggregate of $677,000 . . . Mr. Moores is a controlling stockholder of Skunkware, and Mr. Noell was president of Skunkware. Pursuant to the Acquisition Agreement, the Company

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                    39

provides certain computer and administrative resources to PBTC for a monthly fee of $37,500.

Pursuant to an Agreement and Plan of Merger dated as of November 30, 1995, the Company acquired XVT Software, Inc., a development tools software company ("XVT"). In connection with the acquisition, the Company issued approximately 2,018,808 shares of its Common Stock in exchange for all of XVT's issued and outstanding preferred and common stock. Mr. Moores and persons and entities affiliated with Mr. Moores owned substantially all of XVT's outstanding capital stock, and in connection with the acquisition, the Company issued 1,579,436 shares of the Company's Common Stock to Mr. Moores and affiliated persons and entities.

107. At the time of the acquisition, XVT was unprofitable. Its liabilities exceeded its assets by nearly $1 million. At the time of the acquisition, XVT executives who were to take on prominent roles at Peregrine included David Farley (who became Peregrine's Chief Financial Officer) and William G. Holsten (who became Peregrine's Senior Vice President of Customer Services). Peregrine discontinued XVT's operations three months after the acquisition at a loss of approximately $1.9 million.

108. The IPO prospectus also warned potential investors in no uncertain terms that Peregrine was controlled by Moores. In this regard, the IPO prospectus stated:

Upon completion of this offering, the Company's officers, directors and their affiliates together will beneficially own approximately 75.9% of the outstanding shares of Common Stock (73.1% if the Underwriters' over-allotment option is exercised in full). In particular, John J. Moores, Chairman of the Company's Board of Directors, and entities affiliated with Mr. Moores collectively will own approximately 67.0% of the outstanding shares of Common Stock (64.0% if the Underwriters' over-allotment option is exercised in full). As a result, these stockholders will be able to control most matters requiring stockholder approval, including the election of directors and the approval of mergers, consolidations and sales of all or substantially all of the assets of the Company.

109. By the beginning of the Class Period, Moores and his family trusts still owned almost 11 million shares of Peregrine common stock which, at that time, represented 22.3% of all issued and outstanding shares. At that time, Moores was still far and away Peregrine's largest shareholder. Throughout the Class Period, Moores, as a result of his dominant shareholdings, sat on Peregrine's Board of Directors and headed its Compensation Committee and acted as Chairman of the Board until July 2000. Three business partners of Moores, defendants Noell, van

1  den Berg and Hosley, also represented Moores' interests on Peregrine's Audit Committee.

2       110.  A further indication of Moores' control of Peregrine is the fact that he chose to

3  sublease space from Peregrine for his venture company, JMI Services, Inc. ("JMI Services"). The

4  purpose of locating JMI Services and affiliated entities in space subleased from Peregrine was to

5  keep a close proximity to Peregrine and its executive officers so as to facilitate the monitoring of

6  Peregrine's operations by Moores and Noell, who was the President and Chief Executive Officer

7  of JMI Services and a General Partner of JMI Equity along with defendant van den Berg.

8       111.  Defendant Moores also installed key operating and executive personnel within the

9  Company.  These individuals had significant roles in Peregrine's accounting, finance, legal,

10  corporate, technology, business development, mergers and acquisitions and customer service

11  departments.  They kept Moores and his close business associates, including defendant Noell,

12  advised on key operating and financial issues at Peregrine.  One former Vice President, Product

13  Marketing stated that "Moores' influence on Luddy was unbelievable and Luddy knew everything

14  that went on in the Company.  Moores was hands on managing the Company through Nelson,

15  Luddy and Farley before he died.  Luddy had a personal relationship with Moores."  A former

16  Vice President, Marketing noted that Moores had substantial contact with Gardner and Luddy

17  and they were frequently on Moores' private jet.  One former Peregrine Vice President in

18  Marketing recalled that Luddy had told him that: "All I want to do is work for John Moores and

19  fly around in his jet."

20       112.  For example, Moores brought Alan Hunt in to be Peregrine's Chief Executive

21  Officer prior to the Company's Initial Public Offering in 1997.  Hunt resigned in early 1998.

22  Moores and his business partners (such as defendants Noell, van den Berg and Hosley) on the

23  Peregrine board then caused defendant Gardner to be elevated to the position of Peregrine's Chief

24  Executive Officer.  Prior to that time, Moores was instrumental in causing Peregrine to hire

25  Gardner to work on Peregrine's mergers and acquisitions.

26       113.  Former CFO, David Farley, was a long-time business associate of Moores.  From

27  December 1984 until October 1994, Farley held various accounting and financial positions at

28  BMC Software – a Houston based company founded by Moores.  From November 1994 to

1  November 1995, Farley was Vice President, Finance, Chief Financial Officer and a director of

2  XVT Software, Inc. ("XVT") – a company controlled by Moores and which was acquired by

3  Peregrine in November 1995 in a related party transaction. Farley became Peregrine's Chief

4  Financial Officer in October 1995 a month prior to Peregrine's closing of the XVT acquisition.

5  Farley worked closely with defendants Gardner and Gless and kept Moores and Moores' partner

6  (defendant Noell) current on key operating and financial issues at Peregrine.

7       114.    Defendant Gless was also a long-time business associate of Moores. Moores was

8  instrumental in installing Gless at Peregrine initially as its corporate controller. From 1990 to

9  April 1996, Gless held various accounting and financial positions at Houston based BMC

10  Software – a company founded by defendant Moores. Gless worked closely with defendant

11  Gardner and kept Moores and Moores' partner (defendant Noell) current on key operational and

12  financial issues at Peregrine.

13       115.    Moores also caused Peregrine to hire defendant Nelson as its General Counsel in

14  1995. At the time, Nelson was a Houston-based attorney. At Peregrine, Nelson worked closely

15  with defendants Gardner, Powanda and Gless. In Fiscal 2000, Nelson was promoted to the

16  position of Vice President, Corporate Development. When the accounting irregularities at

17  Peregrine were first disclosed publicly in May 2002, Moores appointed Nelson as interim Chief

18  Executive Officer of Peregrine. During the Class Period, Nelson kept Moores and Noell current

19  on key operating and financial issues at Peregrine. During the Class Period, Nelson sold 287,500

20  shares of Peregrine common stock reaping gross proceeds of approximately $8,845,870.

21       116.    Moores was also instrumental in Peregrine's hiring of Taylor Barada, the nephew

22  of a Peregrine board member. Barada worked closely with defendants Gardner, Gless and Nelson

23  throughout most of the Class Period. Barada was involved in Peregrine's business development

24  and mergers and acquisition program. Until he left the Company in December 2002, Barada kept

25  Moores, Noell and van den Berg current on key operating issues at the Company.

26       117.    Moores was also instrumental in Peregrine's hiring of William G. Holsten

27  ("Holsten"). During much of the Class Period, Holsten was Peregrine's Senior Vice President,

28  Customer Services. Prior to his employment at Peregrine, Holsten was employed by XVT where

---

he was Vice President, Professional Services. XVT was a company, controlled by Moores, which was acquired by Peregrine in November 1995 in a related party transaction. Holsten kept Moores and Noell current on key operating issues during the Class Period. During the Class Period, Holsten sold 285,000 shares of Peregrine common stock receiving gross proceeds of approximately $11,651,655.

118. Further, Moores and his business partners on the board of directors were successful in adopting a business model for Peregrine which called for aggressive revenue growth and the use of acquisitions and other strategic alliances. The top operating officers of the Company reported to Moores and his business partners (defendants Noell and van den Berg) regarding Peregrine's business plans and their execution thereon. Moores and his partners at JMI Services received periodic updates from management as to Peregrine's operating and financial progress.

119. Prior to the Class Period, the board members sued herein and Peregrine's executive operating personnel knew that they could not achieve anticipated revenue growth or their acquisition plans unless they vastly expanded the use of the indirect distribution channels. Moores and his board colleagues encouraged senior management to exploit indirect distribution channels as a means for growing the business notwithstanding their knowledge of the lack of adequate internal accounting controls and the lack of a functioning Audit Committee as alleged herein. In light of the lack of adequate internal accounting controls, the planned aggressive growth of the Company, the lack of a functioning Audit Committee and periodic updates received from employees such as Gardner, Farley, Gless, Luddy, Nelson and Holsten. Further, Moores was kept up to date on the Company's operations by constant e-mail communication with the Company's senior executive. Accordingly, Moores knew or was deliberately reckless in not knowing of the fraudulent accounting practices alleged herein. Nevertheless, Moores signed Peregrine's Form 10-K filed with the SEC for the Fiscal Years ending March 31, 2000 and March 31, 2001 and the Peregrine registration statements (on Forms S-3, S-4 and S-8) filed with the SEC during the Class Period and approved the issuance of quarterly financial results for Fiscal 2000 and 2001 and the first three quarters of Fiscal 2002.

120.     The following defendants served on the Peregrine Audit Committee during all or portions of the Class Period:  Noell, van den Berg, Hosley, Savoy and Watrous.  As previously alleged, Noel, van den Berg and Hosley were business partners of Moores in numerous other ventures.  Defendant Savoy represented the interests of Vulcan.  Defendant Watrous was a former senior partner of Andersen Consulting – an affiliate of or related party to Arthur Andersen and Andersen Worldwide.  Defendants Savoy and Watrous became Audit Committee members for Fiscal 2001 upon the resignations from the board by defendants van den Berg and Hosley.

121.     Peregrine publicly represented that the purpose of the Audit Committee was "to review with the Company's management such matters as internal accounting controls and procedures, the plan and results of the annual audit, and suggestions of the accountants for improvements in accounting procedures [and] to nominate independent accountants."

122.     By April 2000, Peregrine's Board of Directors had adopted a written Charter to govern its Audit Committee.  Under the heading "Responsibilities," the Audit Committee was charged with the following:

**RESPONSIBILITIES:**

The delegated responsibilities of the Audit Committee shall include:

1.     Reviewing on a continuing basis the adequacy of the Company's system of internal controls;

2.     Reviewing the independent auditors' proposed audit scope and approach;

3.     Reviewing and providing guidance with respect to the external audit and the Company's relationship with its external auditors by (i) selecting, and evaluating the performance of the independent auditors; (ii) reviewing the independent auditors' fee arrangements, proposed audit scope and approach; (iii) obtaining a statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the board, and to the extent there are relationships, monitoring and investigating them; (iv) reviewing the independent auditors' peer review conducted every three years; and (v) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters described in SAS No. 61, as may be modified or supplemented;

//

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                              44

4.   Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

5.   Reviewing before release, and recommending to the Board of Directors for inclusion in the Company's annual report on Form 10-K, the audited financial statements and management's Discussion and Analysis of Financial Condition and Results of Operations;

6.   Ensuring that the Company's independent auditors review the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

7.   Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release;

8.   Overseeing compliance with the requirements of the Securities and Exchange Commission for disclosure of auditor's services and audit committee members and activities;

9.   Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

10.  Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

11.  Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments;

12.  Reviewing the Company's compliance with employee benefit plans;

13.  Overseeing and reviewing the Company's policies regarding information technology and management information systems;

14.  If necessary, instituting special investigations and, if appropriate, hiring special counsel or experts to assist;

15.  Reviewing related party transactions for potential conflicts of interest;

16.  Reviewing its own structure, processes and membership requirements;

17.  Providing a report in the Company's proxy statement in accordance with the requirements of Item 306 of Regulation S-K and Item 7(e) (3) of Schedule 14A; and

18.  Performing other oversight functions as requested by the full Board of Directors.

123.  The Charter also provided that the Audit Committee was required to meet at least three (3) times a year and maintain written minutes of its meetings.

//

124. Based on proxy statement disclosures, the Audit Committee did not hold meetings in either Fiscal 1999 or 2000. Peregrine represented that its Audit Committee met four (4) times in 2001. However, when KPMG requested minutes of the Audit Committee meetings, Peregrine management told KPMG that no minutes of Audit Committee meetings existed.

125. The lack of Audit Committee minutes demonstrates that the Audit Committee was not functioning as represented to the investing public. The fundamental failure of the Audit Committee allowed Peregrine to operate without adequate internal accounting controls at a time when Peregrine was growing rapidly and engaging in numerous acquisitions and strategic alliances.

126. In light of the lack of adequate internal accounting controls, the aggressive growth of the Company and the lack of a functioning Audit Committee, defendants Noell, van den Berg, Hosley and Watrous, while on the Audit Committee, knew or were deliberately reckless in not knowing of the fraudulent accounting practices alleged herein. Moreover, as Audit Committee members, each of these defendants had control over Peregrine with respect to the accounting and disclosure policies and practices of the Company.

127. Notwithstanding the foregoing, defendant Noell signed Peregrine's reports on Form 10-K for the Fiscal Years ending March 31, 2000 and March 31, 2001 and all Peregrine registration statements (on Forms S-3, S-4 and S-8) filed with the SEC during the Class Period and approved the issuance of quarterly financial results during Fiscal 2000 and 2001 and the first three quarters of Fiscal 2002. Defendants van den Berg and Hosley signed Peregrine reports on Form 10-K for the Fiscal Year 2000 and the Peregrine registration statements filed with the SEC until they resigned from Peregrine's board and they approved the issuance of quarterly financial results during Fiscal Year 2000. Defendants Savoy and Watrous signed Peregrine's report on Form 10-K for Fiscal Year 2001 and Peregrine's registration statements filed with the SEC while they sat on Peregrine's board and they approved the issuance of Peregrine's quarterly financial results during the Fiscal 2001 and the first three quarters of Fiscal 2002.

//

//

## PEREGRINE'S FRAUDULENT ACCOUNTING SCHEME

128.     During the Class Period, Peregrine was a provider of software and services which was designed to reduce the cost of doing business.  Peregrine offered products and services to address three principal areas:  (a) infrastructure resource management;  (b) employee relationship management (or self-service);  and (c) e-commerce technologies and services.  Specifically, Peregrine's products and services were intended to make its customers more competitive in their markets by reducing costs associated with three primary business processes:

a.     management of infrastructure assets, from the point of procurement through deployment, use, maintenance, change, and ultimately disposition;

b.     employee procurement of required infrastructure, including e-procurement, employee self-service, knowledge access, and reservation of shared assets, such as conference rooms and office space in remote locations; and

c.     e-transaction management, which reduced costs among buyers, suppliers, and market places as customers attempted to transact business through a global web of connected trading partners.

129.     During the Class Period, Peregrine sold its software and services in North America and internationally through a direct sales force.  In addition to its direct sales strategy, Peregrine also distributed its products by marketing and selling them through indirect distribution channels.  As a result, Peregrine established distribution relationships with service providers or partners (such as KPMG, IBM Global Services and EDS), system integrators, and resellers ("resellers").  In order to emphasize such sales, Peregrine created the Alliance Group which was initially headed up by defendant Spitzer, Vice President, Channel Sales, who reported directly to defendant Powanda, Executive Vice President of World-Wide Operations and defendant Gardner.  Sales through these indirect channels contributed significantly to Peregrine's reported revenue growth during the Class Period.

130.     By the commencement of the Class Period, the Peregrine Defendants had adopted a business model for Peregrine which emphasized growth through acquisitions and strategic alliances.  In addition, the Peregrine Defendants focused its sales and marketing efforts on Fortune

1   500 companies and large transactions with those companies in order to generate substantial

2   increases in reported revenue. Increases in reported revenues were expected to and did fuel the

3   increase in the share price of Peregrine common stock.

4        131.   The dramatic rise in the price of Peregrine common stock provided the means for

5   the Company to pursue acquisitions and strategic alliances while using its common stock as

6   currency for these purchases or alliances. During the Class Period, Peregrine completed more

7   than ten (10) acquisitions and three (3) additional strategic alliances for a stated value exceeding

8   $3.4 billion. Each of the foregoing transactions was approved by Peregrine's board of directors.

9   These transactions included the following:

10        a.   In April 1999, Peregrine completed the acquisition of F.Print UK Ltd.

11   ("Fprint"), a developer of desktop inventory and asset discovery software. Peregrine issued

12   approximately 1,508,000 shares of Peregrine common stock and paid $1.3 million in cash for all

13   the outstanding shares of Fprint for a total stated purchase price of $26.2 million.

14        b.   On September 29, 1999, Peregrine completed the acquisition of Knowlix

15   Corporation ("Knowlix"), a developer of knowledge management software. Peregrine issued

16   approximately 706,000 shares of its Common stock for all the outstanding shares of Knowlix for a

17   total stated purchase price of $17.8 million.

18        c.   On March 23, 2000, Peregrine completed the acquisition of Telco Research

19   Corporation Limited ("Telco Research"), a developer of telephony infrastructure management

20   software and related ancillary products. Peregrine issued approximately 2,563,000 shares of its

21   common stock for all of the outstanding shares of Telco Research for a total stated purchase price

22   of $123.9 million.

23        d.   On March 24, 2000, Peregrine completed the acquisition of Barnhill

24   Management Corporation ("Barnhill"), a provider of infrastructure management system solutions

25   and related professional services. Peregrine issued approximately 273,000 shares of its common

26   stock for all of the outstanding shares of Barnhill for a total stated purchase price of $32.2 million.

27        e.   On June 16, 2000, Peregrine completed the acquisition of Harbinger

28   Corporation ("Harbinger"), a provider of electronic business connectivity software and services.

1  Peregrine issued approximately 30,157,000 shares of its common stock (excluding approximately

2  6.0 million shares of Peregrine common stock issuable upon exercise of options and warrants

3  assumed in connection with the acquisition) in exchange for all of the outstanding shares of

4  Harbinger for a total stated purchase price of approximately $1,481.4 million.

5        f.     On September 1, 2000, Peregrine completed the acquisition of Loran

6  Network Holding Corporation, Inc. ("Loran"), a provider of network discovery and management

7  solutions.  Peregrine issued approximately 2,861,000 shares of its common stock (excluding

8  approximately 600,000 shares of Peregrine common stock issuable upon exercise of options

9  assumed in connection with the acquisition) in exchange for all the outstanding shares of Loran

10  for a total stated purchase price of approximately $109.8 million.

11        g.     On December 29, 2000, Peregrine completed the acquisition of the Tivoli

12  Service Desk Suite of products ("Tivoli") and certain related assets from Tivoli Systems, Inc.

13  Peregrine issued approximately 3,015,000 shares of its common stock and $45 million in cash for

14  the Tivoli product suite for a total stated purchase price of approximately $133.1 million.

15        h.     On March 23, 2001, Peregrine completed the acquisition of Extricity, Inc.

16  ("Extricity"), a provider of business-to-business relationship management software.  Peregrine

17  issued approximately 8,398,000 shares of its common stock (excluding approximately 707,000

18  shares of Peregrine common stock issuable upon exercise of options assumed in connection with

19  the acquisition) in exchange for all of the outstanding shares of Extricity for a total stated

20  purchase price of approximately $202.5 million.

21        i.     On August 27, 2001, Peregrine completed the acquisition of Remedy

22  Corporation ("Remedy"), a supplier of information technology service management and customer

23  relationship management solutions.  Peregrine issued approximately 28.3 million shares of its

24  common stock (excluding approximately 12 million shares of Peregrine common stock issuable

25  upon exercise of options assumed in connection with the acquisition) and paid approximately

26  $280 million in cash in exchange for all of the outstanding shares of Remedy for a total stated

27  purchase price of approximately $1.2 billion.

28  //

j.    On November 30, 2001, Peregrine acquired certain assets of XTRA On-Line Corporation, a Delaware corporation, and issued 114,908 shares of its common stock to XTRA On-Line Corporation.

k.    On December 24, 2001, Peregrine acquired Bodha.com, Inc., a California corporation, and issued 54,662 shares of its common stock to the former shareholders of Bodha.com, Inc.

l.    During fiscal 2000, Peregrine entered into a strategic relationship with Goldmine Software Corporation ("Goldmine"), a developer of service desk and customer relationship management software, to collaborate on sales and distribution efforts and in the development of marketing and software content.  As part of the agreement, Peregrine invested approximately $74.5 million of its common stock in exchange for approximately a 10% ownership of Goldmine.

m.    During fiscal 2000, Peregrine entered into a strategic relationship with SupplyAccess, Inc. ("SupplyAccess"), a business-to-business electronic marketplace provider for information technology equipment, to collaborate on the sales and distribution efforts surrounding the information technology equipment procurement market.  As part of the agreement, Peregrine invested approximately $9.1 million of its common stock in exchange for approximately an 18% ownership of SupplyAccess.

132.   Peregrine expected that service providers or partners, system integrators and resellers would sell substantial amounts of Peregrine products to end-users.  GAAP, however, prohibits recognition of any revenue from such a sale unless very specific criteria are met.  Therefore, Peregrine represented in its filings with the SEC both before and during the Class Period that the Company recognized revenues from product license sales to service providers or partners, system integrators or resellers only if the transaction met these criteria.

133.   Indeed, in its 1999 Form 10-K filed with the SEC on or about June 29, 1999 (shortly before the commencement of the Class Period), Peregrine set forth its revenue recognition policy with respect to sales of license agreements:

//

> Revenues from license agreements are recognized currently,
> provided that all of the following conditions are met: a
> noncancellable license agreement has been signed, the product has
> been delivered, there are no material uncertainties regarding
> customer acceptance, collection of the resulting receivable is
> deemed probable and risk of concession is deemed remote, and no
> other significant vendor obligations exist.

134.    Peregrine reiterated substantially the same representation concerning its revenue recognition policy in each of its quarterly and annual reports filed with the SEC during the Class Period.  For example, the Form 10-K for Fiscal Year 2000 included the following statement as to Peregrine's revenue recognition policy from license agreements.  It stated as follows:

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met: a noncancellable license agreement has been signed, the
> product has been delivered, there are no material uncertainties
> regarding customer acceptance, collection of the resulting
> receivable is deemed probable, risk of concession is deemed
> remote, and we have no other significant obligations associated
> with the transaction.

Thus, Peregrine assured the readers of its SEC filings and the investing public throughout the Class Period that its revenues were not improperly inflated through the improper and premature recognition of revenue from transactions which were not completed.

135.    As the size of the license agreements pursued by Peregrine grew, the Company's difficulty in closing these transactions increased.  Purchase commitments from end-users required approval at the top echelons of management of extremely large corporations.  Further, without a purchase commitment from an end-user, Peregrine's resellers were unwilling to enter into irrevocable, noncontingent software licensing agreements and unconditionally obligate themselves to purchase product with uncertain sell-through prospects.  Instead, resellers required significant inducements, in the form of discounts, rebates and the like, to take on Peregrine products and to enter into contingent transactions.

136.    Faced with these obstacles to reported revenue growth, defendants embarked upon a scheme in which they knowingly violated Peregrine's own publicly announced revenue recognition policies as set forth above.  They caused Peregrine to inflate its reported revenue through the use of side agreements, oral and written, with resellers to induce them to enter into

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

large software license agreements in order for Peregrine to report revenue consistent with prior public guidance given to securities analysts and investors by Peregrine's senior management.

137.   In these transactions, Peregrine knowingly recognized revenue from software licensing deals with resellers or end-users despite the fact that one or more conditions for proper recognition of revenue under GAAP were never met, including the following: (1) the fee owed to Peregrine was not fixed and determinable; (2) collectability of the fee was not probable; or (3) the resellers' obligation to pay for the product was contingent upon subsequent sale of the product to an end-user.  In addition, Peregrine provided certain resellers with side payments, deep discounts and rebates to induce them into "purchasing" license agreements where no end-user had committed to purchase the product.

138.   In its restatement, Peregrine admitted the illegality of its revenue recognition practices when it states:

> During fiscal years 2002, 2001 and 2000, Peregrine recognized revenue when it "sold in" to a third party reseller, regardless of whether the reseller had a firm commitment from an end-user to purchase the software.  In many cases, revenue was recognized despite the fact that the purchase commitments with resellers were not fixed, but were subject to conditions and contingencies.  As a result, revenue has been restated to reflect revenue only upon completion of the ultimate sale to an end-user customer.

139.   One witness, a former senior officer of a Peregrine reseller, described the breadth and scope of Peregrine's illegal revenue recognition practices as follows:

> I became aware in my dealings with Peregrine of what it meant to work off the 'burn' – namely, I learned that there were many other transactions similar to RTG [Rainier Technology Group, Inc.] wherein the prepayment commitments had to be 'worked-off' over time by selling the software and that Peregrine had improperly recognized these transactions as revenue when they should have waited for the software to be sold through.  Personally, as one of the stronger resellers pushing Peregrine software, I became a trusted insider, or 'in the club' as it was referred to– that meant that they trusted me and told me things that they would not say to others.
>
> Other trusted insider/resellers in Tier II included:
>
> 1.   Intuition (out of Atlanta)
> 2.   Predictive Systems (out of New York City)
> 3.   Column Business Systems

4.    Evergreen
5.    TIG-Technical Integration Group (out of San Diego)
6.    Denali

Tier I resellers included:

1.    KPMG
2.    Accenture (which was an Anderson successor)
3.    IBM Global
4.    Siemens
5.    Perot Systems

All of the above Tier 1 and Tier II resellers were involved in 'wink and nod' transactions – involving prepayments and 'burn' – I was made privy to this information at a dinner [in February 2002] with myself, Joe Reichner and Gary Lenz [former Peregrine executives]. Peregrine would offer kickbacks to the resellers sometimes things such as tickets and box seats to sporting events and more complex transactions that involved cash.

140.    In addition, Peregrine improperly recognized revenue on "swap" transactions. These were transactions without any economic substance. They involved the contemporaneous purchase and sale of product with customers which were designed solely to increase reported revenue of Peregrine.

141.    A former Peregrine employee, who was a Director of the Alliance Group, stated her understanding of swaps at Peregrine as follows:

. . . Peregrine would say to the customer, if you commit to x dollar amount of purchases — we will commit a comparable amount in consulting services to you. I knew that these type of swaps happened regarding PricewaterhouseCoopers, KPMG and Seibel, the latter was a software swap. Bill Moore was involved with this product swap with Seibel's involving sales force automation . . . Predictive was another company that was involved in a product for guaranteed software services swap with Peregrine.

142.    On June 3, 2002, Peregrine filed with the SEC a Form 8-K in which it disclosed certain information brought to its attention by KPMG. In that Form 8-K, Peregrine admitted that KPMG had discovered revenue recognition irregularities in the following categories:

Revenue recognition irregularities, principally arising in the Company's indirect [i.e., reseller] channel sales and, to a lesser extent, arising in connection with commercial transactions involving contemporaneous product purchase activities and investments or acquisitions [i.e., swaps.] KPMG has advised that correcting these irregularities would have the effect generally of delaying to later periods, or nullifying revenue recognized from product sales.

143.   Indeed, as detailed below, the Peregrine Defendants caused and/or allowed Peregrine to recognize revenue based on such revenue transactions and the Arthur Andersen Defendants allowed such transactions to be recognized notwithstanding knowledge that they violated GAAP and the Company's own publicly stated revenue recognition policy.  Peregrine has admitted that it improperly recognized revenue in excess of $500 million.

**Improper Revenue Recognition**

144.   In early 1999, a meeting took place in the office of Doug Powanda, the then Executive Vice-President of Worldwide Operations for Peregrine.  Defendant Gardner and then Chief Financial Officer Farley were present.  During the meeting, there was a discussion as to whether revenue would be recognized currently on a transaction with IBM Global Services ("IBM").  During the meeting, Gardner told Powanda that Peregrine would book as revenue the pre-commitments made by IBM in order to meet Peregrine's revenue goals.

145.   A former Peregrine employee, who was a Director of the InfraCenter Workgroup ("ICW Group") a group within the Alliance Group, recalls this meeting as follows:

> I was involved directly in a conversation in early 1999 with Doug Powanda, who I reported to specific to I believe IBM Global Services which is one of the very first deals where channel stuffing was involved – Powanda stated to me that Farley had told him that 'we can begin to recognize pre-commitment sales in Q4, January-March 1999' – Powanda told me that 'we can really start to use it' referring to booking pre-commitments . . . When I commented [to] him that we can't do this since I believed it to be wrong based on my prior experience with these matters, . . . Powanda just naively shrugged his shoulders.

> I also remember that both Farley and Gardner popped their heads into Powanda's office during this meeting and acknowledged that we [should] go ahead with the IBM commitment.  It was from this point in early 1999 that Peregrine had made the wholesale decision to book pre-committed re-seller sales as revenue – after they signed-off on the IBM deal that day in Powanda's office -- things really started to go downhill for Peregrine.  Powanda was actually ready to fire Spitzer when he said that Spitzer will get the commitments and we will book them -- this was in the March-April 1999 time frame.

146.   Another former Director of the Alliance Group similarly recalled a meeting in late 1998 involving defendants Powanda and Nelson and CFO Farley where they stated

//

1   that going forward it would be company policy to book "commitments" from resellers as revenue

2   irrespective of whether the reseller had a firm commitment from an end-user.

3       147.   Throughout the Class Period, defendants Gardner, Nelson, Powanda and Spitzer

4   authorized Peregrine's sales executives to enter into transactions with resellers where there was

5   no obligation to pay Peregrine until the product was sold-through to the end-user in order to meet

6   public revenue guidance.  At or about this time, defendants Gardner, Nelson, Gless and Powanda

7   also decided to book revenue on such transactions in order to meet Peregrine's publicly stated

8   revenue goals.  The individuals at Peregrine who were involved in making this corporate decision

9   were defendants Gardner, Gless, Powanda and Peregrine's General Counsel, defendant Nelson.

10  Defendants Spitzer and Luddy also knew from defendant Gardner of the Company's decision to

11  improperly recognize revenue on such transactions, *i.e.*, reseller commitments.

12      148.   Throughout the Class Period, defendant Gardner was actively involved in

13  negotiating many of the larger pre-commitments from resellers which were improperly booked as

14  revenue.  After the revenue had been booked, Farley and defendant Gless were actively involved

15  in overseeing Peregrine's efforts to assist sales by the resellers to end-users so as to be able to

16  collect money from the resellers on sell-through.

17      149.   The active involvement of defendant Gardner was recounted by a former Peregrine

18  employee, who was a Director of the ICW Group, as follows:

19          In March of 2000 in a conversation with Spitzer, he talked about
    the intent of the company to prematurely book pre-commitments as
20          revenue.  Spitzer stated that 'I am just following orders from
    Gardner and I am getting paid commissions on the pre-
21          commitments as they are booked -- and I won't take the fall –
    every quarter I vest my 28,000 option shares'.

22

23          I remember asking Spitzer where the deals were coming from that
    made our quarters when we are getting e-mails constantly to the
    effect that we are going to miss the quarter and then we make it at
24          the last minute – Spitzer told me that he was getting paid on these
    deals and that they were coming from Gardner – Spitzer told me
25          that the deals that Gardner got involved in were all big and over
    $500,000.

26

27  //

28  //

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                55

150.    Peregrine's practice of improperly booking revenue on transactions with resellers spread worldwide in order for Peregrine to meet its publicly announced revenue goals.  As one former Peregrine employee, who was a Director of the ICW Group, recalled:

> Powanda brought the practice of booking pre-commitments to Europe – he was head of European sales and later world-wide sales, then Europe again – Dominic O'Reilly and Jerry Crook were involved – Europe was heavily involved with the booking prematurely of pre-commitments in 1999 and 2000.  O'Reilly was Gardner's buddy from a previous life – or company.

151.    During the Class Period, Peregrine was able to "make its numbers" to the surprise of many of its employees who were actively working on closing deals.  One former Peregrine employee, who was a Director of the Alliance Group, described the situation as follows:

> All of a sudden at the end of a quarter . . . there was always some deal that came from nowhere . . . a deal would just get done . . . it just came!  These deals came from all the big 5, KPMG, EDS, IBM, Fujitsu . . . we had 175 business partners.
>
> I knew that there was something wrong with many of these last minute deals because in my role I was getting partners ready to sell our products . . . and I was surprised because I knew specifically that these partners were not ready to sell our product yet; they weren't ramping up to sell our product; and in fact they were asking us for our help to sell our products for them.

152.    Another former employee, who was a Vice President, Supply Chain Group, recalled the "magic" involved in Peregrine "making its numbers" as follows:

> . . . The Prokom situation was in June of 2001 and the end of the quarter.  The company as a reseller agreed to purchase $5 million in software from Peregrine – and by way of Day's side letter did not have to pay for any software until they sold it  – yet Peregrine booked the entire $5 million as revenue at the end of the quarter.
>
> I participated in weekly forecast meetings where accounts and the potential closing of sales were discussed for each quarter – there was never any discussion of Prokom as an account that had the potential to be closed as a sale – if any sale was closed or had a good possibility of closing prior to the quarter's end you would have known about it from our weekly meetings – Prokom was never even on the radar screen at our meetings.
>
> When we heard after the quarter's end about the Prokom sale, we were simply in awe and I asked Day 'how did you do that – how could you hit your forecast number when Prokom wasn't ever discussed in the forecast meetings'?

> In July or August 2001, Jerry Crook in a conversation told me about how Peregrine made the numbers for the prior quarter, -- 'Magic Quadrant Partners', he said – 'when you really need to count on them at the end of the quarter – you can go to them and they come through'.

153.   Another former Peregrine employee, who was a Director of the ICW Group, also recalled the "magic" involved:

> I was in a June 1999 staff meeting headed by Powanda with Spitzer and Crook discussing specifics as to how and in what accounts we were going to meet our sales numbers . . . Crook was going through every account regarding IMEA (Europe, Middle East and Africa) and saying we would make this here and when – and then he referred to the Magic Quadrant Partners being able to make the next 40% of his sales target and that it was subject to working with Powanda – Crook was referring to the use of pre-commitments booked as revenue to help make earnings estimates.

> I remember e-mails each quarter close to the end of the quarter declaring that the quarter was in trouble – and then lo and behold there were e-mails describing that we had met our quarter and congratulating IMEA on its efforts in this regard.

154.   As Crook stated, Peregrine made its numbers through "magic."

155.   Attempts at collecting on these phony accounts receivable, however, proved fruitless unless sell-through to the end-user had occurred.  For example, in the March/April 2000 time period, Peregrine made an effort to collect from 20 to 25 reseller partner accounts including accounts at O-E Systems, Barnhill and Corporate Software.  The total value of these unpaid pre-commitments at that time was more than $10 million.  When these resellers were contacted, they expressed anger telling Peregrine collectors that they were being billed net 30 days for the balance of their unpaid "commitments" despite the fact that Steve Gardner and other executives from Peregrine had told them, at the time that the pre-commitments were made, that they did not have to pay for software until it was sold-through to the end-user.

156.   A former Peregrine employee who was a Director of the ICW Group and involved in the collection effort recalled that:

> . . . It was Spitzer who told me directly that the pre-commitments had been taken into revenue by the company.  O-E Systems was one account; Barnhill for $1.25 million was another -- Peregrine put this company in a box by extracting an unattainable commitment from them and then acquired them when they failed to pay; and

---

Corporate Software was another – there was a list of these accounts. When I started to call these partners they became very angry telling me that they were getting billed net 30 days for the balance of their unpaid commitments when they were told by Spitzer, Steve Gardner and others from Peregrine at the time of the commitments that they did not have to pay for software that they were unable to sell-though.

157.    Examples of specific transactions in which Peregrine prematurely and improperly booked revenue are set forth below. Each of these transactions were carried out pursuant to the directions of Peregrine senior management, including defendants Gardner, Powanda and Gless as alleged herein.

**KPMG**

158.    KPMG LLP (and/or its former consulting division, KPMG Consulting) was part of the Alliance Group created by Peregrine for the purposes of integrating Peregrine software at customer locations and otherwise promoting the sale of Peregrine products. KPMG and other large corporations such as EDS, Fujitsu, and IBM entered into arrangements with Peregrine for tens of millions of dollars per year in future sales. Payment to Peregrine on these arrangements, however, was dependent on sell-through to an end-user. Notwithstanding such contingencies, Peregrine booked revenue prematurely on these transactions in violation of GAAP.

159.    For example, according to a former Peregrine employee who was a Director of the Alliance Group, in 1999 KPMG placed orders for three end-users: the federal government's Department of Health and Human Services for $2 million; Deutsche Bank, for $4 to $5 million; and Pfizer, Inc. for $2.1 million. The arrangement between KPMG and Peregrine provided that KPMG would not be responsible for payment on the product which KPMG was unable to sell-through to the end-user. Notwithstanding the contingent nature of the transaction, Peregrine improperly booked revenue on these orders in violation of GAAP.

160.    According to another former Director of the Alliance Group, KPMG was an account handled by defendants Powanda and Spitzer and who were assisted by Peter O'Brien and Jack Israel of the Alliance Group. There was a side letter dating from early 2001 regarding the re-sale of Service Center and Asset Center products with the commitment ranging

//

1 | from $5-7million – the side letter described that KPMG had no payment obligation until sell-

2 | through to the end-user occurred.

3 |   161. According to a former sales executive involved in sales to the Alliance Group,

4 | Peregrine used KPMG "to carry the paper" on one or two transactions per quarter. Each of these

5 | transactions were for several millions of dollars. Peregrine improperly booked these transactions

6 | as revenue despite the fact that KPMG had no payment obligation to Peregrine until the software

7 | sold through to the end-user.

8 |   162. A number of years later, KPMG disclosed in a letter to the SEC dated June 4,

9 | 2002, drafted at the request of Peregrine and included in Peregrine's Form 8-K/A filed on June 5,

10 | 2002, that:

11 |     Subsequent to our engagement and during the course of our audit

12 |     activities, the existence of certain contracts entered into a number
of years ago with the former consulting division of KPMG LLP

13 |     came to our attention. These contracts were not entered into
during [Peregrine's] fiscal year that we were engaged to audit.

14 |   163. Peregrine referred to its dealings with KPMG in a press release on May 28, 2002,

15 | stating that:

16 |     The Company has previously stated that certain transactions
involving revenue recognition, totaling as much as $100 million,

17 |     have been called into question. In the course of the internal
investigation being conducted by attorneys representing the

18 |     Company's audit committee, KPMG informed Peregrine that
approximately $35 million of the questionable transactions were

19 |     with KPMG and KPMG Consulting.

20 | **IBM**

21 |   164. IBM Global Services ("IBM") regularly received side letters which provided that it

22 | was not obligated to pay Peregrine for product until the product had sold-through to the end-user.

23 | On a regular and reoccurring basis during the Class Period, IBM would place orders ranging from

24 | $2-$4 million at the request of Peregrine at the end of an accounting reporting period. IBM

25 | would hold the product for Peregrine until Peregrine or IBM sold the product through to the end-

26 | user. A former member of the Alliance Group summarized these transactions as follows: IBM

27 | "would buy inventory at our request and hold it until Peregrine could sell it through – IBM was

28 | acting like a bank."

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

These transactions would generally come at the end of a reporting period.  As a former member of the Alliance Group noted:

> Doug Powanda was very close to IBM and EDS and would go to IBM regularly at the end of a quarter to close a deal with IBM because we needed X millions to make the quarter.  It was common knowledge around the company in 1999 and 2000 when Powanda was North America sales manager, that he would go to IBM and EDS to make this happen – he was a great talker, he was known as someone who could make things happen, he was known as the "miracle worker."

165.   A former sales executive involved in sales to the Alliance Group similarly confirmed that IBM was used regularly at the end of quarters "to carry the paper" while Peregrine continued after the close of the quarter to attempt to sell product to end-users.

166.   In violation of GAAP, Peregrine improperly recorded revenue on the foregoing transactions in order to meet previously announced revenue goals.

**Accenture**

167.   Arthur Andersen's consulting division was spun-off from Arthur Andersen and renamed Accenture.  According to a former member of the Alliance Group, at the end of fiscal 2000 (March 2000), Accenture entered into a $8-$10 million arrangement with Peregrine.  Under the arrangement, Peregrine delivered product to Accenture and a side letter which provided that Accenture was not obligated to pay for the product until the product sold-through to the end-user.  Notwithstanding the contingency of sell through to the end-user, Peregrine booked the Accenture "order" as revenue in March 2000 in violation of GAAP.

**Tivoli**

168.   In December 2000, Peregrine completed the acquisition of the Tivoli Service Desk Suite of Products ("Tivoli") and certain related assets from Tivoli Systems, Inc., a wholly owned subsidiary of IBM.  At the same time and in connection with the asset purchase agreement, Tivoli agreed to purchase $58.9 million of software licenses from Peregrine.

169.   Peregrine improperly recognized revenue on the Tivoli purchase agreement.  Under GAAP, the purchase commitment of Tivoli should have been offset against Peregrine's total purchase consideration.

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                                                                     60

**CI Software Solution**

170.    In 1999, CI Software Solutions ("CI Software") was a small United Kingdom start-up. At that time, it had approximately ten (10) employees. Peregrine had an investment in the company and held a seat on CI Software's board of directors.

171.    In late 1999, CI Software ordered $500,000 in product from Peregrine. The product involved was Peregrine's Desktop Delivery product. The amount of the purchase order was $500,000, the minimum necessary to qualify as a reseller of Peregrine software. Under the arrangement with Peregrine, CI Software did not have any obligation to pay Peregrine for the software until and unless it was sold-through to the end-user. Moreover, CI Software did not have the financial resources to pay for the software until and unless it was sold-through to the end-user. Notwithstanding the foregoing, Peregrine improperly recognized revenue upon the order.

172.    Two months later, CI Software placed a $5 million order for Peregrine software. Like the prior smaller order, this order also was contingent upon CI Software's ability to sell-through to end-users. The $5 million order, however, was prematurely recognized as revenue by Peregrine notwithstanding the contingent nature of the transaction, the fact that CI Software had not paid Peregrine on the prior and much smaller $500,000 order and that CI Software did not have the financial wherewithal to pay for the then outstanding $5.5 million in purchase orders placed with Peregrine.

173.    A former Peregrine employee, who was a product specialist in the InfraTools business unit, recalled the situation at CI Software as follows:

> CI Software Solutions was a U.K. company start-up with 6-7 Experiant managers and at most a 10 person operation.
>
> In late 1999, Peregrine generated a purchase order for $500,000 for its Desktop Discovery product. The minimum sales commitment that Peregrine would accept as a re-seller was $500,000.
>
> Then only 1-2 months later, this same company which was only a start-up suddenly generated a $5 million dollar purchase order.
>
> Peregrine had a seat on CI's board and had an investment stake – Peregrine's Doug Powanda was also involved with CI. The account representative from Peregrine was Toby Cramer.

---

1        This was really strange to me because how really could this start-up
    company that never even made or paid on its first $500,000
2        commitment, now suddenly just a few months later being entering
    into a commitment for $5 million which was 10 times as large?

3

4    **O-E Systems, Inc.**

5        174.    Another example of fraudulent revenue recognition was a transaction with a

6    reseller called O-E Systems, Inc.  In September 1999, O-E Systems entered into a transaction

7    with Peregrine in which it agreed to resell between $500,000 and $750,000 of Peregrine software.

8    This agreement was conditioned upon the reseller's ability to sell the product through to an end-

9    user.  Peregrine's InfraCenter For Workgroup, a group within the Alliance Group, arranged the

10   deal, with the understanding that the reseller would have a semi-exclusive territory in which to sell

11   the product and that Peregrine would provide support to assist in the sale to the end-user.

12       175.    A former Peregrine employee, who was a sales representative in the ICW Group,

13   recalled the situation as follows:

14       A sales commitment was entered into in September 1999 by reseller
    O-E Systems for between $500,000 to $750,000 by Greg Spitzer.
15       Peregrine's Blaine Bragg was the sales representative responsible
    for this account.  Bragg was paid 100% of his commission up front
16       at the time of commitment.

17       O-E Systems was given semi-exclusivity and in order to meet their
    commitment [and] were also allowed to sell Peregrine's Asset and
18       Service Center products.

19       O-E Systems had not paid anything toward their commitment by
    August 2000 and I was now involved in dealing with them directly
20       to negociate payment.  O-E had simply refused to pay, claiming that
    Peregrine had not provided the agreed upon support and that the
21       ICW product was not selling – and that Peregrine had
    misrepresented the product and market potential when the
22       commitment was entered into.

23       I was dealing with Scott Goemmel at O-E.  In subsequent
    conversations with Goemmel after I left Peregrine, he indicated that
24       O-E Systems had still not paid a dime to Peregrine.

25       176.    Notwithstanding the contingent nature of the transaction and Peregrine's

26   obligation to provide subsequent support for the sale to the end-user, Peregrine improperly

27   recorded the transaction as revenue in September 1999.

28   //

---

**Barnhill**

177.    In 1999, Barnhill Management Corporation ("Barnhill") was a small reseller of Peregrine software. According to a former Peregrine employee who was a Director of the ICW Group, Peregrine obtained a $3 million commitment from Barnhill only by making payment of cash to Barnhill's president. In the summer of 1999, Doug Powanda of Peregrine approached Barnhill's President, Michael Witt. Powanda offered Witt an envelope containing cash in the amount of between $25,000 and $50,000 if Witt would cause Barnhill to make a commitment for Peregrine software in the amount of $3 million. Witt agreed to do so. As promised, Powanda gave Witt the envelope of cash. Barnhill did not have financial resources to pay on such a commitment. Powanda and Peregrine knew that Barnhill did not have the financial resources to pay for the Peregrine software. The arrangement between Peregrine and Barnhill provided that Barnhill would not be obligated to pay Peregrine until sell-through to an end-user.

178.    According to a former sales executive involved in sales to the Alliance Group, the total amount of "bad deals" placed at Barnhill was approximately $15 million. Peregrine knew that these "receivables" from Barnhill would never be paid. In order to avoid the receivables from having to be written off, Peregrine acquired Barnhill as of March 24, 2000. According to a former Vice President, Product Marketing, Peregrine had no plan to integrate Barnhill into its operations. The acquisition of Barnhill allowed Peregrine to avoid the write-off of Barnhill's large receivables at year-end March 31, 2000. Instead, Peregrine improperly buried the write-off in the line item "Acquisition Costs and Other."

**ICL**

179.    According to a former Peregrine employee who was a product specialist in the InfraTools business unit, in 1999, ICL, a European entity, entered into a "swap" transaction with Peregrine. To avoid the appearance that the transaction was a software swap, ICL and Peregrine prepared separate contracts for each purchase. ICL ordered $3 to $4 million of Peregrine's Service Center and Asset Center products. In return, Peregrine ordered product from ICL which consisted of Peregrine Service Center product which had been customized to more closely follow IT Infrastructure Library ("ITIL") standards. By structuring these software purchases as two

1  separate and independent transactions, Peregrine disguised the true nature of the transactions and

2  improperly booked revenue based upon ICL's order of Peregrine product.  The recognition of

3  revenue from this swap transaction was improper and resulted in the overstatement of Peregrine's

4  revenue in violation of GAAP.

5  **Critical Path**

6      180.   Another example of improper revenue recognition was a software swap between

7  Peregrine and Critical Path, Inc.  David Thatcher, the former president of Critical Path, pled guilty

8  to federal charges of criminal conspiracy to commit securities fraud.  In his plea agreement,

9  Thatcher described the transaction as follows:

10       Critical Path agreed to a software exchange with Peregrine.  From
   Critical Path's perspective, this transaction was driven by the need

11       to report revenue during the third quarter.  At the end of
   September, 2000, Critical Path bought software from Peregrine,

12       and Peregrine bought software from Critical Path.  To avoid the
   appearance that the transaction was a software swap, Critical Path

13       and Peregrine prepared separate contracts for each purchase, each
   paid the full amounts owed, and made payment to each other on

14       different days.

15       I participated in the negotiations with Peregrine for this software
   swap.  I spoke with the CEO of Peregrine [i.e., defendant Gardner]

16       about the software swap.  I also helped to set the value of the
   transaction.  By structuring the software swap as two independent

17       transactions, I realized that I and others working on the deal were
   consciously avoiding disclosure of the true nature of the

18       transaction.

19     181.   The software that Peregrine agreed to "buy" from Critical Path was priced at

20 approximately $3.09 million.  The software that Peregrine agreed to "sell" to Critical Path was

21 also priced at approximately $3 million.  The recognition of revenue from these transactions was

22 improper and resulted in the overstatement of Peregrine's revenue in violation of GAAP.

23 **Edwards Jones**

24     182.   Peregrine also improperly recognized revenue on a transaction with Edward Jones.

25 The transaction was subject to contingencies which made revenue recognition improper under

26 GAAP.  A former Peregrine employee who was a Director of the ICW Group recalls the situation

27 as follows:

28 //

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

1                 "I was also aware of another account that Powanda was responsible
                  for namely, Edward Jones, that featured a $3-4 million pre-
2                 commitment that was booked inappropriately."

3 **Corporate Software**

4        183.     In March 2000, Peregrine improperly booked revenue on a $3.5 million dollar pre-

5 commitment from Corporate Software. The transaction was subject to contingencies which made

6 revenue recognition improper under GAAP. As a former Peregrine employee who was a Director

7 of the ICW Group recalls:

8                 Chad White told me that in Q4, March 2000, his account Corporate
                  Software, after Gardner and Spitzer talked with them, had entered
9                 into an additional $3.5 million commitment.

10                 White told me that Spitzer told him in the airport prior to meeting
                  with this customer that Gardner had already negotiated the
11                 additional commitment and that the purpose of the meeting was
                  window dressing -- and since the deal was already done by
12                 Gardner, nothing should be said or done to mess it up.

13 **Citigroup**

14        184.     Another example of improper revenue recognition was Peregrine's premature

15 booking of revenue on a proposed transaction with Citigroup, Inc.'s Global Technology

16 Infrastructure Group, located in Tampa, Florida. The transaction was detailed in an e-mail from a

17 Peregrine employee and was described as follows in an article in the Los Angeles Times on

18 October 1, 2002:

19                 Citigroup had committed "in principle" to making the acquisition,
                  but contract negotiations were 'still several months away from
20                 completion,' according to the e-mail. Peregrine, however, booked
                  the deal in September 2000 after it got a nonbinding letter of
21                 acquisition from Citigroup. The actual sale wasn't completed until
                  the following quarter--in December 2000. Citigroup acknowledged
22                 the deal but declined further comment.

23 **Systematics AG**

24        185.     Systematics AG ("Systematics") was a German software reseller. In March 2001,

25 Peregrine entered into an arrangement with Systematics for $12 million of Peregrine software.

26 Payment on the transaction was due, in part, in twelve (12) months and the balance was due

27 twenty-four (24) months later. There, however, was a side letter involved in this transaction

28 which made any payment obligation of Systematics dependent on Systematics' ability to sell the

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW --
Master File No. 02-CV-0870 J(RBB)

1  product through to the end-user. The side letter was signed on the instruction of Peregrine's

2  senior management. Sarah Forest, an in-house counsel at Peregrine's IMEA operating division

3  and Doug Powanda were involved in the issuance of the side-letter to Systematics.

4      186.    In connection with the side-letter issued to Systematics, a former Director of the

5  Alliance Group, recalled a discussion he had with defendant Gless and Andrew Cahill of

6  Peregrine.

> In February or March 2002, I was in Matt Gless' office with Andy
> Cahill. The side-letter [involving Systematics AG] was signed by
> Swen Ereletich of PRGN who was the acting general manager of
> PRGN's office in Germany. I remember Gless and Cahill
> instructing me to take the side letter to my office because they
> stated specifically that neither of them wanted a copy in their office.

11     187.    A former Peregrine employee in the Alliance Group recalled attempts to collect

12  from Systematics as follows:

> One year after the contract is signed and payment comes due, I was
> aware that Systematics had no intention to pay – I had seen the
> side-letter which Spitzer and Cahill were also aware of – I had told
> them that we should not have booked this transaction because
> Systematics had a side letter from us and they had no intention of
> paying the contract amount due after the first 12 months of the
> contract. In March of 2002, I was on a conference call with Spitzer
> and Cahill trying to resolve this deal – Systematics on the call told
> us they had no intention of paying and referred to their side letter
> and Peregrine's commitment to either reduce the payment or drive
> business through Systematics. Peregrine did not have the business
> to drive through Systematics.

20     188.    In March 2001, Peregrine improperly booked as revenue all or a significant portion

21  of this transaction and "sold" the resulting receivable to Fleet Bank. Recognizing any revenue on

22  this transaction violated GAAP because of the terms of the side letter which negated Systematics'

23  obligation to pay Peregrine until and unless sell-through of the product had occurred.

24  **Action Computer Supplies**

25     189.    According to a former Peregrine employee who was a product specialist in the

26  InfraTools business unit, in 2001, Peregrine entered into a "swap" transaction with Action

27  Computer Supplies ("Action Computer"), a wholly owned subsidiary of Insight Enterprises, Inc.

28  In order to disguise the nature of the transaction, separate contracts were prepared for each

purchase.  Pursuant to the swap, Action Computer placed a purchase order for $10 million of Peregrine software which was improperly booked as revenue by Peregrine in 2001.  Peregrine in turn placed an order for the rights to Action Computer's XML based component catalog for Peregrine software.  Peregrine never exploited the rights which it had "purchased."  The recognition of revenue from this transaction was improper and resulted in the overstatement of Peregrine's revenue in violation of GAAP.

**Prokom Software**

190.    Another example of improper recognition of revenue by Peregrine was the arrangement entered into with Prokom Software, S.A.  Prokom, a Polish company, was a reseller of Peregrine software in Europe.  In June 2001, Prokom agreed to take $10 million in software from Peregrine for future sale to end-users.  Richard Day, head of Peregrine's Emerging Markets business in East Europe and Africa, signed a side letter that stated that Prokom did not have to pay Peregrine if it could not resell the software to an end-user.  A former Peregrine employee, who was a product specialist in the InfraTools business unit, recalled the Prokom side letter and the general use of side letters in Europe as follows:

> . . . Chip Shore was the sales person for the Prokom account; and Richard Day was the sales director responsible for Emerging Markets who had replaced Dominic O'Reilly.  It was O'Reilly and Jerry Crook that started the practice of side letters in Europe – anything that Day would have done he would have learned from working with O'Reilly.
>
> A side letter basically confirmed to the re-seller account that they only had to pay the difference between what they actually sold regarding the purchase order specific to the appropriate date and what was committed for – this came into play only if the account failed to meet its commitment by the time date specified on the P.O.
>
> One quarter before Alan Kerr was brought on to clean up the U.K operation, Jerry Crook dismissed both Chip Stone and Richard Day regarding accusations of stuffing the channel and the use of side letters.  I believe that Crook knew and condoned the side letters and fired Stone and Day to protect his position.  Day was fired around the time that the Prokom commitment was expiring and they would be forced to pay the difference between what they committed to and what they actually sold.  When Prokom was pushed to pay-up they showed the side letter which confirmed that they only had to pay for what they sold.

//

191.    Another former Peregrine employee, who was in sales, recalls the Prokom transaction as follows:

> I remember that it was announced at the end of the quarter that we had closed a $10 million dollar deal internationally right at the end of the quarter with an international company called 'Prokom'. I knew this to be a fact because it was announced at the President's Club venue in July or August 2001 in the Cayman Islands. It was during a subsequent lunch with several ex-employees several months after I had been laid off, that I learned that this was a 'fishy' deal in that it was just a commitment to sell our product with no cash exchanging hands – but that the company had booked the commitment nonetheless as revenue.

192.    A former Director of the Alliance Group recalled the use of the side-letter in the Prokom transaction in order to document that Prokom had no payment obligation until it sold Peregrine's product to an end-user.

193.    Nevertheless, Peregrine booked revenue of $10 million on this transaction in June 2001. When Peregrine employees subsequently contacted Prokom concerning payment on the receivable, they were told that Prokom had no obligation to pay because of the side agreement as alleged above.

**eXchangeBridge**

194.    eXchangeBridge, Inc. ("EXB") is a Delaware corporation with its principal place of business located at 1277 Lenox Park Boulevard, Atlanta, Georgia. EXB provides electronic and paper transaction processing services to the food brokerage industry.

195.    By February 2001, Peregrine had become the majority shareholder in EXB – with roughly 78% of the preferred stock (with voting rights). Peregrine acquired 1,750,000 shares through a capital contribution of $1,750,000 and purchased another 1,750,000 shares from Crossmark in February 2001 at $1.74 per share in Peregrine stock. Defendant Nelson of Peregrine and Eric Deller of Peregrine were two of the three members of EXB's board of directors.

196.    Crossmark, EXB's only significant customer, had signed an exclusive service agreement with EXB for all of its transaction processing at a price of $3.50 for each electronic transaction and $7.00 for each paper transaction. Within a matter of months, Nelson was pushing

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                        68

1  to renegotiate the deal at a huge cost to EXB in an attempt to artificially increase reported

2  revenues for the June 2001 quarter at Peregrine.

3      197.    At the close of the quarter on June 30, 2001, Nelson signed an agreement with

4  Crossmark to reduce the price to $1.25 for each electronic transaction up to 593,000 transactions

5  per annum and to $6.50 for each paper transaction up to 331,000 transactions per annum.

6  Crossmark was running roughly at those volume levels and this deal would save them

7  approximately $1.5 million per year.  On behalf of Peregrine, Nelson also agreed to purchase an

8  EXB note and another debt owed to Crossmark for $1.5 million in Peregrine stock.

9      198.    In exchange, Crossmark agreed to "purchase" approximately $1.6 million of

10  software from Peregrine through EXB.  Nelson planned to book the software as $1.6 million in

11  revenue for the June 2001 quarter for EXB and for Peregrine.  This additional amount of reported

12  revenue would allow Peregrine to continue its sequential reported revenue growth.

13      199.    In violation of GAAP, Nelson insisted that EXB – and thus Peregrine – recognize

14  the full $1.6 million software license fee immediately in the June 2001 quarter despite the fact that

15  the transaction was nothing more than a contingent swap transaction.  After the CFO at EXB

16  objected to Nelson's accounting treatment for the transaction, she was terminated.  With the

17  addition of the full $1.6 million in revenue in the June 2001 quarter, Peregrine was able to

18  improperly report sequential revenue growth of $1 million – growing from $171 million in

19  reported revenue to $172 million in reported revenue.

20  **MGX**

21      200.    In 2001, MGX, a South African company, was a reseller of Peregrine software.

22  During that year, MGX had made a pre-commitment for Peregrine software of approximately $2

23  million.  Under the arrangement, MGX was not obligated to pay Peregrine until the software was

24  sold-through to the end-user.  Nevertheless, Peregrine improperly recognized revenue on the pre-

25  commitment.

26      201.    In the summer of 2001, there were discussions within Peregrine that MGX would

27  be terminated for lack of performance and be replaced by a Remedy reseller in the region.

28  Peregrine, however, did not terminate MGX.  Instead, during September of 2001, MGX placed

an additional $12 million pre-commitment to purchase Peregrine software notwithstanding the fact that it had failed to make any payment on its $2 million pre-commitment. The arrangement on the $12 million pre-commitment was that MGX was not obligated to pay for the Peregrine software until it had sold-through to the end-user.

202.    A former Peregrine employee, who was a product specialist in the InfraTools business unit, recalls the MGX transaction as follows:

> There was a side letter involving the South African company MGX. The initial re-seller commitment was for approximately $2 million dollars. After Remedy was acquired, we heard that MGX was going to be dumped for non-performance and replaced by the strong Remedy re-seller; but MGX was never dumped, in fact in fiscal Q3, for the quarter ending 2001, I became aware that MGX had entered into a new $12 million commitment after it failed to make its $2 million commitment.

203.    A former Director of the Alliance Group recalled the use of a side-letter in connection with the MGX transaction to document the lack of payment obligation to Peregrine until MGX had sold the product sold-through to the end-user.

204.    Notwithstanding the fact that Peregrine had not received payment on the prior $2 million pre-commitment and the fact that the $12 million pre-commitment was subject to the contingency of sell-through, Peregrine improperly booked revenue on MGX's $12 million pre-commitment.

**RTG**

205.    In March 2001, Peregrine improperly recognized revenue on a transaction with a company called Rainier Technology Group Inc. ("RTG"), based in Seattle, Washington. Peregrine pressured RTG to sign purchase orders totaling at least $2 million for copies of Xanadu, one of Peregrine's software packages. There was never any intention on the part of either Peregrine or RTG that RTG would actually pay the monies unless the product sold-through to the end-user. RTG was a "shell" company with very few assets and no revenue.

206.    A former senior officer of a Peregrine reseller recalls his dealings with Peregrine on this transaction as follows:

//

I had a flurry of contacts starting in December 2001 through March 2002, e-mails and telephone conversations with Gary Lenz, a Peregrine officer and President of Infrastructure; Joe Reichner, EVP of Worldwide Channel Sales, Steve Gardner, Peregrine's CEO and VP, Partner Relations, David Roudenbush. I dealt directly with Roudenbush . . . I kept telling them that Xanadu was not engineered and did not work and that it was at least one year away from being able to be sold off the shelf so that they were fully aware of these issues.

I also told these individuals specifically that RTG had no revenues, no D&B, was a shell company and would be bankrupt before the invoice arrived. I told them in various conversations, e-mails and in writing.

I also told them that I had heard that they had booked this transaction as revenue in Q4, 2001 and that I was really surprised as such. It was a little later that they re-approached us offering us luxury box seats to the Buick Open to ostensibly keep the lid on this matter.

\* \* \*

There was never any intent by RTG to pay Peregrine. This was agreed upon between Peregrine's Roudebush and RTG's Kirby orally and was confirmed later in a side e-mail from Roudenbush.

207.   Peregrine was aware of all of these facts. Nevertheless, it improperly booked the deal as revenue in March 2001 in order to meet publicly announced revenue goals.

**FM International**

208.   FM International ("FM") was a small organization in 2001. It consisted of approximately fifteen (15) people including two (2) outside sales persons. According to a former member of the Alliance Group, in order to obtain and book a $2 million commitment from FM as revenue in September 2001, defendant Spitzer authored a side letter to FM's President Mark Douglas. Under the arrangement, FM was not obligated to pay Peregrine until the product had sold-through to the end-user.

209.   Notwithstanding the sell-through contingency and FM's lack of credit worthiness for an order of this magnitude, Peregrine improperly booked the FM commitment as revenue in violation of GAAP.

//

//

1  **Fujitsu**

2      210.    In December 2001, Peregrine entered into a software swap with Fujitsu

3  Transactional Services ("Fujitsu").  The transaction provided that Fujitsu would take $10 million

4  of Peregrine products.  Peregrine was in turn obligated to provide "solution" software to Fujitsu.

5  Neither company actually paid for the software or services.

6      211.    The details of the Fujitsu swap, as recalled by a former Peregrine employee who

7  was a Senior Manager, Strategic Corporate Accounts, are as follows:

8          One example of a swap . . . was a swap transaction between
           Peregrine and Fujitsu for approximately $3-5 million in equivalent
9          value.  It was proposed that Fujitsu develop solutions with
           Peregrine and jointly market the resulting product naming it
10         "Peregrine Retail" – Peregrine obligated Fujitsu to $5 million in
           license fees for product; and after 9-12 months another $5 million.
11
           Fujitsu was getting services and invoices from Peregrine but was
12         not paying Peregrine.  Peregrine was getting invoices from Fujitsu
           but was not paying Fujitsu.
13
           I realized in March 2002 that Fujitsu was not paying its invoices to
14         Peregrine and I was not certain that we should continue to provide
           support services.  I went to a financial analyst in the Finance
15         department who was responsible for invoices to inquire about this
           situation.  I was shown two invoices with notes written in pen and
16         signed by Matt Gless on each invoice stating that Peregrine was
           waiving the fees owed by Fujitsu in lieu of services.  The note
17         stated that it was "ok" that Fujitsu did not have to pay and the
           service was not rendered.  The two invoices were put into the
18         accounting system as revenue, however.  The company's finance
           person traced the 2 Fujitsu invoices amounting to $500,000 to $1
19         million each in the system that had not been paid and showed me
           that they has been posted as revenue – yet I knew that Fujitsu was
20         not paying Peregrine.

21         The note in the accounting system stated that neither Fujitsu nor
           Peregrine were providing services  – there was also an override in
22         the system that instructed that the situation was ongoing.

23         Dave Roudenbush, Director, Alliances told me when I brought this
           issue specifically up with him the first time that "we will take care
24         of it;" and then after 2-3 weeks when I head nothing but kept
           inquiring, I was told by Roudenbush that the matter was taken care
25         of.  I was told specifically by Rodenbush, "we can take care of it
           you have more important things to do!"  Right then and there I
26         knew that something was wrong!

27  //

28  //

> Finally, I was able to verify that Fujitsu paid only $1 to $1.5 million in fees to Peregrine – this showed up on the invoice report – only later did I realize that $8.5 million was missing in payment to Peregrine.

212.   In December 2001, Peregrine improperly booked revenue on all or a significant portion of the $10 million transaction.

**British Telecom**

213.   According to a former Peregrine employee, who was a product specialist in the InfraTools business unit, in late 2001, British Telecom entered in a contract for the purchase of Peregrine software. Andrew Highland, Peregrine's European Sales Executive, obtained the order from British Telecom. The British Telecom transaction was described as a $30 million deal within the company. Under the arrangement, Peregrine agreed to deliver Xanadu and, to a lesser extent, Peregrine's Service Center product. Xanadu was a combination of technology derived from Loran and Peregrine's Kinnetics Network Management Product, a Linux-based appliance integrated with Service Center and other Peregrine applications. At that time, defendants Gardner and Luddy were directly informed that Xanadu was not close to being deliverable as a working product and would require many months of intense development effort to make it work according to specifications and to be delivered as a revenue producing product. Peregrine was not in a position to deliver a commercially viable product to British Telecom by the end of 2001. Defendant Luddy nevertheless recommended the commercial release to British Telecom at this time. In order to recognize revenue in the quarter, Peregrine delivered the product prematurely. British Telecom, however, refused to accept the product. Peregrine improperly recognized revenue on the sale in late 2001 even though it knew British Telecom had not accepted the product which made collection of the receivable doubtful.

214.   According to a former Peregrine employee, who was a Vice-President, Supply Chain Group, in January 2002, Alan Kerr of Peregrine investigated the British Telecom transaction and determined that Highland "had got into BT and [the transaction] was not real and it was a wonder that Andy [Highland] could sell anything." The product was not commercially viable at that time. As a result, Peregrine refused to pay Highland any commission on the

1  transaction. Highland threatened to expose Peregrine's improper revenue recognition practices

2  unless he was paid. Subsequently, Highland brought suit against Peregrine in the United Kingdom

3  for unpaid commissions. This litigation has been settled between Peregrine and Highland.

4  **Quarters Were Kept Open**

5       215.   Peregrine engaged in other improper accounting practices in order to maintain the

6  appearance of revenue growth. This included holding the books open for the Company's

7  reporting quarters well past the end of the fiscal period, sometimes for as long as seven (7) days.

8  This occurred on a regular basis throughout the Class Period.

9       216.   In its restatement, Peregrine admitted that quarters were being kept open. In this

10  regard, Peregrine stated:

11              In addition, Peregrine previously recorded numerous
transactions as revenue in a given period, although the sales order

12  was not completed until after the end of the fiscal period. Revenue
has been restated to record these transactions in the proper periods.

13

14       217.   A former member of the Alliance Group recalls the quarters being kept open as

15  follows:

16              Starting in 1999, Spitzer would tell me each quarter that if I had
any outstanding deals pending, that I had a few extra days after the

17  month's end in the quarter to process them – other Alliance
managers were told the same thing.

18              Also, in 1999, it was routine at the end of a quarter to see John

19  Moores, who had an office next door to our offices roam the halls
of our building with Farley and Powanda. Moores and the others

20  wanted to know how the quarter ended.

21       218.   A former Director of the Alliance Group stated that there were repeated

22  occurrences where "we were not at the number for the quarter by the end of the month and then

23  mysteriously we would hear that we had made the quarter. Quarters were held open as a practice

24  each and every quarter over my six and one-half year tenure with the company ranging from 2-5

25  days after the calender end of the quarter. It was an ongoing joke in the company and was

26  referred to as being the 34th or 35th of the month. It got worse quarter by quarter after 2000 when

27  the prevailing attitude in the company was that we had to make our quarters at all costs."

28  //

219.     One former employee of Peregrine, who worked in sales at the ICW Group, recalled the quarters being kept open as follows:

> I can recall specifically by e-mail and through verbal directives coming from Bill Moore, Doug Powanda and Maree Chung, that we were going to keep the quarter open for 3 days, 4 days and sometimes 7 days specifically referring to each quarter ending in March 2000, June 2000, September 2000 and December 2000. The relayed intent was to bring in more sales so that the company could meet its earnings targets for the previous quarter. . .

220.     Another former employee, who also worked in sales, recalled the quarters being kept open as follows:

> Leaving the quarter open happened on a regular basis . . . it was almost on a 'wink-wink' basis.  It was standard operating procedure.  My earliest recollection was in 2001.  The quarter would stay open if we had not made our number or if we were close to making our number – I remember that quarters were left open from 2001 until when I left the company . . .
>
> I remember specifically at the end of the fiscal year 2001, March 2001 that Andy Cahill, a senior sales manager, wandered into Inside Sales – he knew and understood that we were still working on deals for the quarter when the quarter should have been closed.  It was also my knowledge that VP, Sales, Bill Moore and Ken Mellett also both knew about this practice.

221.     By holding open the quarters, Peregrine added additional sales into the affected periods and thereby artificially inflated the Company's reported revenue in order to meet publicly announced revenue goals set by Peregrine management.  This practice – of keeping the quarters open – was widely known at Peregrine.  Instructions to hold quarters open so as to allow the Company to make revenue goals were given to employees in the sales department through verbal directives as well as by e-mail.

**Improper Balance Sheet Accounting**

222.     Due to Peregrine's practice of improperly booking revenue on contingent sales agreements, the Company accumulated millions of dollars in accounts receivable which Defendants knew could not be collected.  This in turn resulted in increasingly large figures for Peregrine's "days sales outstanding" ( "DSO") figures.  DSO is an analytical tool used by financial analysts and investors to assess the quality of a company's receivables, as well as its revenue.  DSO represents the average number of days which a company takes to collect on its accounts

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)                                             -75-

1  receivable. Defendants engaged a scheme to conceal the increasing difficulties in the collection of

2  Peregrine's accounts receivable by manipulating DSO.

3       223.   In order to reduce the Company's DSO figures and its reported accounts

4  receivable, Defendant Gless, after consultation with defendant Gardner, instructed Ilse Cappel,

5  Peregrine's Senior Treasury Manager, to remove receivables from the Company's balance sheet

6  by "selling" them to banks at the end of each quarter. Cappel thus calculated the dollar amount of

7  receivables that had to be "sold" to banks to reach a target range set by Gardner and Gless for the

8  DSO, and "sold" the requisite amount for cash. The receivables were then removed from

9  Peregrine's balance sheet. This practice was not disclosed in Peregrine's public statements, and

10  created the illusion that Peregrine's customers were paying on a more timely basis than they

11  actually were. This scheme also helped conceal the existence of the contingent sales which were

12  being entered into by Peregrine throughout the Class Period.

13       224.   Toward the end of the quarter ending June 30, 1999, Peregrine had "sold" all

14  available accounts receivable but still had not reached its targeted DSO. Cappel, defendant Gless

15  and other Peregrine personnel prepared invoices for transactions, which had not yet closed, in the

16  total amount of $12 million, and then sold them to banks as receivables. When some of the

17  contracts ultimately did not close, Peregrine was left with a shortfall of several million dollars.

18       225.   In June 2001, Cappel told Gless that Peregrine would miss the targeted DSO

19  number for the quarter. With Gless's approval, Cappel created a false invoice in the amount of

20  $19.58 million and sold it to a bank. Peregrine's cash flow was thereby overstated and its

21  accounts receivable were understated on its books and records.

22       226.   Peregrine also distorted and falsified its DSO and balance sheet by improperly

23  accounting for cash collected from its customers. Peregrine had an agreement with its banks that

24  the Company would collect on receivables that it "sold" to the banks, and remit payment to the

25  banks within a certain time period. Peregrine had a practice of reducing its accounts receivable

26  when it "sold" the accounts to a bank while still retaining the monies from the collections on these

27  accounts until such time as it had to pay them to its banks. When the money was collected by

28  //

Peregrine from the customers whose receivables had been "sold" to banks, Cappel would again reduce the Company's accounts receivable, thus resulting in what Cappel called a "double dip."

227.    Peregrine also failed to include its liability to the bank for these "sales" on its accounts payable and it would record the cash received for the benefit of the banks as its own instead of holding it in trust as required. Peregrine would then remit the payments to the banks in the next quarter and reverse the "double dip" entries. These "double dips" occurred almost every quarter during the Class Period beginning in September 1999. The double dips resulted in artificially reduced account receivables and also in an artificial increase in Peregrine's reported cash.

228.    For example, on December 11, 2001, a Peregrine customer made an early payment of $13.8 million on a receivable which Peregrine had sold to a bank. The customer's payment was not due until February 13, 2002. Peregrine's contract required it to receive and hold payments on receivables in trust and to remit them within two weeks. Instead, Peregrine did neither. As a result, its accounts receivable for the quarter were understated by $13.8 million as was its liability to the bank.

229.    Peregrine's transactions with its banks as alleged above did not constitute a "sale" of the receivables. Rather, these transactions were nothing more than borrowings from the banks. Throughout the Class Period, Peregrine routinely borrowed money from financial institutions and treated the funds received as proceeds from the sale of assets as opposed to borrowings as required by GAAP. The amount of the undisclosed liabilities reached up to $180 million during the Class Period and exceeded $100 million by the end of the Class Period. The effect of this accounting irregularity was to understate Peregrine's liabilities significantly.

230.    In its restatement, Peregrine admitted that "these factoring arrangements should have been recorded as loans instead of sales of receivables." Accordingly, Peregrine restated its balance sheet to reflect the accounts receivable and related bank loans. As of March 31, 2000 and 2001, the undisclosed liability of the Company on these loans was approximately $90 million and $180 million, respectively.

//

## Concealment Of The Write-Off Of Receivables

231.    Peregrine also violated GAAP by including the write-off of receivables in the expense category of "Acquisition costs and other," and in other accounts.  For example, Peregrine did so with respect to a $3 million receivable of Barnhill as of March 31, 2000 as specifically alleged above.  In its June 6, 2002 letter to the SEC, KPMG stated that they had advised Peregrine "and its audit committee that the classification of the write-offs of accounts receivable or revenue reversals recorded as an "'Acquisition costs and other' expense in [Peregrine's] statement of operations was not in accordance with generally accepted accounting principles."

232.    As admitted by Peregrine in its restatement, "[m]any accounts receivable balances arising from improperly recorded revenue transactions . . . were inappropriately charged to bad debt expense, cost of acquisitions or accrued liabilities.  The restated results reflect those transactions as reductions in previously reported revenue."

## Understatement Of Stock Option Compensation

233.    Peregrine also understated by approximately $100 million the represented value of stock option compensation.  In its restatement, Peregrine admitted to its improper accounting for stock option compensation and therefore restated its financial statements with respect to stock option accounting.  In its restatement, Peregrine states:

> Based on Peregrine's past practice, many employee stock options contained exercise prices that were below the common stock market values on the dates the options were granted. Under APB Opinion No. 25, the Company should have recorded compensation cost equal to the aggregate difference between the fair value of the stock and the exercise price of the options granted. The Company also accelerated the vesting periods for certain options which had previously been granted to employees. Under FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation, an Interpretation of APB Opinion No. 25" ("FIN 44"), the acceleration of vesting of stock options after June 30, 2000 could cause an accounting charge for the affected options. The consolidated financial statements, as restated, now reflect the appropriate accounting for stock options.

//

//

//

## PEREGRINE'S FAILURE TO IMPLEMENT AND
## MAINTAIN ADEQUATE INTERNAL ACCOUNTING CONTROLS

234.   All defendants knew or recklessly disregarded, throughout the Class Period, that Peregrine was experiencing pervasive deficiencies in its internal accounting controls and that the financial information generated for inclusion in Peregrine's financial statements was grossly inaccurate and unreliable.

235.   The Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §78m(b)(2), was enacted on the principle that accurate record-keeping is an essential ingredient in promoting management responsibility and is an affirmative requirement for publicly held American corporations to strengthen the accuracy of corporate books and records, which are "the bedrock elements of our system of corporate disclosure and accountability." Remarks of Senator Harrison Williams, 123 Cong. Rec. 519, 400 (Daily Edition Dec. 6, 1977), quoted in D. Goelzer, "The Accounting Provisions of the FCPA – The Federalization of Corporate Recordkeeping and Internal Control," 5 J. Corp. L. 1 (1979). The representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management.

236.   Pursuant to the FCPA, every issuer having a class of securities registered pursuant to §12 of the Exchange Act, 15 U.S.C. §78l, shall:

a.   Make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.   Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

(1)   transactions are executed in accordance with management's general or specific authorization;

(2)   transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;

(3)   access to assets is permitted only in accordance with management's general or specific authorization; and

(4)     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

237.    Moreover, SEC Rule 13b-2, promulgated pursuant to the FCPA, was enacted to (1) assure that an issuer's books and records accurately and fairly reflect its transactions and the disposition of assets, (2) protect the integrity of the independent audit of issuer financial statements that are required under the Exchange Act, and (3) promote the reliability and completeness of financial information that issuers are required to file with the Commission or disseminate to investors pursuant to the Exchange Act.

238.    To comply with the FCPA, GAAP and SEC rules, and to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a public company is required to establish and maintain adequate internal financial and accounting controls. Contrary to the requirements of the FCPA, GAAP and SEC rules, the Peregrine Defendants failed to implement and maintain adequate internal accounting and financial controls and the Arthur Andersen Defendants had knowledge of such deficiencies.  The indicia of the lack of internal accounting controls at Peregrine included the following:

a.      the use of oral and written "side agreements" providing for nonpayment by customers;

b.      the absence of formal minutes from any meetings of the Audit Committee;

c.      substantial delays in providing, or inability to provide, information such as trial balances, general ledgers and subledgers that would customarily be readily available from a company's accounting systems;

d.      the presentation of manually prepared schedules when such information would customarily be readily available from computerized accounting systems;

e.      the inability to quantify the amount of sales to resellers during particular accounting periods;

f.      the inability to provide a list of resellers used during particular accounting periods;

//

1    g.    the existence of numerous, significant manual adjustments to software

2  license and maintenance revenue;

3    h.    the preparation of the registrant's fiscal 2001 tax provision based upon *pro*

4  *forma* earnings rather than earnings computed in accordance with Generally Accepted Accounting

5  Principles; and

6    i.    the failure to record the tax deferred effects for accruals recorded in

7  Peregrine's various business combinations.

8    239.    The Company's lack of adequate internal controls or a properly functioning Audit

9  Committee of the Board of Directors, combined with the tremendous pressure placed on the

10  Company's employees and its Board of Directors to increase dramatically reported revenue,

11  created an environment that encouraged the type of accounting irregularities that Peregrine now

12  admits caused the material overstatement of Peregrine's financial results during the Class Period.

13  The Company's lack of adequate internal accounting controls constituted a "red flag" for both the

14  Peregrine Defendants and the Arthur Andersen Defendants.

15    **ARTHUR ANDERSEN'S PARTICIPATION IN THE FRAUD**

16    240.    The Arthur Andersen Defendants boasted of their expertise in the software

17  industry when they solicited the business of Peregrine.  In their February 1996 proposal letter to

18  Peregrine, the Arthur Andersen Defendants wrote:

19    Our people understand the business, accounting and tax issues that
    impact emerging companies and will provide proactive creative
20    solutions.  We pride ourselves on being similar to the clients we
    serve – entrepreneurial, hands on, highly motivated and accessible.
21

22    241.    At that time, the Arthur Andersen Defendants also touted their diligence in

23  performing audit services for their clients:

24    Although it is believed that every accounting firm can perform an
    audit, the value a client receives as part of that process varies
25    widely.  We believe the difference between firms lies in the
    approach, commitment, concern and competence of those
26    individuals who perform the audit.  <u>We audit the business, not just
    the financial statements</u>  Accordingly, we will devote significant
27    time to planning, analyzing audit and business risks, supervising and
    reviewing the audit team's work.

28

---

242. The Arthur Andersen Defendants also noted that their commitment to learning the "business operations and controls" of the company and maintaining a continuous dialogue with management throughout the year and not just during the audit. They stated:

> We add value beyond the frame of the primary services we are providing. We strive to understand the operational and financial issues that are important to your success and help you address those matters, as well as anticipate new issues. <u>Our inquiries of your business operations and controls will extend beyond the accounting and finance functions and include sales and marketing, customer service, software development, administration and organization and information systems.</u> Accordingly, we anticipate maintaining a continuous dialog with Peregrine throughout the year, not just at audit time. In short, we want to be a partner of Peregrine throughout the year so that the year-end audit is a non-event, with no last minute "surprises" or unanticipated accounting adjustments.

243. Based on these representations, Peregrine retained the services of Arthur Andersen in July 1996.

244. Arthur Andersen was engaged by Peregrine to provide independent auditing and accounting services throughout the Class Period. Arthur Andersen's San Diego office was engaged to examine and issue opinions on Peregrine's fiscal 2000 and 2001 year-end financial statements and to perform review services with respect to Peregrine's interim results in fiscal years 2000, 2001 and the first three quarters of fiscal year 2002. Defendant Stulac was the engagement or concurring audit partner for Arthur Andersen for the Peregrine engagements. Arthur Andersen and Stulac utilized the services of Andersen Worldwide in the course of Peregrine engagements. In its audit opinions, Arthur Andersen falsely represented that Peregrine's financial statements for fiscal years 2000 and 2001 were presented in accordance with GAAP and that Arthur Andersen's audits had been performed in accordance with GAAS.

245. Arthur Andersen also consented to the use of its false audit opinions on Peregrine's fiscal years 2000 and 2001 financial statements in Peregrine's annual reports on Form 10-K for those years and in Peregrine's registration statements on Forms S-3, S-4 and S-8, which were filed with the SEC during the Class Period. Arthur Andersen's issuance of materially false audit opinions on Peregrine's fiscal 2000 and 2001 financial statements and Arthur Andersen's failure to //

1   require revision of Peregrine's false interim financial statements in 2000, 2001 and 2002 filed with

2   the SEC was in violation of GAAS.

3       246.   The Arthur Andersen Defendants knew or recklessly disregarded that Peregrine's

4   financial statements were false and prepared in violation of GAAP.  Among other things, the

5   Arthur Andersen Defendants knew, or recklessly disregarded (1) that Peregrine had improperly

6   recorded over $500 million in revenues; (2) that the Company's liabilities had been understated by

7   up to $180 million; (3) that the Company's option compensation was understated by $100 million

8   during the Class Period; (4) that the Company's reported accounts receivable were consistently

9   understated by a material amount during the Class Period; (5) that the Company's reported cash

10  position was materially overstated during the Class Period; (6) that the Company's liabilities were

11  materially understated throughout the Class Period; and (7) that the Company failed to disclose

12  adequately the nature of and the revenue recognized from product/service swaps which it entered

13  into.

14      247.   The Arthur Andersen Defendants knew that the Company had material weaknesses

15  in its internal accounting control structure such that no reliance could be placed on the Company's

16  financial reporting system.  For example, the Arthur Andersen Defendants knew that the

17  Company's Audit Committee was not functioning.  Similarly, the Arthur Andersen Defendants

18  knew of and approved the revenue recognition practices engaged in by Peregrine.  In fact, the

19  Arthur Andersen Defendants were routinely consulted by defendant Gless regarding how to

20  structure transactions with customers so as to permit current revenue recognition.  The Arthur

21  Andersen Defendants also knew about and approved the failure of the Company to treat

22  transactions with financial institutions as borrowings as opposed to sales, as Peregrine was doing.

23  The Arthur Andersen Defendants also knew of and approved the massive understatement of stock

24  option compensation expense.  The Arthur Andersen Defendants also knew of the complete and

25  utter breakdown of the Company's internal accounting controls which, in light of the Company's

26  tremendous growth, was a blatant "red flag" that the Arthur Andersen Defendants chose to ignore

27  because of, among other things, its lack of independence from Peregrine and the pressure put on

28  Arthur Andersen partners by its management to increase revenue.

248.    The Arthur Andersen Defendants falsely endorsed the propriety of Peregrine's financial statements because Arthur Andersen desired to retain Peregrine as a client, to continue generating substantial fees from its engagement and to secure additional business from Peregrine, including lucrative consulting business.  The partners responsible for the Peregrine engagement were particularly motivated to participate in the wrongdoing alleged herein because their incomes were directly tied to the fees generated from Peregrine .  In addition, the Arthur Andersen Defendants lacked independence because certain senior executives of Peregrine, such as Joseph G. Reichner, Louis Blatt, Gary Lenz, Thomas Smith and a member of the Audit Committee, defendant Watrous, were former members of Arthur Andersen or its affiliates.

249.    The lack of Arthur Andersen Defendants' independence from Peregrine is demonstrated by the detailed background statement on Joseph G. Reichner, a former Arthur Andersen partner, a former Board member of defendant Andersen Worldwide and a former Senior Vice President of Peregrine, set forth in a press release announcing Reichner's employment with UBmatrix.  In pertinent part, the press release reads as follows:

Mr. Reichner spent 31 years with Arthur Andersen starting his career in the Audit and Business Risk practice for the first eleven years and then was admitted to the Worldwide Partnership to develop a new consulting practice offering for a worldwide rollout. He then built another new practice around improving large company's go-to-market strategies, organizational structures and performance measures.  Reichner was one of 12 partners appointed to a "Change Management Task Force" selected by Andersen's CEO to reorganize the Firm into two Business Units, Arthur Andersen and Andersen Consulting.  Joe was elected to the Worldwide Board of Partners of Andersen Worldwide and put in charge of the second largest but fourth most profitable region in the U.S. for all of Arthur Andersen's business units.  He improved growth and profitability to #1 in the U.S.  Joe next went on to be the Managing Partner Industry Verticals and Specialty Consulting Practices.  While in that role he created Arthur Andersen's Business Consulting Unit and the Economic and Financial Consulting Unit where he built those Units from $100 million to over $2 Billion in less than 5 years.

After retiring from Andersen in 2000, he was recruited by Peregrine Systems, Inc. to be Senior Vice President Alliances, Verticals and Business Development.  In that role he developed programs that generated or influenced over 50% of worldwide revenue.  Joe also created and was President of a new business, Peregrine Financial

//

1      Management to expand the B to B enablement business offerings
       into the e-Finance marketplace and was serving as COO of the
2      Integrated Solutions Group.

3      250.   With respect to Peregrine's audited financial statements for 2000, Arthur Andersen

4    represented, in its audit opinion dated April 25, 2000, the following:

5      REPORT OF INDEPENDENT ACCOUNTANTS

6      To Peregrine Systems, Inc.:

7            We have audited the accompanying consolidated balance
       sheets of Peregrine Systems, Inc. (a Delaware corporation) and
8      subsidiaries as of March 31, 2000 and 1999, and the related
       consolidated statements of operations, stockholders' equity (deficit)
9      and cash flows for each of the three years in the period ended
       March 31, 2000. These consolidated financial statements and the
10     schedule referred to below are the responsibility of the Company's
       management. Our responsibility is to express an opinion on these
11     consolidated financial statements and the schedule based on our
       audits.
12
             We conducted our audits in accordance with auditing
13     standards generally accepted in the United States. Those standards
       require that we plan and perform the audit to obtain reasonable
14     assurance about whether the financial statements are free of
       material misstatement. An audit includes examining, on a test basis,
15     evidence supporting the amounts and disclosures in the financial
       statements. An audit also includes assessing the accounting
16     principles used and significant estimates made by management, as
       well as evaluating the overall financial statement presentation. We
17     believe that our audits provide a reasonable basis for our opinion.

18           In our opinion, the financial statements referred to above
       present fairly, in all material respects, the financial position of
19     Peregrine Systems, Inc. and subsidiaries as of March 31, 2000 and
       1999, and the results of their operations and their cash flows for
20     each of the three years in the period ended March 31, 2000 in
       conformity with accounting principles generally accepted in the
21     United States.

22           Our audits were made for the purpose of forming an opinion
       on the basic financial statements taken as a whole. The schedule
23     listed in the index to the consolidated financial statements is
       presented for purposes of complying with the Securities and
24     Exchange Commission's rules and is not part of the basic
       consolidated financial statements. The schedule has been subjected
25     to the auditing procedures applied in the audits of the basic
       consolidated financial statements and, in our opinion, fairly states,
26     in all material respects, the financial data required to be set forth
       therein in relation to the basic financial statements taken as a whole.

27

28   //

---

251.   With respect to Peregrine's audited financial statements for 2001, Arthur Andersen represented, in its audit opinion dated April 26, 2001, the following:

### REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Stockholders of Peregrine Systems, Inc.:

We have audited the accompanying consolidated balance sheets of Peregrine Systems, Inc. (a Delaware corporation) and subsidiaries as of March 31, 2001 and 2000, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended March 31, 2001. These consolidated financial statements and the schedule referred to below are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and the schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Peregrine Systems, Inc. and subsidiaries as of March 31, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2001 in conformity with accounting principles generally accepted in the United States.

Our audits were made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The schedule listed in the index to the consolidated financial statements is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated financial statements. The schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, fairly states, in all material respects, the financial data required to be set forth therein in relation to the basic consolidated financial statements taken as a whole.

/s/ Arthur Andersen LLP

//

//

252.    The foregoing audit opinions were materially false and misleading due to the Arthur Andersen Defendants' failure to comply with GAAS and due to the fact that the Arthur Andersen Defendants knew or recklessly disregarded that Peregrine's financial statements were not prepared in conformity with GAAP, causing Arthur Andersen's reports to be in violation of GAAS and SEC rules.  The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting . . . Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.

SEC Accounting Series Release No. 296.  The Arthur Andersen Defendants did not meaningfully perform its audit function with regard to Peregrine.

253.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of auditors in performing and reporting on audit engagements.  Statements on Auditing Standards are recognized by the AICPA as the interpretation of GAAS.

254.    Arthur Andersen's representations concerning Peregrine's fiscal 2000 and 2001 financial statements were materially false and misleading when made, because the Arthur Andersen Defendants knew that those financial statements were not prepared in accordance with GAAP nor had the Arthur Andersen Defendants conducted its audits in accordance with GAAS. The Arthur Andersen Defendants knew that Arthur Andersen's reports would be relied upon by potential investors in Peregrine securities.  Moreover, the Arthur Andersen Defendants' failure to require Peregrine to revise its false interim financial reports was a violation of GAAS due to the Arthur Andersen Defendants' knowledge of factors indicating Peregrine's deviation from GAAP in the presentation of its interim results for each of the quarterly periods in 2000, 2001 and for the first three quarters of fiscal 2002.  As to the published interim financial results, which it reviewed and approved, the Arthur Andersen Defendants also knew that such results would be relied upon by potential investors in Peregrine securities.

//

255.    Under GAAS, as set forth in AICPA AU §326, Evidential Matter, the auditor is required to obtain sufficient, competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU §326.01.  When an auditor believes that financial statements contain material departures from GAAP, the auditor should express a qualified or adverse opinion.  *See* AU §508.20, §508.35-.60.

256.    In violation of GAAS and contrary to the representations in its opinions on Peregrine's fiscal 2000 and 2001 financial statements, the Arthur Andersen Defendants did not obtain sufficient competent evidential matter to support Peregrine's assertions regarding its financial statements for fiscal 2000 and 2001 and failed to modify its reports to express a qualified or adverse opinion.  In fact, the Arthur Andersen Defendants were aware of several factors which contradicted or gave rise to serious questions regarding Peregrine's internal accounting controls:

a.     Peregrine had weak and/or non-existent internal accounting controls and thus no ability to generate reliable financial statements under GAAP;

b.     The absence of any minutes of the Audit Committee;

c.     The existence of numerous significant manual adjustments to software license and maintenance revenue;

d.     The failure to record the deferred tax effects for accruals recorded in Peregrine's various business combinations;

e.     The inability to quantify the amount of sales to resellers (and their identity) during particular accounting periods;

f.     Substantial delays in providing, or an inability to provide, information such as trial balances, general ledgers and subledgers that would customarily be readily available from a company's accounting systems; and

g.     Peregrine did not have a functioning Audit Committee.

257.    In addition, the Arthur Andersen Defendants violated AU Section 316 concerning Consideration of Fraud in a Financial Statement Audit and AU Section 317, Illegal Acts by Clients by failing to expand its audit procedures in the face of these numerous "red flags"

1 | concerning the reliability of Peregrine's financial statements. AU 316 requires that the auditor
2 | plan and perform an audit to obtain reasonable assurance about whether the financial statements
3 | are free of material misstatement, whether caused by error or fraud. AU 317 requires the auditor
4 | to give consideration to the possibility of illegal acts by a client in an audit of financial statements.
5 | For the reasons alleged above, in conducting its audits of Peregrine's fiscal 2000 and 2001
6 | financial statements, the Arthur Andersen Defendants knew or recklessly disregarded facts and
7 | circumstances which showed Peregrine and its senior management was committing a fraud and/or
8 | committing illegal acts which rendered the financial statements unreliable and materially misstated.

9 |      258. In November 1998, the AICPA circulated to public accounting firms Practice Alert
10 | 98-3 entitled "Revenue Recognition Issues." The Practice Alert identified various issues which
11 | required "special consideration" by auditors. Among the issues identified were the following:

12 |        - Significant sales or volume of sales that are recorded at or near the end of
13 |          the reporting period.
14 |        - Unusual volume of sales to distributors/resellers.
15 |        - Barter transactions.
16 |        - The existence of "side agreements."

17 | Each of these conditions existed at Peregrine during the Class Period and required the Arthur
18 | Andersen Defendants to employ heightened scrutiny.

19 |      259. The Practice Alert also put auditors on notice that a "company constantly
20 | increasing sales that 'always meets or exceeds' budgeted sales targets and that result in the 'build
21 | up' of accounts receivable may warrant extra attention. When a substantial portion of the
22 | company's sales occur at the end of the accounting period, extra caution in auditing revenue
23 | transactions is appropriate." Despite notice of specific types of problems which could (and were
24 | occurring) at Peregrine, the Arthur Andersen Defendants knowingly or with deliberate
25 | recklessness failed to employ "extra caution," "extra attention" or "special consideration" as
26 | dictated by the facts and circumstance of the Peregrine engagements.

27 |      260. Given these factors, the Arthur Andersen Defendants knew or recklessly
28 | disregarded that Peregrine's audited financial statements for fiscal years 2000 and 2001 were

---

misstated and Arthur Andersen should have modified its reports to be adverse or withdrawn from the engagement. Similarly, the Arthur Andersen Defendants knew or recklessly disregarded that Peregrine's unaudited interim financial statements for each of the reporting quarters of 2000, 2001 and the first three quarters of 2002 were misstated and not prepared in accordance with GAAP. However, in order to keep Peregrine as a client and continue to generate lucrative consulting business from Peregrine, Arthur Andersen issued unqualified opinions on April 25, 2000 and April 26, 2001, falsely representing that Peregrine's audited financial statements were presented in conformity with GAAP and that Arthur Andersen's audits had been conducted in conformity with GAAS.

261.    Peregrine and Arthur Andersen have since admitted that Peregrine's fiscal 2000 and 2001 audited financial statements as well as Peregrine's interim financial results for fiscal years 2000, 2001 and the first three quarters of fiscal 2002 cannot be relied on.

## ARTHUR ANDERSEN'S FAILURE TO REQUIRE REVISIONS OF PEREGRINE'S INTERIM FINANCIAL RESULTS

262.    The Arthur Andersen Defendants had a duty under GAAS to insist on revision of Peregrine's false interim financial reports for fiscal years 2000 and 2001 and the first three quarters of fiscal 2002 when they became aware that the results were misstated. The Arthur Andersen Defendants knowingly participated in Peregrine's false financial reporting by its failure to require such revisions on a timely basis, which was in violation of GAAS.

263.    The Arthur Andersen Defendants reviewed and approved of each of the financial statements reflecting Peregrine's interim quarterly results which were issued during the Class Period. As to the interim results for the quarters in fiscal 2001 and 2002, SEC Rule 10-01 of Regulation S-X, 17 CFR §210.10-01(d) required the Arthur Andersen Defendants to review Peregrine's interim financial information prior to the Company filing its quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews, as established by GAAS.

//

//

---

264.    GAAS, as set forth in AU §§722.20-.22 states:

.20    As a result of performing the services described in paragraph .05, the accountant may become aware of matters that cause him or her to believe that interim financial information, filed or to be filed with a specified regulatory agency, is probably materially misstated as a result of a departure from generally accepted accounting principles. In such circumstances, the accountant should discuss the matters with the appropriate level of management as soon as practicable.

.21    If, in the accountant's judgment, management does not respond appropriately to the accountant's communication within a reasonable period of time, the accountant should inform the audit committee, or others with equivalent authority and responsibility (hereafter referred to as the audit committee), of the matters as soon as practicable. This communication may be oral or written. If information is communicated orally, the accountant should document the communication in appropriate memoranda or notations in the working papers.

.22    If, in the accountant's judgment, the audit committee does not respond appropriately to the accountant's communication within a reasonable period of time, the accountant should evaluate (a) whether to resign from the engagement related to interim financial information, and (b) whether to remain as the entity's auditor or stand for reelection to audit the entity's financial statements. The accountant may wish to consult with his or her attorney when making these evaluations.

265.    Due to the Arthur Andersen Defendants' knowledge of Peregrine's internal control structure obtained from auditing procedures performed during Peregrine's audits, and from its other work performed for Peregrine, as well as the Arthur Andersen Defendants' frequent contacts with Peregrine personnel, the Arthur Andersen Defendants knew or recklessly disregarded that Peregrine was falsely reporting its results in the Company's interim financial statements during fiscal years 2000 and 2001 and the first three quarters of fiscal year 2002. Statement on Auditing Standards No. 71, Interim Financial Information(AU§722), sets forth the professional standards and guidance for conducting interim reviews.  Among the analytical review procedures to be implemented, based on the auditor's knowledge of financial reporting practices and significant accounting matters, are: (i) inquiries concerning internal controls; (ii) analytical review procedures; and (iii) reading the interim financial information for conformity with GAAP. Based on the foregoing, the Arthur Andersen Defendants knew, or was deliberately reckless in not knowing, of Peregrine's misstated interim financial results for fiscal years 2000 and 2001 and

1  the first three quarters of fiscal year 2002, and failed to insist on revision of the false interim

2  financial statements.

3    266.    Based on Arthur Andersen's false audit opinions and the failure to qualify and/or

4  modify its reports to identify Peregrine's false financial reporting, the Arthur Andersen Defendants

5  violated the following GAAS standards, among others:

6    a.    The second general standard which requires that the auditors should

7  maintain an independence in mental attitude in all matters relating to the engagement;

8    b.    The third general standard which requires that due professional care is to

9  be exercised in the performance of the audit and preparation of the report;

10    c.    The first standard of field work which requires that the audit is to be

11  adequately planned and that assistants should be properly supervised;

12    d.    The second standard of field work which requires that the auditor should

13  obtain a sufficient understanding of internal controls so as to plan the audit and determine the

14  nature, timing and extent of tests to be performed;

15    e.    The third standard of field work which requires that sufficient competent

16  evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial

17  statements under audit; and

18    f.    The third standard of reporting which requires that informative disclosures

19  are regarded as reasonably adequate unless otherwise stated in the report.

20  ## GAAP VIOLATIONS

21    267.    SEC Regulation S-X (17 C.F.R. §210.4-01(a) (1)) provides that financial

22  statements filed with the SEC which are not prepared in compliance with GAAP are presumed to

23  be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that

24  interim financial statements must also comply with GAAP, with the exception that interim

25  financial statements need not include disclosure which would be duplicative of disclosures

26  accompanying annual financial statements.  17 C.F.R. §210.10-01(a).  The responsibility for

27  preparing financial statements that conform to GAAP rests with corporate management as set

28  forth in Section 110.03 of the AICPA Professional Standards:

---

The financial statements are managements responsibility. . . Management is responsible *for adopting sound accounting policies and for establishing and maintaining internal control* that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . .Thus, the fair presentation of financial statements in conformity with [GAAP) is an implicit and integral part of managements responsibility.

268.     Pursuant to these requirements, Peregrine represented in its annual reports on Form 10-K and quarterly reports on Forms 10-Q filed with the SEC during the Class Period (as detailed below), that its financial results were presented appropriately, in accordance with GAAP, in substantially these terms:

Revenues from direct and indirect license agreements are recognized, provided that all of the following conditions are met: a noncancellable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

269.     Contrary to these representations, Peregrine inflated its revenues and net income during the Class Period by improperly recognizing revenue on the types of transactions set forth above. AICPA Statement of Position ("SOP") 97-2, entitled <u>Software Revenue Recognition</u> which governs the accounting for the product license sales by Peregrine during the Class Period, sets forth the criteria under which a software vendor is permitted to recognize revenue derived from software license agreements. Specifically, ¶ .08 of SOP 97-2 precludes recognition of revenue from license sales, where the contract "does not require significant production, modification, or customization of software", unless all of the following criteria are met:

--Persuasive evidence of an arrangement exists.

--Delivery has occurred.

--The vendor's fee is fixed or determinable.

--Collectability is probable (<u>i.e.</u> is likely to occur).

270.     Each of these requirements for revenue recognition must be met regardless of whether the software is sold directly to the end-user, or through a reseller. For example, ¶ .18 of

this SOP expressly provides that the delivery requirement "applies whether the customer is a user or a reseller." Further, SOP 97-2 expressly precludes recognition of revenue from product license sales to resellers where the fee is not fixed and determinable, or collectability is not likely to occur. In such circumstances, the sale to the reseller is not final but, in reality, is contingent upon the reseller's subsequent sale of the product to the end-user.

271.   Thus, ¶ .30 of SOP 97-2 requires consideration of the following factors, among others, to evaluate whether product license sales to resellers are legitimate, final sales, and recognition of revenue from the agreement is appropriate:

> i.   Business practices, the reseller's operating history, competitive pressures, informal communications, or other factors indicate that payment is substantially contingent on the reseller's success in distributing individual units of the product.
>
> ii.   Resellers are new, undercapitalized, or in financial difficulty and may not demonstrate an ability to honor a commitment to make fixed or determinable payments until they collect cash from their customers.
>
> iii.   Uncertainties about the potential number of copies to be sold by the reseller may indicate that the amount of future returns cannot be reasonably estimated on delivery; examples of such factors include the newness of the product or marketing channel, competitive products, or dependence on the market potential of another product offered (or anticipated to be offered) by the reseller.
>
> iv.   Distribution arrangements with resellers require the vendor to rebate or credit a portion of the original fee if the vendor subsequently reduces its price for a product and the reseller still has rights with respect to that product (sometimes referred to as price protection) . . .

272.   As detailed above, defendants knowingly or with deliberate recklessness caused Peregrine to recognize revenue from sales to both resellers and end-users where one or more conditions for proper recognition of revenue under GAAP were never met, including the following: (i) the product was never delivered to the purchaser; (ii) the purchaser's obligation to pay for the product was not fixed and determinable; (iii) collectability of the fee was not probable; or (iv) the reseller's obligation to pay for the product was contingent upon subsequent sale of the product to the end-user.

//

273.     Defendants sought to conceal these facts by entering into multiple agreements with respect to each product license sale: (i) a primary contract, which provided for the reseller to take delivery of the product, and providing no right of return; and (ii) a verbal or written side agreement designed to make the sale of the product contingent upon performance of additional obligations.

274.     The falsification of Peregrine's DSO resulted from Peregrine understating its accounts receivable in violation of the following GAAP principles including Statement of Financial Accounting Concepts ("Concepts Statement") No. 5, ¶83; Concepts Statement No. 2, ¶¶58-59; Concepts Statement No. 2, ¶¶95-97; and Concepts Statement No. 2, ¶79 as more fully described below.  Peregrine's overstatement of its reported cash position also violated the GAAP principles including Concepts Statement No. 2, ¶¶58-59, 79 and 95-97 as more fully described below.

275.     Further, Peregrine's ultimate disclosure that it would restate its previously reported financial results during the Class Period constitutes an admission that each of these statements, as included in the Company's press releases and Forms 10-K and 10-Q, were materially false and misleading when issued.  Indeed, under Statement of Financial Accounting Standards No. 16, Prior Period Adjustments, restatements are only permitted - - and are required - - for the correction of errors or fraudulent financial reporting.

276.     Peregrine's announced restatement confirms that the Company's financial results for fiscal years of 2000 and 2001 and for the first three quarters of Fiscal 2002 were materially false and misleading when disseminated.

277.     As a result of its accounting improprieties, defendants caused Peregrine's reported financial results to violate at least the following provisions of GAAP for which each defendant is necessarily responsible:

        a.     the principle that revenues must be realizable (collectible) and earned prior to recognition.  Statement of Financial Accounting Concepts ("Concepts Statement"), No. 5, ¶83.

//

//

1         b.     the principle that financial reporting should provide information that is

2 useful to present and potential investors and creditors and other users in making rational

3 investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

4         c.     the principle that financial reporting should be reliable in that it represents

5 what it purports to represent. That information should be reliable as well as relevant is a notion

6 that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

7         d.     the principle of completeness, which means that nothing is left out of the

8 information that may be necessary to ensure that it validly represents underlying events and

9 conditions (Concepts Statement No. 2, ¶79);

10         e.     the principle that conservatism be used as a prudent reaction to uncertainty

11 to try to ensure that uncertainties and risks inherent in business situations are adequately

12 considered. The best way to avoid injury to investors is to try to ensure that what is reported

13 represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97);

14         f.     GAAP's requirement of the disclosure of an existing condition, situation or

15 set of circumstances involving an uncertainty when there is at least a reasonable possibility that a

16 loss or an additional liability may have been incurred. (Statement of Financial Accounting

17 Standards No. 5 (Accounting for Contingencies.));

18         g.     the principle that financial reporting should provide information about an

19 enterprise's financial performance during a period. Investors and creditors often use information

20 about the past to help in assessing the prospects of an enterprise. Thus, although investment and

21 credit decisions reflect investors' expectations about future enterprise performance, those

22 expectations are commonly based at least partly on evaluations of past enterprise performance

23 (Concepts Statement No. 1, ¶42);

24         h.     the principle that financial reporting should provide information about how

25 management of an enterprise has discharged its stewardship responsibility to owners

26 (stockholders) for the use of enterprise resources entrusted to it. To the extent that management

27 offers common stock of the enterprise to the public, it voluntarily accepts wider responsibilities

28 //

1  for accountability to prospective investors and to the public in general.  (Concepts Statement No.

2  1, ¶50); and

3            i.        the principle that financial reporting should provide information about the

4  economic resources of an enterprise, the claims to those resources, and the effects of transactions,

5  events and circumstances that change resources and claims to those resources.  (Concepts

6  Statement No. 1, ¶40).

7        278.    The magnitude, duration and pervasiveness of the accounting manipulations

8  alleged herein, all of which violated the foregoing provisions of GAAP, compels the conclusion

9  that these methods were implemented by defendants knowingly, or that, at a minimum, defendants

10 were deliberately reckless in disregarding the overwhelming prevalence of the lack of adequate

11 internal controls which resulted in material falsifications in Peregrine's financial statements as

12 alleged herein.

13            **THE FALSE STATEMENTS**

14 **Q1 2000**

15      279.    On July 21, 1999, Peregrine issued a press release stating that Peregrine had

16 achieved "record" quarterly revenues of $51.6 million for the first quarter of fiscal year 2000

17 which ended on June 30, 1999 – a 137% increase in revenues over revenues reported in the

18 first fiscal quarter of the prior year.  Peregrine stated that "[o]verall results were driven by a 131

19 percent increase in license revenue over the comparable quarter in the prior year."  Defendant

20 Gardner was quoted in the release as saying: "We are extremely pleased with the outstanding

21 growth in both our software license sales and our professional services activity in the first fiscal

22 quarter . . ."

23      280.    The foregoing statements were materially false and misleading because Peregrine's

24 reported annual revenue was overstated by more than $120 million, its accounts receivable were

25 understated, its cash balances were overstated, its liabilities were understated by more than $90

26 million and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and

27 Paragraphs 62 through 278 above.

28 //

281.   The Peregrine Defendants (other than defendant Savoy) read and approved the issuance of Peregrine's July 21, 1999 false press release.  As part of its quarterly review work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing statement was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

282.   On July 21, 1999, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's first quarter results.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that it saw strength in its product lines, distribution channels and geographic regions, that international revenues had increased 195% or 47% of total reported revenue and that DSO finished the quarter at 76 days within Company expectations.

283.   On July 22, 1999, the brokerage firm CIBC World Markets ("CIBC") issued a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that:  "Peregrine saw strength across its product lines, distribution channels and geographies."  The report also stated that "International revenues soared an incredible 195% to make up 47% of the mix as Peregrine focused its attention on the world market" and that DSO finished the quarter at 76 days.  Relying on management's representations and Peregrine's publicly released financial results, CIBC raised its earnings estimates and rated Peregrine's stock a "strong buy."

284.   On July 22, 1999, First Union Capital Markets ("First Union") also issued a report on Peregrine based on the prior day's conference call with Peregrine management.  In its report, First Union repeated Peregrine's previously released financial results and raised its earnings estimates in reliance on Peregrine's publicly released financial results and management's representations.  As a result, First Union rated Peregrine a "buy" in its report dated July 22, 1999.

285.    In response to the information disseminated by the Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $15.34 per share on July 22, 1999.

286.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

287.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 62 through 99 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

288.    On July 26, 1999, defendant Moores sold 2,493,642 shares of Peregrine common stock and received gross proceeds of approximately $71,068,797 million.

289.    On July 26, 1999, defendant Gless sold 14,375 shares of Peregrine common stock and received gross proceeds of approximately $431,394.

290.    On August 13, 1999, the Company filed its Form 10-Q for Q1 2000 with the SEC.  The Form 10-Q reported Peregrine's false financial statements that were included in the July 21, 1999 press release.  Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief Accounting Officer.

291.    The 10-Q also contained the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

//

//

292. The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

293. The Peregrine Defendants (other than defendant Savoy) and the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q1 2000 with the SEC. Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the Form 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

294. Between August 4, 1999 and August 13, 1999, defendant Gardner sold 100,000 shares of Peregrine common stock and received gross proceeds of approximately $2,933,225.

295. On August 12, 1999, defendant Spitzer sold 27,500 shares of Peregrine common stock and received gross proceeds of approximately $866,250.

296. On August 16, 1999, defendant Powanda sold 16,250 shares of Peregrine common stock and received gross proceeds from $536,250.00.

297. Between August 17, 1999 and August 26, 1999, defendant Gless sold 11,250 shares of Peregrine common stock and received gross proceeds of approximately $383,750.

298. Between August 16, 1999 and August 31, 1999, defendant Nelson sold 87,500 shares of Peregrine common stock and received gross proceeds of approximately $2,919,870.

299. Between August 11 and August 25, 1999, defendant Luddy sold 9,474 shares of Peregrine common stock and received gross proceeds of approximately $307,616.

**Q2 2000**

300. On October 20, 1999, Peregrine issued a press release announcing that the Company had achieved "record" quarterly results for Q2 2000 (which ended on September 30, 1999). Peregrine stated that total revenues "increased 95 percent to a record $57.8 million" compared to revenue reported in the comparable prior year period. Peregrine credited a 121% increase in software license revenues over the prior year comparable period. Defendant Gardner was quoted as saying:

> We are delighted with our continued rapid growth and with the on-going development of customer demand for our end-to-end Infrastructure Management solutions. . . . This quarter marked a significant maturation of our alliances on a global basis, leading to both increased software license sales via alliances and a shift in some service revenue growth to some of our partners. . . .

301.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

302.    The Peregrine Defendants (other than defendant Savoy) read and approved the issuance of Peregrine's October 20, 1999 false press release.  As part of its quarterly review work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing press release was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

303.    On October 20, 1999, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's second quarter results.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that they continued to see strength for all of Peregrine's products in all geographical regions, that the Company was working on a number of very large orders which would have a material positive impact on future revenues and earnings and that the balance sheet had improved this quarter with $24.9 million in cash on hand.

304.    On October 21, 1999, CIBC issued and disseminated a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that the Company "executed flawlessly in the quarter with strength across all product lines and geographies."  Management was also reported as representing that there were a number of "mega deals" that

1  were likely to close and which would have a "material positive impact on the top-and-bottom line

2  in the quarter in which they close" and that there was improvement in the balance sheet.  Relying

3  on management's representations and Peregrine's publicly released financial results, CIBC

4  continued its "strong buy" rating.

5       305.  On October 21, 1999, First Union issued a report on Peregrine based the prior

6  day's conference call with Peregrine management.  In its report, First Union repeated Peregrine's

7  previously released financial results and noted management's statements concerning the "mega

8  deals," and that they were being described as between 20% to 25% of a quarter's revenue.  As a

9  result, First Union reiterated its assessment on Peregrine as a "strong buy" in its report dated

10  October 21, 1999.

11       306.  In response to the information disseminated by the Peregrine and the contents of

12  the analyst reports based on information provided by Peregrine management, Peregrine's stock

13  closed at $20.875 per share on October 22, 1999.

14       307.  The foregoing statements, as stated in the conference call and as repeated in the

15  research reports of securities analysts, were materially false and misleading because Peregrine's

16  reported revenue was materially overstated, its accounts receivable were understated, its cash

17  balances were overstated, its liabilities were understated and its DSO were understated for the

18  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

19       308.  The Management Defendants either knew or were deliberately reckless in not

20  knowing that the financial information provided to investors and securities analysts in the

21  foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21

22  through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that

23  securities analysts would rely on their materially false and misleading statements in writing their

24  research reports which would be publicly disseminated to the investing public.

25       309.  On  November 14, 1999, the Company filed its Form 10-Q for Q2 2000 with the

26  SEC.  It incorporated the financial statements that were included in the October 20, 1999 press

27  release.  Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and

28  Chief Financial Officer.

310.    The 10-Q also included the following statement on revenue recognition:

Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

311.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

312.    The Peregrine Defendants (other than defendant Savoy) and the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q2 2000 with the SEC. Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing Form 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

**Q3 2000**

313.    On January 20, 2000, Peregrine issued a press release announcing "record" quarterly results for Q3 2000 (which ended on December 31, 1999).  Peregrine stated that the Company had achieved total revenues of $67.5 million – a 67% increase compared with revenues reported in comparable prior year period.  Defendant Gardner was quoted as saying:

"[W]e had a number of large transactions and a remarkably strong surge of both interest and initial sales from our new Get.It! and Get.Resources! employee self service and e-procurement products. In addition, we exceeded our expectations for the launch of our new midrange solution, InfraCenter for Workgroups."

314.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

315.    The Peregrine Defendants (other than defendant Savoy) read and approved the issuance of Peregrine's January 20, 2000 press release.  As part of its quarterly review work, the

1  Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of

2  these defendants either knew or were deliberately reckless in not knowing that the financial

3  information contained in the foregoing press release was materially false and misleading for the

4  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

5       316.   On January 20, 2000, Peregrine management, led by defendant Gardner, held a

6  conference call with investors and securities analysts.  The purpose of the conference call was to

7  give Peregrine management the opportunity to discuss with investors the Company's quarterly

8  results.  During the conference call, Peregrine management reported on Peregrine's previously

9  released financial results for the quarter.  In addition, Peregrine management stated that customer

10 acceptance Peregrine's new Get.It! e-products far surpassed expectations and that the balance

11 sheet remained strong with cash increasing and DSO remaining steady at an acceptable level of 79

12 days.

13      317.   On January 21, 2000, CIBC issued a report based on the conference call with

14 Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial

15 results and noted that "[t]he enthusiastic reception of Peregrine's New Get.It! e-procurement

16 products far exceeded management's expectations, and generated $5 million in sales in just three

17 weeks of release."  The report also indicated "that the deal pipeline was more active than usual."

18 CIBC also noted that:

19         The balance sheet remained strong this quarter, increasing
           $300,000 to $25.2 million with cash remaining at $0.38 per share.
20         Accounts receivable rose $8.5 million $59.6 million, with DSO
           remaining steady at 79, also within what management regards as an
21         acceptable range.  Deferred revenues grew $9.8 million to $31.3
           million, and were made up solely of customer support.
22

23      318.   Relying on management's representations and Peregrine's publicly released

24 financial results, CIBC continued to rate Peregrine as a "strong buy."  On January 21, 2000, First

25 Union also issued a report on Peregrine based on the prior day's conference call with Peregrine

26 management.  In its report, First Union repeated Peregrine's previously released financial results

27 and reiterated its rating on Peregrine as a "strong buy."

28 //

319. In response to the information disseminated by Peregrine management and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock rose to $44.53 per share at the close of trading on January 24, 2000.

320. The foregoing statements, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

321. The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above. The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

322. On February 11, 2000, the Company filed its Form 10-Q for Q3 2000 with the SEC. It incorporated the financial statements that were included in the January 20, 2000 press release. Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief Accounting Officer.

323. The Form 10-Q for Q3 2000 also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

324. The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

---

325. The Peregrine Defendants (other than defendant Savoy) and the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q3 2000. Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

326. Between February 15 and 16, 2000, defendant Luddy sold 87,500 shares of Peregrine common stock and received gross proceeds of approximately $3,869,350.

327. Between February 17 and February 29, 2000, defendant Moores sold 4,980,186 shares of Peregrine common stock and received gross proceeds of approximately $229,140,356 million.

328. Between February 17, 2000 and February 25, 2000, defendant Powanda sold 200,000 shares of Peregrine common stock and received gross proceeds of approximately $8,750,560.00.

329. Between February 22 and February 24, 2000, defendant Gardner sold 250,262 shares of Peregrine common stock and received gross proceeds of approximately $11,035,426.

330. Between February 15 and February 25, 2000, defendant Gless sold 68,000 shares of Peregrine common stock and received gross proceeds of approximately $3,263,045.

331. On February 23, 2000, defendant Noell sold 90,000 shares of Peregrine common stock and received gross proceeds of approximately $3,897,900.

332. On February 22, 2000, defendant van den Berg sold 40,000 shares of Peregrine common stock and received gross proceeds of approximately $1,728,000.

333. On February 25, 2000, defendant Spitzer sold 20,000 shares of Peregrine common stock and received gross proceeds of approximately $1,048,400.

**Q4 2000**

334. On April 26, 2000, Peregrine issued a press release regarding Peregrine's Q4 2000 and fiscal year 2000 financial results. It stated that the Company had "record" quarterly revenues of $76.3 million (a 66% increase compared with revenues in the comparable prior year period) and "record" annual revenue of $253.3 million (a 83% increase over prior year revenues).

1  Defendant Gardner was quoted as saying that "[t]he market remains strong" and the "our

2  products continue to lead in their respective areas."

3        335.    The foregoing statements were materially false and misleading because Peregrine's

4  reported revenue was materially overstated, its accounts receivable were understated, its cash

5  balances were overstated, its liabilities were understated and its DSO were understated for the

6  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

7        336.    The Peregrine Defendants (other than defendant Savoy) read and approved the

8  issuance of Peregrine's April 26, 2000 press release.  As part of its audit procedures, the Arthur

9  Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of these

10 defendants either knew or were deliberately reckless in not knowing that the financial information

11 contained in the foregoing statements was materially false and misleading for the reasons set forth

12 in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

13       337.    On April 26, 2000, Peregrine management, led by defendant Gardner, held a

14 conference call with investors and securities analysts.  The purpose of the conference call was to

15 give Peregrine management the opportunity to discuss with investors the Company's Q4 and

16 fiscal year 2000 results.  During the conference call, Peregrine management reported on

17 Peregrine's previously released financial results for the quarter.  In addition, Peregrine

18 management stated that the Company had closed a very large order with EDS, that the Company

19 had excellent visibility into the next quarter and that the Company expected a $40-$50 million

20 dollar revenue contribution from Get.It! for the year.

21       338.    On April 27, 2000, CIBC issued a report based on the conference call with

22 Peregrine management.  In its report, CIBC noted that Peregrine management had indicated that:

23           Peregrine's 4Q00 results indicate that its core business remains
             strong.  During the quarter, the company closed a particularly large
24           deal with EDS; the size of the deal was not disclosed, but
             management implied that the company has "great visibility into the
25           next quarter."  We regard this as an extremely positive sign that
             there is no slowdown in Peregrine's business, which was a concern
26           last quarter.

27 The report also stated that "management comments referring to a $40-50 million revenue

28 contribution from Get.It! for the year [which] would imply a significant ramp-up must be in

---

store," as well as management's indication "that it was seeing a strong rebound in mid-size deal flow ($100,000 - $300,000) . . ." Relying on management's representations and Peregrine's publicly released financial results, but expressing concern over possible logistical and integration difficulties associated with the acquisition of Harbinger, CIBC rated Peregrine's stock as "Hold."

339.    In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $24.06 per share on April 28, 2000.

340.    The foregoing statements, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

341.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

342.    On May 10, 2000, the Company filed its Form 10-K for fiscal year 2000 with the SEC.  It incorporated the financial statements that were included in the April 26, 2000 press release.  The Form 10-K for fiscal year 2000 also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed, the product has been delivered, there are no material uncertainties regarding customer acceptance, collection of the resulting receivable is deemed probable; risk of concession is deemed remote, and we have no other significant obligations associated with the transaction.

//

343.   Defendant Gless signed the Form 10-K in his capacity as Vice President of Finance and Chief Accounting Officer and defendant Gardner signed in his capacity as President, Chief Executive Officer, and a director of the Company.  In addition, defendants Moores, Noell, van den Berg, Watrous and Hosley signed the Form 10-K for fiscal 2000 as directors of the Company. The Form 10-K contained an unqualified audit report by defendant Arthur Andersen on Peregrine's year end financial statements for fiscal 2000.

344.   The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

345.   The Peregrine Defendants (other than defendant Savoy) and the Arthur Andersen Defendants read and/or signed Peregrine's Form 10-K for fiscal 2000.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing 10-K was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

346.   On May 22, 2000, Peregrine filed Amendment No. 1 to its Form S-4 Registration Statement with the SEC.  The Amendment contained a Joint Proxy Statement and Prospectus, the purpose of which was to solicit proxies from Harbinger shareholders to approve of the proposed merger of Peregrine and Harbinger.  The Joint Proxy contained a discussion of Peregrine's business, and incorporated Peregrine's audited financial statements for the fiscal year ending March 31, 2000.  The Joint Proxy also stated that Peregrine's "selected consolidated financial data derives from the consolidated financial statements of Peregrine Systems, Inc. and its subsidiaries," and that "[t]hese financial statements have been audited by Arthur Andersen LLP, independent public accountants."  The Amendment was signed by each of the Peregrine Defendants (except defendant Savoy).  Arthur Andersen consent to the use of its false audit report for the fiscal year ending March 31, 2000.

347.   The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash

1   balances were overstated, its liabilities were understated and its DSO were understated for the

2   reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

3       348.    Each of the Peregrine Defendants (other than defendant Savoy) and the Arthur

4   Andersen Defendants either knew or were negligent in not knowing that the financial information

5   contained in the Joint Proxy was materially false and misleading for the reasons set forth in

6   Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

7   **Q1 2001**

8       349.    On July 19, 2000, Peregrine issued a press release announcing "record" quarterly

9   financial results for Q1 2001 (the period ended June 30, 2000) which, according to Peregrine,

10   were "driven by a 95 percent increase in software license revenues." Peregrine announced that

11   total revenues had increased by 83% "to a record $94.3 million" compared to revenues reported

12   in the comparable prior year period. Defendant Gardner was also quoted in the release as saying:

13           Growth in the Get.It! Business was very strong this quarter, and

14           continued to reflect customer recognition that Get.Resources!TM offers a unique lifecycle approach to the e-procurement process associated with assets used inside our customers' businesses . . .

15           We were also very pleased to see strong performance from our Infrastructure Management products, including several large

16           transactions and some key competitive wins[.]

17       350.    The foregoing statements were materially false and misleading because Peregrine's

18   reported revenue was materially overstated, its accounts receivable were understated, its cash

19   balances were overstated, its liabilities were understated and its DSO were understated for the

20   reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

21       351.    The Peregrine Defendants (other than defendants Savoy and Hosley) read and

22   approved the issuance of Peregrine's July 19, 2000 press release. As part of its quarterly review

23   work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.

24   Each of these defendants either knew or were deliberately reckless in not knowing that the

25   financial information contained in the foregoing statement was materially false and misleading for

26   the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

27       352.    On July 19, 2000, Peregrine management, led by defendant Gardner, held a

28   conference call with investors and securities analysts. The purpose of the conference call was to

1  give Peregrine management the opportunity to discuss with investors the Company's Q1 results of

2  operations. During the conference call, Peregrine management reported on Peregrine's previously

3  released financial results for the quarter. In addition, Peregrine management stated that the

4  Company's cash position more than doubled to $70 million and that the increase in accounts

5  receivable (to $128 million) and DSO (to 122 days) was attributable to the Harbinger acquisition.

6  353. On July 20, 2000, CIBC issued a report based on the conference call with

7  Peregrine management. In its report, CIBC repeated Peregrine's previously released financial

8  results and noted that Peregrine's earnings per share of $0.10 had beaten CIBC's estimate of

9  $0.09 and that Peregrine management had indicated that:

10  On the balance sheet, cash more than doubled to $70 million from
    $34 million, which equates to $0.57 per share, up from $0.29.
11  Accounts receivable rose significantly to $128 million from $70
    million, with the increase attributed to Harbinger. As a result, days
12  sales outstanding rose to 122 from 82. Management indicated that
    it intends to address the receivables issue; consequently, DSO
13  should trend down sharply in the next quarter.

14  Relying on management's representations and Peregrine's publicly released financial results,

15  CIBC gave Peregrine's stock a "buy" rating.

16  354. In response to the information disseminated by the Peregrine management and the

17  contents of the analyst reports based on information provided by Peregrine management,

18  Peregrine's stock closed at $29.25 per share on July 21, 2000.

19  355. The foregoing statements of Peregrine, as stated in the conference call and as

20  repeated in the research reports of securities analysts, were materially false and misleading

21  because Peregrine's reported revenue was materially overstated, its accounts receivable were

22  understated, its cash balances were overstated, its liabilities were understated and its DSO were

23  understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278

24  above.

25  356. The Management Defendants either knew or were deliberately reckless in not

26  knowing that the financial information provided to investors and securities analysts in the

27  foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21

28  through 35 and Paragraphs 62 through 278 above. The Management Defendants knew that

1   securities analysts would rely on their materially false and misleading statements in writing their

2   research reports which would be publicly disseminated to the investing public.

3       357.   On August 14, 2000, the Company filed its Form 10-Q for Q1 2001 with the SEC.

4   It incorporated the financial statements that were included in the July 19, 2000 press release.

5   Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief

6   Accounting Officer.

7       358.   The Form 10-Q for Q1 2001 also included the following statement on revenue

8   recognition:

9           Revenues from license agreements are recognized currently,
            provided that all of the following conditions are met: a
10          noncancelable license agreement has been signed, the product has
            been delivered, there are no material uncertainties regarding
11          customer acceptance; collection of the resulting receivable is
            deemed probable, risk of concession is deemed remote, and no
12          other significant vendor obligations exist.

13      359.   The foregoing statements were materially false and misleading because Peregrine's

14   reported revenue was materially overstated, its accounts receivable were understated, its cash

15   balances were overstated, its liabilities were understated and its DSO were understated for the

16   reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

17      360.   The Peregrine Defendants (other than defendants Hosley and van den Berg) and

18   the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q1

19   2001 with the SEC.  Each of these defendants either knew or were deliberately reckless in not

20   knowing that the financial information contained in the foregoing statement was materially false

21   and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through

22   278 above.

23   **Q2 2001**

24      361.   On October 3, 2000, Peregrine issued a press release stating that Peregrine's

25   financial results for Q2 2001 (which ended on September 30, 2000) would "meet or exceed

26   consensus earnings per share estimates of $.11 per share and total revenue of $142 million."  The

27   Peregrine issued another press release on October 24, 2000 that announced "record" quarterly

28   results for Q2 2001, with revenues of $142.7 million.  The press release noted that "[t]he record

1    second quarter results were driven by a 136% increase in software license revenues over the

2    comparable prior year period." The release also noted that "total revenues for the second quarter

3    increased 147%" . . . compared with revenues in the comparable prior year period. In addition,

4    defendant Gardner was quoted in the release as saying:

5
6
7

> We had a remarkable quarter of growth in our infrastructure
> management solutions and Get.It! employee self service solutions.
> This quarter saw a large number of new products, technology, and
> alliances come to fruition, further establishing the basis for
> continued growth into the future.

8      362.    The foregoing statements were materially false and misleading because Peregrine's

9    reported revenue was materially overstated, its accounts receivable were understated, its cash

10    balances were overstated, its liabilities were understated and its DSO were understated for the

11    reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

12      363.    The Peregrine Defendants (other than defendants Hosley and van den Berg) read

13    and approved the issuance of Peregrine's October 3 and October 24, 2000 press releases. As part

14    of its quarterly review work, the Arthur Andersen Defendants read and cleared the October 24,

15    2000 Peregrine press release. Each of these defendants either knew or were deliberately reckless

16    in not knowing that the financial information contained in the foregoing statements were

17    materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and

18    Paragraphs 62 through 278 above.

19      364.    On October 24, 2000, Peregrine management, led by defendant Garnder, held a

20    conference call with investors and securities analysts. The purpose of the conference call was to

21    give Peregrine management the opportunity to discuss with investors the Company's Q2 2001

22    results. During the conference call, Peregrine management reported on Peregrine's previously

23    released financial results for the quarter. In addition, Peregrine management stated that the

24    Company is expected to be cash flow positive during the second half of the year and that accounts

25    receivable rose to $165 million while DSO fell from 122 days to 106 days.

26      365.    On October 25, 2000, CIBC issued a report based on the conference call with

27    Peregrine management. In its report, CIBC repeated Peregrine's previously released financial

28    results and noted that Peregrine management had indicated that:

On the balance sheet, cash declined to $35.2 million from $70 million.  The decrease resulted from cash acquisition costs relating to the Harbinger transaction.  Management expects the company to be cash flow positive during the second half of the year, but this is a situation that we will continue to monitor.  Accounts receivable rose to $165 million from $128 million, but DSOs fell to 106 from 122.  The decline was related to management's efforts to better control DSOs from the recently acquired e-commerce business. Management is focused on achieving further reductions and expects DSOs to fall to the 95-100 level in the third-quarter.

Relying on management's representations and Peregrine's publicly released financial results, CIBC rated Peregrine's stock a "buy."

366.    In response to the information disseminated by the Peregrine management and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $23.00 per share on October 26, 2000.

367.    The foregoing statements of Peregrine management, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

368.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

369.    On November 14, 2000, the Company filed its Form 10-Q for Q2 2001 with the SEC.  It incorporated the financial statements that were included in the October 24, 2000 press release.  Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and Chief Accounting Officer.

//

370.     The Form 10-Q for Q2 2001 also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

371.     The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

372.     The Peregrine Defendants (other than defendants Hosley and van den Berg) and the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q2 2001 with the SEC.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

**Q3 2001**

373.     On January 24, 2001, Peregrine issued a press release that announced "record" quarterly financial results for Q3 2001 (which ended on December 31, 2000), with total revenues of $156.6 million.  The release stated that "[t]otal revenues . . . climbed by 132%" compared with revenues in the comparable prior period.  Peregrine stated that these results were "driven by a 114% increase in software license revenues over the comparable prior year period . . ." Defendant Gardner was quoted as saying that "[d]espite uncertainty and turbulence in the economy, particularly in the United States, we exceeded our objectives for the December quarter."

374.     The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash

//

903

1    balances were overstated, its liabilities were understated and its DSO were understated for the

2    reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

3          375.    The Peregrine Defendants (other than defendants Hosley and van den Berg) read

4    and approved the contents of Peregrine's January 24, 2001 press release. As part of its quarterly

5    review work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press

6    release. Each of these defendants either knew or were deliberately reckless in not knowing that

7    the financial information contained in the foregoing statement was materially false and misleading

8    for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

9          376.    On January 24, 2001, Peregrine management, led by defendant Gardner, held a

10    conference call with investors and securities analysts. The purpose of the conference call was to

11    give Peregrine management the opportunity to discuss with investors the Company's Q3 2001

12    results. During the conference call, Peregrine management reported on Peregrine's previously

13    released financial results for the quarter. In addition, Peregrine management stated that the

14    balance sheet improved as DSOs fell to 97 days from 106 days last quarter and that the Company

15    expects to make additional progress on this front by the end of the fourth quarter and that

16    international revenues had increased over 37%.

17          377.    On January 25, 2001, CIBC issued a report based on the conference call with

18    Peregrine management. In its report, CIBC repeated Peregrine's previously released financial

19    results and noted that Peregrine management had indicated that:

20              During the quarter the balance sheet strengthened. Accounts
               receivables were flat at $165 million while DSOs fell to 97 from

21              106 last quarter as the company stepped up its collection activities.
               Management expects to make additional progress on this front and

22              expects DSOs to fall to the low 90s by the end of the fourth-
               quarter. Deferred revenue increased 22% sequentially ($15 million)

23              to $83 million. Management attributed the increase to some recent
               wins in its EMG operation.

24

                             \*    \*    \*

25

26              Internationally, Peregrine knocked the cover off the ball. License
               revenue increased over 37% sequentially to $40.8 million. Driving

27              this growth were several large deals in the quarter in the
               infrastructure and e-markets groups. Management believes that

28              what the company witnessed in the quarter is quite sustainable and
               is shifting resources to Europe and Asia.

1  Relying on management's representations and Peregrine's publicly released financial results,

2  CIBC rated Peregrine's stock a "buy."

3       378.    In response to the information disseminated by the Peregrine management and the

4  contents of the analyst reports based on information provided by Peregrine management,

5  Peregrine's stock rose to $29.81 per share at the closing of trading on January 29, 2001.

6       379.    The foregoing statements of Peregrine, as stated in the conference call and as

7  repeated in the research reports of securities analysts, were materially false and misleading

8  because Peregrine's reported revenue was materially overstated, its accounts receivable were

9  understated, its cash balances were overstated, its liabilities were understated and its DSO were

10  understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278

11  above.

12       380.    The Management Defendants either knew or were deliberately reckless in not

13  knowing that the financial information provided to investors and securities analysts in the

14  foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21

15  through 35 and Paragraphs 62 through 278 above. The Management Defendants knew that

16  securities analysts would rely on their materially false and misleading statements in writing their

17  research reports which would be publicly disseminated to the investing public.

18       381.    Between February 8 and February 14, 2001, defendant Luddy sold 224,924 shares

19  of Peregrine common stock and received gross proceeds of approximately $6,229,296.

20       382.    Between February 8 and February 28, 2001, Moores sold 3,456,223 shares of

21  Peregrine common stock and received gross proceeds of approximately $101,430,942.

22       383.    On February 8, 2001, defendant Powanda sold 400,000 shares of Peregrine

23  common stock and received gross proceeds of approximately $11,232,000.00.

24       384.    On February 14, 2001, the Company filed its Form 10-Q for Q3 2001 with the

25  SEC. It incorporated the financial statements that were included in the January 24, 2001 press

26  release. Defendant Gless signed the Form 10-Q in his capacity as Vice President of Finance and

27  Chief Financial Officer.

28  //

1    385.    The Form 10-Q for Q3 2001 also included the following statement on revenue

2    recognition:

3           Revenues from direct and indirect license agreements are
            recognized currently, provided that all of the following conditions
4           are met: a noncancelable license agreement has been signed; the
            product has been delivered; there are no material uncertainties
5           regarding customer acceptance; collection of the resulting
            receivable is deemed probable; risk of concession is deemed
6           remote; and no other significant vendor obligations exist.

7    386.    The foregoing statements were materially false and misleading because Peregrine's

8    reported revenue was materially overstated, its accounts receivable were understated, its cash

9    balances were overstated, its liabilities were understated and its DSO were understated for the

10    reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

11    387.    The Peregrine Defendants (other than defendants Hosley and van den Berg) and

12    the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q3

13    2001 with the SEC.  Each of these defendants either knew or were deliberately reckless in not

14    knowing that the financial information contained in the foregoing 10-Q was materially false and

15    misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278

16    above.

17    388.    On February 15, 2001, defendant Nelson sold 200,000 shares of Peregrine

18    common stock and received gross proceeds of approximately $5,926,000.

19    389.    Between February 15 and 16, 2001, defendant Noell sold 84,375 shares of

20    Peregrine common stock and received gross proceeds of approximately $2,497,912.

21    **Q4 2001**

22    390.    On April 4, 2001, Peregrine issued a press release stating that its revenues and

23    earnings per share for Q4 2001 (which ended on March 31, 2001) would be consistent with

24    guidance previously provided to investors by the Company.  Specifically, it stated that "[f]or the

25    fiscal fourth quarter ended March 31, 2001, the Company expects to report license revenues of

26    approximately $105 million, total revenues of approximately $170 million and earnings per share

27    of $0.16 . . ." "Defendant Gardner is quoted as saying that "[d]espite challenging economic

28    conditions worldwide, we were able to meet our objectives for the quarter and deliver strong

1   profitable results, the sixteenth consecutive quarter we have done so." After this press release

2   was issued, Peregrine's stock gained $5.25 per share, closing at $19.06 per share on April 5,

3   2001.

4       391.   The foregoing statements were materially false and misleading because Peregrine's

5   reported annual revenue was overstated by more than $250 million, its accounts receivable were

6   understated, its cash balances were overstated by more than $180 million, its liabilities were

7   understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35

8   and Paragraphs 62 through 278 above.

9       392.   The Peregrine Defendants (other than defendants Hosley and van den Berg) read

10   and approved the issuance of Peregrine's April 4, 2001 press release. Each of these defendants

11   either knew or were deliberately reckless in not knowing that the financial information contained

12   in the foregoing statement was materially false and misleading for the reasons set forth in

13   Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

14       393.   On April 26, 2001, Peregrine issued a press release confirming the preliminary

15   results it had announced on April 4. It stated that revenue for Q4 2001 was "a record $171.0

16   million, an increase of 124 percent from the same quarter a year ago." For fiscal year 2001, the

17   press release states that revenue totaled $564.7 million an increase of 123% from the prior year.

18   In the April 26 release, defendant Gardner was also quoted as saying:

19       Our results this quarter in the face of challenging economic
         conditions demonstrate the value of our solutions . . . As we enter
20       fiscal 2002, we remain confident in our market position and the
         opportunity we address . . .
21
         We were particularly pleased with the strength of our sales through
22       managed services providers and our professional services partners.
         As we continue to meet major milestones in our corporate
23       development and build our solutions portfolio, these relationships
         become increasingly important to our ability to extend our reach to
24       new customers and markets.

25       394.   Peregrine's stock closed at $25.60 per share on April 27, 2001.

26       395.   The statements in the April 26, 2001 press release were materially false and

27   misleading when made because Peregrine's reported revenue was materially overstated, its

28   accounts receivable were understated, its cash balances were overstated, its liabilities were

1 understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35
2 and Paragraphs 62 through 278 above.

3      396.    The Peregrine Defendants (other than defendants Hosley and van den Berg) read
4 and approved the issuance of Peregrine's April 26, 2001 press release. As part of its audit
5 procedures, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press
6 release. Each of these defendants either knew or were deliberately reckless in not knowing that
7 the financial information contained in the foregoing statements were materially false and
8 misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278
9 above.

10      397.    On April 26, 2001, Peregrine management, led by defendant Gardner, held a
11 conference call with investors and securities analysts. The purpose of the conference call was to
12 give Peregrine management the opportunity to discuss with investors the Company's Q4 2001
13 results. During the conference call, Peregrine management reported on Peregrine's previously
14 released financial results for the quarter. In addition, Peregrine management stated that the
15 Company met its earnings per share guidance and that key balance sheet metrics improved or
16 remained steady (such as a cash increase of $38 million) with DSOs remaining essentially flat at
17 95 days.

18      398.    On April 27, 2001, CIBC issued a report based on the conference call with
19 Peregrine management. In its report, CIBC noted that Peregrine management had indicated that:

> Not only was the company able to meet its EPS expectation, but key balance sheet metrics also improved or held steady. Even though accounts receivables showed a moderate $15 million increase in the quarter, DSOs were essentially flat at 95. Deferred revenue, which consists almost exclusively of service related activities (maintenance, network usage, etc.) climbed $12 million $14% sequentially) to $95 million. Cash increased in the quarter by about $38 million to $287 million. Management attributed the growth to financing activity in the quarter, option exercises, acquisitions (Extricity brought some cash) as well as a moderate amount of cash flow from operations.

26 Relying on management's representations and Peregrine's publicly released financial results,
27 CIBC rated Peregrine's stock a "strong buy."

28 //

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

0903

399.    In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $25.78 per share on April 30, 2001.

400.    The foregoing statements of Peregrine, and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

401.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

402.    On June 29, 2001, the Company filed its Form 10-K for fiscal 2001 with the SEC. It incorporated the financial statements that appeared in the April 26, 2001 press release. Defendant Gless signed the Form 10-K in his capacity as Vice President of Finance and Chief Accounting Officer, defendant Gardner signed it in his capacity as Chief Executive Officer and Chairman of the Board of Directors and defendants Moores, Noell, Watrous and Savoy signed it as directors of the Company.

403.    Peregrine's financial statements contained in the Form 10-K were audited by the Arthur Andersen Defendants and contained Arthur Andersen's unqualified audit report on Peregrine's fiscal 2001 financial statements.

404.    The Form 10-K for fiscal year 2001 also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized currently, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

1  receivable is deemed probable; risk of concession is deemed
   remote; and no other significant vendor obligations exist.
2

3    405.   The foregoing statements were materially false and misleading because Peregrine's

4  reported revenue was materially overstated, its accounts receivable were understated, its cash

5  balances were overstated, its liabilities were understated and its DSO were understated for the

6  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

7    406.   The Peregrine Defendants, who signed the Form 10-K, read and approved its

8  contents and approved its filing with the SEC.  Each of these defendants and the Arthur Andersen

9  Defendants either knew or were deliberately reckless in not knowing that the financial information

10  contained in the Form 10-K was materially false and misleading for the reasons set forth in

11  Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

12    407.   On July 23, 2001, Peregrine filed Amendment No. 1 to its Form S-4 Registration

13  Statement with the SEC.  The Amendment contained a Joint Proxy Statement and Prospectus, the

14  purpose of which was to solicit proxies from Remedy Corporation shareholders to approve of the

15  proposed merger of Peregrine and Remedy.  The Joint Proxy contained a discussion of

16  Peregrine's business, and incorporated by reference Peregrine's financial statements (and audit

17  reports) for the three years ended March 31, 2001.  The Joint Proxy also stated that:

18         Peregrine's selected consolidated financial data is presented below
           as of March 31, 2001, 2000, 1999, 1998 and 1997 and for each of
19         the years in the five-year period ended March 31, 2001, and derives
           from the consolidated financial statements of Peregrine Systems,
20         Inc. and its subsidiaries, which financial statements have been
           audited by Arthur Andersen LLP, independent public accountants.
21

22    408.   The foregoing statements were materially false and misleading because Peregrine's

23  reported revenue was materially overstated, its accounts receivable were understated, its cash

24  balances were overstated, its liabilities were understated and its DSO were understated for the

25  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

26    409.   The Amendment was signed by each of the Peregrine Defendants (other than

27  defendants Hosley and van den Berg).  Arthur Andersen consented to the use of its false audit

28  reports for the fiscal years ending March 31, 2000 and 2001.  Each of these defendants and the

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

Arthur Andersen Defendants either knew or were negligent in not knowing that the financial information for the fiscal years ending 2000 and 2001 contained in or incorporated into the Joint Proxy was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

**Q1 2002**

410.   On July 24, 2001, Peregrine issued a press release announcing its financial results for Q1 2002 (which ended on June 30, 2001).  Peregrine stated that revenues for the quarter were a "record $172.0 million, an increase of 82% from the same quarter a year ago."  In the release, defendant Gardner was quoted as saying: "We were pleased to post significant top-line [revenue] growth in this challenging economic environment[.]"

411.   The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

412.   The Peregrine Defendants (other than defendants Hosley and van den Berg) read and approved the issuance of Peregrine's July 24, 2001 press release.  As part of its quarterly review work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing statement was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

413.   On July 24, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's Q1 2002 results of operations.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that it was comfortable with analysts projections of 30%-40% revenue growth and 25%-35% earnings per share growth based on the strength of its business and that DSOs were 99 days and expected to decrease in the next quarter to 80-90 days.

414.   On July 24, 2001, Bear Stearns & Co., Inc. ("Bear Stearns") issued a report based on the conference call with Peregrine management.  In its report, Bear Stearns repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that it saw "positive growth in Asia Pacific, Africa, and Eastern Europe."  The report also stated that:

> In sharp contrast to the norm, management reiterated revenue and EPS guidance of 30-40% top line growth and 25-35% EPS growth for the full FY02, citing strength in all areas of business (product mix, geographic mix, and a return to strength in key vertical markets).

Relying on management's representations in the conference call and Peregrine's publicly released financial results, Bear Stearns gave Peregrine a "buy" rating.

415.   On July 25, 2001, CIBC also issued a report based on the prior day's conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial statements and noted that Peregrine management had indicated that: "Peregrine's revenues of $172 million came in ahead of expectations, which the Street had pegged at $165 million."  The report also stated that "Management noted that the strong verticals during the quarter were financial, telecom, high tech, and government and that the mix was a return to a more typical mix, after the financial vertical was very weak in the March quarter.  Excluding acquisitions, the company indicated that year over year revenue growth was about 50%."  Accordingly, CIBC rated Peregrine a "strong buy" in its report dated July 25, 2001.

416.   On July 25, 2001, U.S. Bancorp Piper Jaffray ("Piper Jaffray") also issued a report based on the prior day's conference call with Peregrine management.  In its report, Piper Jaffray noted that Peregrine management had exceeded the revenue expectations and that Peregrine management indicated that "[t]he Company expects to approach DSOs of 80-90 days in the coming quarter."  Relying on management's representations and Peregrine's publicly released financial results, Piper Jaffray rated Peregrine's stock a "strong buy."

417.   In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management,  Peregrine stock rose to $27 per share at the close of trading on July 26, 2001.

418.    The foregoing statements of Peregrine, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

419.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

420.    On August 1, 2001, defendant Luddy sold 46,891 shares of Peregrine common stock and received gross proceeds of approximately $1,317,397.

421.    On August 14, 2001, the Company filed its Form 10-Q for Q1 2002 with the SEC. It incorporated the financial statements that were included with the July 24, 2001 press release. Defendant Gless signed the Form 10-Q in his capacity as Executive Vice President and Chief Accounting Officer.

422.    The Form 10-Q for Q1 2002 also included the following statement on revenue recognition:

> Revenues from direct and indirect license agreements are recognized, provided that all of the following conditions are met: a noncancelable license agreement has been signed; the product has been delivered; there are no material uncertainties regarding customer acceptance; collection of the resulting receivable is deemed probable; risk of concession is deemed remote; and no other significant vendor obligations exist.

423.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

424.    The Peregrine Defendants (other than defendants Hosley and van den Berg) and the Arthur Andersen Defendants read and approved the filing of Peregrine's 10-Q for Q1 2002 with the SEC.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

425.    On September 4, 2001, Gardner sold 2,250 shares of Peregrine common stock and received gross proceeds of $61,875.

**Q2 2002**

426.    On October 3, 2001, Peregrine issued a press release announcing the Company's preliminary financial results for Q2 2002 (which ended on September 30, 2001).  It stated that "Peregrine expects to report quarterly revenue of approximately $175 million.  Based on these revenues, the company expects to report net income of approximately $.05 per share, excluding acquisition costs and restructuring charges."  The press release quotes defendant Gardner as saying:

> Like many companies in our industry, the tragic events of September 11 and the subsequent effect on the global economy impacted our September quarter results.  However, even during these challenging times, we were able to generate approximately $175 million in total revenue, demonstrating the strength of our product portfolio and the value proposition we deliver to our customers . . .

427.    The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

428.    The Peregrine Defendants (other than defendants Hosley and van den Berg) read and approved the issuance of Peregrine's October 3, 2001 press release.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing statement was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

//

429.   On October 24, 2001, Peregrine issued a press release confirming the preliminary financial results it had previously announced for Q2 2002.  It stated that total revenues were a "record" $175 million, an increase of 23% from that reported in the second quarter of fiscal 2001. The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

430.   The Peregrine Defendants (other than defendants Hosley and van den Berg) read and approved the issuance of Peregrine's October 24, 2001 press release.  As part of its quarterly review work, the Arthur Andersen Defendants read and cleared the foregoing Peregrine press release.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing statement was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

431.   On October 24, 2001, Peregrine management, led by defendant Gardner, held a conference call with investors and securities analysts.  The purpose of the conference call was to give Peregrine management the opportunity to discuss with investors the Company's Q2 2002 results of operations.  During the conference call, Peregrine management reported on Peregrine's previously released financial results for the quarter.  In addition, Peregrine management stated that guidance for remainder of this and next year remain unchanged, that the Company expects to finish the fiscal year with $140-$150 million in cash and that DSOs for Peregrine on a stand alone basis were 99 days and 113 days when including recently acquired Remedy.

432.   On October 24, 2001, CIBC issued a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that:

> Guidance for the remainder of this year and next year remain unchanged.  The Company expects revenue of $450 million in the second half and a snap back in operating margins, which were 8% this quarter, vs. 17% last year.  Management indicated that operations appeared to be returning to a more normal pace after a virtual standstill in late September.  Peregrine expects to finish the fiscal year with $140 million to $150 million in cash.

---

433.   On October 24, 2001, Bear Stearns issued a report based on the conference call with Peregrine management.  In its report, Bear Stearns repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that:"Management affirmed guidance -- we are maintaining estimates."

434.   On October 25, 2001, Thomas Weisel Partners ("Weisel") issued a report based on the conference call with Peregrine management.  In its report, Weisel repeated Peregrine's previously released financial results and noted that Peregrine management had indicated that "management commentary was encouraging."

435.   On October 25, 2001, Piper Jaffray also issued a report based on the conference call with Peregrine management.  In its report, Piper Jaffray repeated Peregrine's previously released financial results and noted that Peregrine management had stated that the Company reported revenues in line with expectations, finished the quarter with $142 million in cash and DSOs for Peregrine, excluding Remedy, remained essentially flat at 99 days.

436.   Relying on management's representations and Peregrine's publicly released financial results, CIBC, Bear Stearns, Weisel and Piper Jaffray each rated Peregrine a "buy."

437.   In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $16.46 per share on October 26, 2001.

438.   The foregoing statements of Peregrine, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

439.   The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that

1    securities analysts would rely on their materially false and misleading statements in writing their

2    research reports which would be publicly disseminated to the investing public.

3        440.    On November 31, 2001, Peregrine filed its Form 10-Q for Q2 2002 with the SEC.

4    It incorporated the financial statements that appeared in the October 24, 2001 press release.

5    Defendant Gless signed the Form 10-Q in his capacity as Executive Vice President and Chief

6    Accounting Officer.

7        441.    The Form 10-Q for Q2 2002 also stated the following on revenue recognition:

8            Revenues from direct and indirect license agreements are
             recognized, provided that all of the following conditions are met: a
9            noncancelable license agreement has been signed; the product has
             been delivered; there are no material uncertainties regarding
10           customer acceptance; collection of the resulting receivable is
             deemed probable; risk of concession is deemed remote; and no
11           other significant vendor obligations exist.

12       442.    The financial statements in the Form 10-Q for Q2 2002 were materially false and

13   misleading when made because Peregrine's reported revenue was materially overstated, its

14   accounts receivable were understated, its cash balances were overstated, its liabilities were

15   understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35

16   and Paragraphs 62 through 278 above.

17       443.    The Peregrine Defendants (other than defendants Hosley and van den Berg) and

18   the Arthur Andersen Defendants read and approved the issuance of Peregrine's filing of the 10-Q

19   for Q2 2002 with the SEC.  Each of these defendants either knew or were deliberately reckless in

20   not knowing that the financial information contained in the foregoing statements were materially

21   false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62

22   through 278 above.

23   **Q3 2002**

24       444.    On January 2, 2002, Peregrine issued a press release announcing the Company's

25   preliminary results for Q3 2002 (which ended on December 31, 2001).  It stated that Peregrine

26   anticipated total revenues of approximately $175 million.

27       445.    The foregoing statements were materially false and misleading because Peregrine's

28   reported revenue was materially overstated, its accounts receivable were understated, its cash

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

1  balances were overstated, its liabilities were understated and its DSO were understated for the

2  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

3      446.  The Peregrine Defendants (other than defendants Hosley and van den Berg) read

4  and approved the issuance of Peregrine's January 2, 2002 press release. Each of these defendants

5  either knew or were deliberately reckless in not knowing that the financial information contained

6  in the foregoing statement was materially false and misleading for the reasons set forth in

7  Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

8      447.  On January 3, 2002, Peregrine management, led by defendant Gardner, held a

9  conference call with investors and securities analysts. The purpose of the conference call was to

10  give Peregrine management the opportunity to discuss with investors the Company's Q3 2002

11  preliminary results. During the conference call, Peregrine management reported on Peregrine's

12  previously released preliminary financial results for the quarter.

13      448.  On January 3, 2002, CIBC issued a report based on the conference call with

14  Peregrine management. In its report, CIBC repeated Peregrine's previously released preliminary

15  financial results. Relying on management's representations and Peregrine's publicly released

16  financial results, CIBC gave Peregrine's stock a "buy" rating.

17      449.  On January 3, 2002, Piper Jaffray also issued a report based on the conference call

18  with Peregrine management. In its report, Piper Jaffray repeated Peregrine's previously released

19  preliminary financial results and gave Peregrine's stock a rating of "outperform."

20      450.  On January 3, 2002, Bear Stearns also issued a report based on the conference call

21  with Peregrine management. In its report, Bear Stearns repeated Peregrine's previously released

22  financial results and rated Peregrine's stock as "attractive."

23      451.  In response to the information disseminated by Peregrine and the contents of the

24  analyst reports based on information provided by Peregrine management, Peregrine's stock closed

25  at $9.40 per share on January 4, 2002.

26      452.  The foregoing statements of Peregrine, as stated in the conference call and as

27  repeated in the research reports of securities analysts, were materially false and misleading

28  because Peregrine's reported revenue was materially overstated, its accounts receivable were

---

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)
-130-

1  understated, its cash balances were overstated, its liabilities were understated and its DSO were

2  understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278

3  above.

4       453.    The Management Defendants either knew or were deliberately reckless in not

5  knowing that the financial information provided to investors and securities analysts in the

6  foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21

7  through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that

8  securities analysts would rely on their materially false and misleading statements in writing their

9  research reports which would be publicly disseminated to the investing public.

10       454.    On January 24, 2002, Peregrine issued a press release confirming that total

11  revenues for Q3 2002 were $175.2 million.

12       455.    The Peregrine Defendants (other than defendants Hosley and van den Berg) read

13  and approved the issuance of Peregrine's January 24, 2002 press release.  As part of its quarterly

14  review work, the Arthur Andersen Defendants read and cleared the foregoing press release.  Each

15  of these defendants either knew or were deliberately reckless in not knowing that the financial

16  information contained in the foregoing statement was materially false and misleading for the

17  reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

18       456.    The reasons why such statements were materially false and misleading is because

19  Peregrine's reported revenue was materially overstated, its accounts receivable were understated,

20  its cash balances were overstated, its liabilities were understated and its DSO were understated for

21  the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

22       457.    On January 24, 2002, Peregrine management held a conference call with investors

23  and securities analysts.  The purpose of the conference call was to give Peregrine management the

24  opportunity to discuss with investors the Company's Q3 2002 results.  During the conference call,

25  Peregrine management reported on Peregrine's previously released financial results for the

26  quarter.  In addition, Peregrine management stated that its DSO remained essentially flat at 100

27  up one day from the prior quarter and that the Company finished the quarter with approximately

28  $107 million in cash.

458.    On January 24, 2002, CIBC issued a report based on the conference call with Peregrine management.  In its report, CIBC repeated Peregrine's previously released financial results and noted that the "Company appears to be on the right track."  Relying upon management's representations and Peregrine's publicly released financial results, CIBC rated Peregrine's stock a "buy."

459.    On January 24, 2002, Piper Jaffray and Bear Stearns also issued reports based on the conference call with Peregrine management.  Piper Jaffray and Bear Stearns each repeated Peregrine's previously released financial results and rated Peregrine's stock as "outperform" and "attractive," respectively.

460.    In response to the information disseminated by Peregrine and the contents of the analyst reports based on information provided by Peregrine management, Peregrine's stock closed at $7.95 per share on January 25, 2002.

461.    The foregoing statements of Peregrine, as stated in the conference call and as repeated in the research reports of securities analysts, were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

462.    The Management Defendants either knew or were deliberately reckless in not knowing that the financial information provided to investors and securities analysts in the foregoing conference call were materially misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.  The Management Defendants knew that securities analysts would rely on their materially false and misleading statements in writing their research reports which would be publicly disseminated to the investing public.

463.    On February 14, 2002, Peregrine filed its Form 10-Q for Q3 2002 with the SEC.  It incorporated the financial statements that appeared in the January 24, 2002 press release.  The Form 10-Q was signed by defendant Gless in his capacity as Executive Vice President and Chief Accounting Officer.

464.   The foregoing statements were materially false and misleading because Peregrine's reported revenue was materially overstated, its accounts receivable were understated, its cash balances were overstated, its liabilities were understated and its DSO were understated for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

465.   The Peregrine Defendants (other than defendants Hosley and van den Berg) and the Arthur Andersen Defendants read and approved the filing of Peregrine's Form 10-Q for Q3 2002 with the SEC.  Each of these defendants either knew or were deliberately reckless in not knowing that the financial information contained in the foregoing Form 10-Q was materially false and misleading for the reasons set forth in Paragraphs 21 through 35 and Paragraphs 62 through 278 above.

## INSIDER STOCK TRADING

466.   Notwithstanding their participation in and knowledge of the financial fraud as detailed herein and their possession of material nonpublic information about Peregrine, certain of the Peregrine Defendants sold more than 12,000,000 shares of Peregrine common stock during the Class Period for gross proceeds exceeding $450,000,000 as set forth below.

**Stephen P. Gardner**

| Date | Type | Shares | Price | Proceeds |
|---|---|---|---|---|
| 08/04/99 | Sell | 12,500 | $28.63 | $ 357,875.00 |
| 08/04/99 | Sell | 7,500 | $28.63 | $ 214,725.00 |
| 08/05/99 | Sell | 7,500 | $28.71 | $ 215,325.00 |
| 08/06/99 | Sell | 5,000 | $28.50 | $ 142,500.00 |
| 08/09/99 | Sell | 5,000 | $28.72 | $ 143,600.00 |
| 08/09/99 | Sell | 42,500 | $28.72 | $ 1,220,600.00 |
| 08/13/99 | Sell | 12,500 | $31.93 | $ 399,125.00 |
| 08/13/99 | Sell | 7,500 | $31.93 | $ 239,475.00 |
| 02/22/00 | Sell | 35,000 | $43.31 | $ 1,515,850.00 |
| 02/23/00 | Sell | 15,000 | $43.90 | $ 658,500.00 |
| 02/23/00 | Sell | 25,000 | $43.90 | $ 1,097,500.00 |
| 02/23/00 | Sell | 117,762 | $43.90 | $ 5,169,751.80 |
| 02/24/00 | Sell | 37,238 | $45.11 | $ 1,679,806.18 |

| | | | | | |
|---|---|---|---|---|---|
| 02/24/00 | Sell | 20,262 | $45.11 | $ | 914,018.82 |
| 09/04/01 | Sell | 2,250 | $27.50 | $ | 61,875.00 |
| **Total Sold:** | | **352,512** | | **$14,030,526.80** | |
| | | | | | |
| 02/08/01 | Buy | 2,500 | $27.76 | | $ 69,400.00 |
| 02/13/01 | Buy | 2,500 | $28.06 | | $ 70,150.00 |
| 09/21/01 | Buy | 10,000 | $14.41 | | $144,100.00 |
| 02/08/02 | Buy | 9,500 | $ 7.43 | | $ 70,585.00 |
| **Total Bought:** | | **24,500** | | | **$354,235.00** |

**Matthew Gless**

| | | | | | |
|---|---|---|---|---|---|
| 07/26/99 | Sell | 3,125 | $30.01 | $ | 93,781.25 |
| 07/26/99 | Sell | 11,250 | $30.01 | $ | 337,612.50 |
| 08/17/99 | Sell | 1,250 | $33.00 | $ | 41,250.00 |
| 08/26/99 | Sell | 5,000 | $34.50 | $ | 172,500.00 |
| 08/26/99 | Sell | 5,000 | $35.00 | $ | 175,000.00 |
| 02/15/00 | Sell | 9,000 | $45.44 | $ | 408,960.00 |
| 02/15/00 | Sell | 4,000 | $45.63 | $ | 182,520.00 |
| 02/15/00 | Sell | 5,000 | $44.50 | $ | 222,500.00 |
| 02/15/00 | Sell | 5,000 | $45.00 | $ | 225,000.00 |
| 02/15/00 | Sell | 2,500 | $45.50 | $ | 113,750.00 |
| 02/15/00 | Sell | 500 | $45.50 | $ | 22,750.00 |
| 02/15/00 | Sell | 6,250 | $46.00 | $ | 287,500.00 |
| 02/15/00 | Sell | 7,750 | $46.00 | $ | 356,500.00 |
| 02/15/00 | Sell | 10,000 | $45.19 | $ | 541,900.00 |
| 02/23/00 | Sell | 5,000 | $46.00 | $ | 230,000.00 |
| 02/25/00 | Sell | 8,000 | $50.00 | $ | 400,000.00 |
| 02/25/00 | Sell | 500 | $54.00 | $ | 27,000.00 |
| 02/25/00 | Sell | 2,000 | $54.50 | $ | 109,000.00 |
| 02/25/00 | Sell | 1,000 | $54.38 | $ | 54,380.00 |

| | | | | |
|---|---|---|---|---|
| 02/25/00 | Sell | 1,500 | $54.19 | $   81,285.00 |
| **Total Sold:** | | **93,625** | | **$4,083,188.75** |
| | | | | |
| 02/07/02 | Buy | 4,000 | $6.60 | $26,400.00 |
| 02/07/02 | Buy | 1,000 | $6.63 | $ 6,630.00 |
| **Total Bought:** | | **5,000** | | **$33,030.00** |

**Isle Cappel**

| | | | | |
|---|---|---|---|---|
| | Sell | 16,249 | | $334,287.00 |
| **Total Sold:** | | **16,249** | | **$334,287.00** |

**Douglas S. Powanda**

| | | | | |
|---|---|---|---|---|
| 08/16/99 | Sell | 10,000 | $33.00 | $    330,000.00 |
| 08/16/99 | Sell | 6,250 | $33.00 | $    206,250.00 |
| 02/17/00 | Sell | 30,000 | $45.98 | $ 1,379,400.00 |
| 02/17/00 | Sell | 20,000 | $46.19 | $    923,800.00 |
| 02/17/00 | Sell | 10,000 | $45.94 | $    459,400.00 |
| 02/17/00 | Sell | 20,000 | $46.13 | $    922,600.00 |
| 02/17/00 | Sell | 20,000 | $46.22 | $    924,400.00 |
| 02/17/00 | Sell | 10,000 | $46.44 | $    464,400.00 |
| 02/23/00 | Sell | 2,500 | $44.94 | $    112,350.00 |
| 02/23/00 | Sell | 5,000 | $45.19 | $    225,950.00 |
| 02/24/00 | Sell | 22,500 | $45.00 | $ 1,012,500.00 |
| 02/24/00 | Sell | 10,000 | $45.13 | $    451,300.00 |
| 02/24/00 | Sell | 10,000 | $46.00 | $    460 000.00 |
| 02/24/00 | Sell | 2,500 | $45.56 | $    113,900.00 |
| 02/24/00 | Sell | 10,000 | $46.38 | $    463,800.00 |
| 02/24/00 | Sell | 7,500 | $45.50 | $    341,250.00 |
| 02/25/00 | Sell | 5,000 | $47.75 | $    238,750.00 |
| 02/25/00 | Sell | 10,000 | $48.13 | $    481,300.00 |
| 02/25/00 | Sell | 5,000 | $47.00 | $    235,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 02/08/01 | Sell | 400,000 | $28.08 | $11,232,000.00 |
| 2 | **Total Sold:** | | **616,250** | | **$20,518,810.00** |

**Steven S. Spitzer**

| | | | | |
|---|---|---|---|---|
| 08/12/99 | Sell | 27,500 | $31.50 | $866,250.00 |
| 02/25/00 | Sell | 20,000 | $52.42 | $1,048,400.00 |
| **Total Sold:** | | **47,500** | | **$1,914,650.00** |

**Richard T. Nelson**

| | | | | |
|---|---|---|---|---|
| 08/16/99 | Sell | 12,500 | $33.25 | $ 415,625.00 |
| 08/16/99 | Sell | 37,500 | $33.50 | $1,256,250.00 |
| 08/23/99 | Sell | 25,000 | $33.50 | $ 837,500.00 |
| 08/26/99 | Sell | 1,000 | $35.25 | $ 35,250.00 |
| 08/31/99 | Sell | 11,500 | $32.63 | $ 375,245.00 |
| 02/15/01 | Sell | 200,000 | $29.63 | $5,926,000.00 |
| **Total Sold:** | | **287,500** | | **$8,845,870.00** |

**Frederick B. Luddy**

| | | | | |
|---|---|---|---|---|
| 08/11/99 | Sell | 3,224 | $30.22 | $ 97,429.28 |
| 08/25/99 | Sell | 6,250 | $33.63 | $ 210,187.50 |
| 02/15/00 | Sell | 22,500 | $43.50 | $ 978,750.00 |
| 02/16/00 | Sell | 10,000 | $44.19 | $ 441,900.00 |
| 02/16/00 | Sell | 10,000 | $44.25 | $ 442,500.00 |
| 02/16/00 | Sell | 25,000 | $44.40 | $ 1,110,000.00 |
| 02/16/00 | Sell | 20,000 | $44.81 | $ 896,200.00 |
| 02/08/01 | Sell | 10,000 | $28.00 | $ 280,000.00 |
| 02/09/01 | Sell | 56,000 | $28.01 | $ 1,568,560.00 |
| 02/09/01 | Sell | 50,000 | $28.53 | $ 1,426,500.00 |
| 02/12/01 | Sell | 20,924 | $27.94 | $ 584,616.56 |
| 02/12/01 | Sell | 50,000 | $28.07 | $ 1,403,500.00 |
| 02/13/01 | Sell | 5,000 | $28.82 | $ 44,100.00 |

| | Date | Type | Shares | Price | Amount |
|---|---|---|---|---|---|
| 1 | 02/14/01 | Sell | 33,000 | $27.94 | $ 922,020.00 |
| 2 | 08/01/01 | Sell | 16,000 | $28.16 | $ 450,560.00 |
| 3 | 08/01/01 | Sell | 10,891 | $28.10 | $ 306,037.1 |
| 4 | 08/01/01 | Sell | 20,000 | $28.04 | $ 560,800.00 |
| 5 | **Total Sold:** | | **368,789** | | **$11,823,660.44** |

**John J. Moores**

| | Date | Type | Shares | Price | Amount |
|---|---|---|---|---|---|
| 7 | 07/26/99 | Sell | 1,522,719 | $28.50 | $ 43,397,491.50 |
| 8 | 07/26/99 | Sell | 970,923 | $28.50 | $ 27,671,305.50 |
| 9 | 02/17/00 | Sell | 1,143,016 | $46.06 | $ 52,647,316.96 |
| 10 | 02/17/00 | Sell | 251,436 | $46.06 | $ 11,581,142.16 |
| 11 | 02/18/00 | Sell | 2,122,736 | $43.68 | $ 92,721,108.48 |
| 12 | 02/18/00 | Sell | 466,960 | $43.68 | $ 20,396,812.80 |
| 13 | 02/28/00 | Sell | 408,220 | $51.35 | $ 20,962,097.00 |
| 14 | 02/28/00 | Sell | 89,799 | $51.35 | $ 4,611,178.65 |
| 15 | 02/29/00 | Sell | 89,799 | $52.65 | $ 4,727,917.35 |
| 16 | 02/29/00 | Sell | 408,220 | $52.65 | $ 21,492,783.00 |
| 17 | 02/08/01 | Sell | 77,000 | $30.19 | $ 2,324,630.00 |
| 18 | 02/12/01 | Sell | 175,000 | $28.00 | $ 4,900,000.00 |
| 19 | 02/13/01 | Sell | 385,000 | $28.54 | $ 10,987,900.00 |
| 20 | 02/15/01 | Sell | 1,104,022 | $29.67 | $ 32,756,332.74 |
| 21 | 02/16/01 | Sell | 280,000 | $29.76 | $ 8,332,800.00 |
| 22 | 02/16/01 | Sell | 218,978 | $28.91 | $ 6,330,653.98 |
| 23 | 02/20/01 | Sell | 210,000 | $30.04 | $ 6,308,400.00 |
| 24 | 02/23/01 | Sell | 506,223 | $30.52 | $ 15,449,925.96 |
| 25 | 02/26/01 | Sell | 360,000 | $28.97 | $ 10,429,200.00 |
| 26 | 02/27/01 | Sell | 50,000 | $26.70 | $ 1,335,000.00 |
| 27 | 02/28/01 | Sell | 90,000 | $25.29 | $ 2,276,100.00 |
| 28 | **Total Sold:** | | **10,930,051** | | **$401,640,096.08** |

**Charles E. Noell, III**

| | | | | |
|---|---|---|---|---|
| 02/23/00 | Sell | 90,000 | $43.31 | $3,897,900.00 |
| 02/15/01 | Sell | 68,978 | $29.76 | $2,052,785.28 |
| 02/16/01 | Sell | 15,397 | $28.91 | $ 445,127.27 |
| **Total Sold:** | | **174,375** | | **$6,395,812.55** |

**Norris van den Berg**

| | | | | |
|---|---|---|---|---|
| 02/22/00 | Sell | 40,000 | $43.20 | $1,728,000.00 |
| **Total Sold:** | | **40,000** | | **$1,728,000.00** |

467. This insider selling was unusual and suspicious, both in timing and amount. All of the sales came on the heels of Peregrine's various press releases falsely announcing "record" levels of revenues and improving balance sheet metrics, including cash and DSO, which the selling defendants knew or were deliberately reckless in not knowing were materially false and misleading.

468. Further, the amount of defendants' insider selling during the Class Period is suspicious. For example, defendant Gardner sold zero (0) shares in 1997, zero (0) shares in 1998 and 100,000 shares in 1999 prior to the Class Period for gross proceeds of less than $2.5 million. By contrast, defendant Gardner sold more than 352,000 shares during the Class Period for gross proceeds of over $14 million. In sum, almost 58% of Gardner's proceeds from insider sales were derived from sales during the Class Period.

469. Similarly, defendant Gless sold 3,000 shares in 1997 and 1998 for gross proceeds of only $120,000. During the Class Period, Gless accelerated his insider selling by selling more than 93,000 shares for gross proceeds of over $4,000,000.00. In sum, 97% of Gless' proceeds from insider sales were derived from sales during the Class Period.

470. Defendant Powanda greatly increased his insider trading during the Class Period. Prior thereto, Powanda had sold 250,000 shares of Peregrine common stock receiving gross proceeds of almost $6.6 million. During the Class Period, Powanda sold 616,250 shares of

//

1   Peregrine common stock receiving gross proceeds of approximately $20,518,810.00.  In sum,

2   76% of Powanda's proceeds from insider sales were derived from sales during the Class Period.

3        471.    Defendant Nelson also increased his insider trading during the Class Period.  Prior

4   thereto, Nelson sold 33,375 shares of Peregrine common stock and received gross proceeds of

5   approximately $784,218.75.  During the Class Period, Nelson sold 287,500 shares of Peregrine

6   common stock and received gross proceeds of $8,845,870.  In sum, approximately 92% of

7   Nelson's proceeds from insider sales were derived from sales during the Class Period.

8        472.    Defendant Spitzer also increased his insider trading during the Class Period.  In

9   early 1999, Spitzer sold 55,000 shares of Peregrine common stock and received gross proceeds of

10  approximately $998,750.  During the Class Period, Spitzer sold, at least, 47,500 shares of

11  Peregrine common stock and received gross proceeds of, at least, $1,914,650.  In sum, at least,

12  65% of Spitzer's proceeds from insider sales were derived from sales during the Class Period.

13       473.    Defendant Luddy also increased his insider trading during the Class Period.  Prior

14  to the Class Period, Luddy sold 131,174 shares of Peregrine common stock and received gross

15  proceeds of approximately $3,908,702.  During the Class Period, defendant Luddy sold 368,789

16  shares of Peregrine common stock and received gross proceeds of approximately $11,823,660.  In

17  sum, approximately 75% of Luddy's proceeds from insider sales were derived from sales during

18  Class Period.

19       474.    Defendant Moores also increased his selling during the Class Period.  Moores sold

20  almost 11,000,000 shares during the Class Period for gross proceeds of over $400 million.  Prior

21  to the Class Period, Moores sold approximately 6,000,000 shares for gross proceeds of

22  approximately $162 million.  In sum, 71% of Moores' proceeds from insider sales were derived

23  from sales during the Class Period.

24       475.    Similarly, defendant Noell sold fewer shares prior to the Class Period (107,000)

25  than during the Class Period (174,375).  The disparity in Noell's gross proceeds received is even

26  more dramatic.  Noell received approximately $2.2 million in gross proceeds on sales prior to the

27  Class Period.  Noell, however, received almost $6.4 million in gross proceeds, for his Class Period

28  //

1  sales. In sum, approximately 74% of Noell's proceeds from insider sales were derived on sales

2  during the Class Period.

3      476.    Since the wrongdoing alleged herein commenced in early 1999, it is more

4  appropriate to compare defendants' sales in 1997 and 1998 (the clean years) with their sales in

5  1999, 2000 and 2001 (the period of alleged fraudulent conduct). The chart below shows that

6  comparison in terms gross proceeds received.

| Defendant | $ Sale Proceeds For Years 1997 and 1998 | $ Sale Proceeds For Years 1999-2001 | % Sale Proceeds From Sales in Years 1999-2001 |
|---|---|---|---|
| Stephen P. Gardner | $0.00 | $16,520,326.00 | 100% |
| Matthew C. Gless | $120,000.00 | $4,083,188.00 | 97% |
| Douglas S. Powanda | $3,676,985.00 | $23,433,670.00 | 86% |
| Frederick B. Luddy | $2,502,009.00 | $13,230,354.19 | 84% |
| Richard T. Nelson | $784,218.75 | $8,845,870.00 | 92% |
| Steven S. Spitzer | $0.00 | $2,913,400.00 | 100% |
| John J. Moores | $92,873,435.36 | $470,804,666.00 | 83.5% |
| Charles E. Noell | $512,340.00 | $8,104,982.00 | 94% |
| Norris van den Berg | $705,600.00 | $3,069,700.00 | 81% |

## THE TRUTH BEGINS TO EMERGE

    477.    On April 5, 2002, Peregrine issued a press release announcing that it was replacing Arthur Andersen as its independent auditor with KPMG. It quoted defendant Gardner as saying that "we have the highest regard for our audit team's work ethic," but "in light of the current uncertainties at Arthur Andersen [relating to Enron], we felt it was in the best interest of our company and shareholders to retain KPMG as our independent auditors at this time."

    478.    After the close of trading on April 30, 2002, Peregrine issued a press release announcing that it would delay the release of its financial results for Q4 and year-end 2002. The results were supposed to have been announced on May 2, 2002, but now would be delayed until the week of May 6, 2002.due to the "continued audit activities by KPMG, the company's independent auditors."

//

479.     Before the market opened on May 6, 2002 (and approximately thirty (30) days after the engagement of KPMG), Peregrine issued a press release announcing (1) the discovery of accounting irregularities; (2) an internal accounting investigation; and (3) the resignation of defendants Gardner and Gless.

480.     Peregrine's stock price fell approximately 67% in response to this disclosure.  On May 3, 2002, Peregrine stock closed at $2.57 per share.  On the next trading day (May 6, 2002), Peregrine common stock closed at $0.89 per share on extremely heavy volume.

481.     On May 28, 2002, Peregrine filed a Form 8-K with the SEC stating that its Board of Directors had terminated its engagement of KPMG as its auditor.  Approximately $35 million of the then estimated $100 million in improperly recognized revenue came from questionable transactions with KPMG's consulting arm.

482.     In a Form 8-K filed with the SEC on June 3, 2002 (which was dated May 24, 2002), Peregrine stated that, in the course of its engagement, KPMG had informed the Company's Audit Committee and other Board members that:

> a.      Information had come to the attention of KPMG that had led it to no longer be able to rely on representations by some members of management. This information consisted principally of customer documentation and accounting information provided by personnel within the company's sales and finance organizations which, when taken together, pointed out accounting inconsistencies, errors and irregularities, principally in the company's indirect channel sales; and

> b.      KPMG had concluded the information provided to it during the course of its audit activities would impact the fairness and reliability of the company's audited financial statements for fiscal 2000 and 2001 and for each of the three subsequent unaudited quarterly periods reported by the company for fiscal 2002.  On May 23, 2002, the Company announced that it would be restating its financial statements for fiscal 2000 and 2001 and each of the first three quarters of fiscal 2002.

483.     In the Form 8-K, Peregrine stated that the "questions and issues" raised about Peregrine's financial statements by KPMG fell into four categories:

> a.      Revenue recognition irregularities, principally arising in the company's indirect channel sales and, to a lesser extent, arising in connection with commercial transactions involving contemporaneous product purchase activities and investments or acquisitions.  KPMG has advised that correcting these irregularities

would have the effect generally of delaying to later periods, or nullifying, revenue recognized from product sales;

b.    Accounting and transparency-of-presentation issues associated with the accounting treatment for impaired accounts receivable. KPMG has advised that some write-offs of impaired accounts receivable should have been accounted for as errors in the previous recognition of revenue. KPMG also advised that where write-offs of impaired accounts receivable were appropriately made, reclassification of those adjustments as bad debt or as a reversal of revenue would be appropriate;

c.    The appropriateness, from an accounting perspective, of the manner in which the company recorded on its balance sheet the financing of some of its accounts receivable with three banks; and

d.    KPMG has advised that the financing of some of these accounts receivable should be recorded for balance sheet purposes as loan transactions and not as sales of accounts receivable.

484.    On June 5, 2002, Peregrine filed an 8-K/A for the purpose of filing a letter from KPMG to the SEC.  In its letter, KPMG noted that the prior statements made by Peregrine in the June 3, 2002 Form 8-K were inaccurate or incomplete in that KPMG had determined that it was necessary to significantly expand the scope of the fiscal 2002 audit, and recommended an internal investigation by forensic auditing experts "into the various indicators of possible fraud."

485.    On June 27, 2002, Peregrine issued a press release announcing that the NASDAQ Stock Market had notified the Company of its intention to delist the Company at the opening of trading on August 30, 2002 because it had not filed periodic reports with the SEC.  On August 16, 2002 Peregrine announced in a press release that it had been given further notification of noncompliance by the NASDAQ based on the stock's failure to maintain a bid price over $1.00 per share.

486.    On August 29, 2002 Peregrine issued a press release announcing that it was "restructuring" its accounts receivable, and that management now estimated the overstatement of revenue during the eleven quarter period (ending the third quarter of fiscal 2002) to be $250 million.  In this release, Peregrine also quantified the amount of debt not reflected on its financial statements (up to $180 million) and the amount by which it had understated stock option compensation ($100 million).

//

487.   On August 29, 2002 Peregrine issued another press release announcing that NASDAQ would delist the Company from the NASDAQ National Market at the opening of trading on August 30, 2002 because the Company "had not filed periodic reports with the Securities and Exchange Commission."

488.   On September 22, 2002 Peregrine, "[c]iting the financial and legal issues raised by the company's inability to file audited financial reports for the 2000, 2001 and 2002 fiscal years, among other reasons," announced in a press release that it had filed a voluntary petition to reorganize under Chapter 11 of the U.S. Bankruptcy Code.

489.   On February 28, 2003, Peregrine filed with SEC its restatement of its financial statements for Fiscal Years 2000 and 2001 and the restatement of its financial statements for first, second and third quarters for Fiscal Year 2002 when it filed its audited financial statements for Fiscal Year 2002.

## BASIS OF FACTUAL ALLEGATIONS

490.   The basis for Lead Plaintiffs' factual allegations as alleged herein consists of the following: (1) a review of Peregrine press releases; (2) a review of Peregrine SEC filings; (3) a review of BMC Software's SEC filings; (4) a review of Peregrine's website; (5) a review of securities analysts' reports on Peregrine; (6) a review of reports, articles and discussions concerning Peregrine and/or its accounting irregularities contained in the print and electronic media; (7) interviews of witnesses; (8) a review of the trading volume and pricing of Peregrine; (9) consultations with expert consultants; (10) a review of complaints filed in other pending actions; and (11) a review of pleadings filed in Peregrine's bankruptcy case.

## DEFENDANTS' CONCEALMENT OF WRONGDOING

491.   Defendants actively concealed their wrongdoing as alleged herein such that no reasonable investor would have been put on inquiry or actual notice of the wrongdoing alleged herein until, at the earliest, May 6, 2002 when Peregrine announced the resignations of defendants Gardner and Gless and the commencement of an investigation into potential accounting irregularities. These consolidated actions were filed within one year of May 6, 2002.

//

## NO SAFE HARBOR

492. The statutory safe harbor provision for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead herein. The vast majority of the statements plead herein as being false are not "forward-looking statements" but are statements of financial results which are statements of historical fact and which are not protected by the statutory safe harbor. To the extent that there are any forward-looking false statements alleged, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false.

## COUNT I

### (Violations Of Section 10(b) Of The Exchange Act)

493. Plaintiffs incorporate by reference Paragraphs 1 through 492, as though fully set forth herein.

494. This Count is asserted by plaintiffs and the Class against the Peregrine Defendants and the Andersen Defendants.

495. These defendants carried out a plan, scheme, and course of conduct which was intended to and did:

    a.    deceive the investing public, including plaintiffs and other Class Members;

    b.    artificially inflate and maintain the market price of Peregrine securities; and

    c.    cause Class Members to acquire Peregrine securities at artificially inflated prices.

496. In furtherance of this unlawful scheme, these defendants employed devices, schemes and artifices to defraud plaintiffs and Class Members. They made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading. In addition, these defendants engaged in acts, practices, and a course of business that

1   operated as a fraud and deceit upon plaintiffs and Class Members. These defendants did so to

2   maintain artificially inflated market prices for Peregrine's securities in violation of Section 10(b)

3   of the Exchange Act and Rule 10b-5 promulgated thereunder.

4       497.    In addition to the duties of full disclosure imposed on defendants as a result of

5   their making or approving of affirmative statements and reports, or their participation in the

6   making of affirmative statements and reports to the investing public, the defendants had a duty to

7   promptly disseminate truthful information that would be material to investors in compliance with

8   the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R.

9   210.01 *et seq.*) and S-K (17 C.F.R. 229.10 *et seq.*) and other SEC regulations, including accurate

10  and truthful information with respect to the Company's operations and performance so that the

11  market price of the Company's securities would be based on truthful, complete and accurate

12  information.

13      498.    The liability of the Peregrine Defendants arises from the following facts as more

14  specifically alleged above:

15      a.    the Peregrine Defendants were high-level executives at the Company and

16  were members of the Company's senior management team or were members of the Company's

17  Audit or Compensation Committees;

18      b.    the Peregrine Defendants, by virtue of their responsibilities and activities as

19  senior officers and directors of the Company, were privy to and participated in the drafting,

20  reviewing and/or approving the misleading statements, press releases, reports and other public

21  representations about Peregrine, and/or were engaged in authorizing or entering into the

22  fraudulent transactions alleged herein, and/or signed the Company's public filings with the SEC

23  which contained the materially misleading statements as alleged herein;

24      c.    the Peregrine Defendants knew of or had access to the material, adverse,

25  non-public information about Peregrine's financial results and business, which were materially at

26  odds with reported financial results; and

27  //

28  //

1                d.     the Peregrine Defendants were aware of the Company's dissemination of

2 information to the investing public which they knew or were deliberately reckless in not knowing

3 was materially false and misleading.

4        499.     Arthur Andersen was engaged by Peregrine to provide the auditing and accounting

5 services to Peregrine and to audit Peregrine's annual financial results and to review Peregrine's

6 quarterly financial results during fiscal year 2000 and 2001 and the first three quarters in fiscal

7 2002. Defendant Stulac was the engagement or concurring partner for Arthur Andersen on the

8 Peregrine engagements. Stulac and Arthur Andersen used the services of Andersen Worldwide in

9 connection with the Peregrine engagements. As a result, the Arthur Andersen Defendants owed a

10 duty of full and complete disclosure to shareholders and prospective shareholders of Peregrine.

11 The Arthur Andersen Defendants breached that duty by failing to fully and adequately disclose

12 Peregrine's true financial condition through the issuance of unqualified audit reports on

13 Peregrine's audited financial statements for fiscal years 2000 and 2001 and by failing to cause

14 Peregrine to revise or withdraw materially false interim financial statements as alleged herein. The

15 Arthur Andersen Defendants' actions or inactions, as alleged herein, violated GAAS as set forth

16 above.

17        500.     The defendants named herein had actual knowledge of the misrepresentations and

18 omissions of material facts set forth herein, or acted with deliberate recklessness in that they failed

19 to ascertain and to disclose such facts, even though such facts were readily available to them.

20 These defendants' material misrepresentations and/or omissions were done knowingly or with

21 deliberate recklessness to conceal Peregrine's true financial condition from the investing public

22 and to support the artificially inflated price of its securities.

23        501.     As a result of the dissemination of the materially false and misleading information

24 and failure to disclose material facts, the market price of Peregrine securities was artificially

25 inflated throughout the Class period. In ignorance of the fact that the market price of Peregrine

26 securities was artificially inflated, and relying directly or indirectly on the false and misleading

27 statements by these defendants, or upon the integrity of the market in which Peregrine securities

28 //

---

1  trade, plaintiffs and Class Members purchased Peregrine securities at artificially inflated prices and

2  were damaged thereby.

3       502.   At the time of the alleged misrepresentations and omissions, plaintiffs and Class

4  Members were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other

5  Class Members known of the defendants' false statements as alleged herein they would not have

6  purchased Peregrine securities.

7       503.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and

8  Class Members suffered damages in connection with their purchase or acquisition of Peregrine

9  securities during the Class Period.

10  **COUNT II**

11  **(Violations Of Section 14(a) Of The Exchange Act –**
**The Harbinger Proxy Solicitation)**

12

13       504.   Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth

14  herein, Paragraphs 1(b), 33-38, 39(l)-(o), 40-49 and 54-61 above.

15       505.   This Count is asserted by Plaintiffs Waga and Sutliff on behalf of all those who

16  held Harbinger common stock on May 22, 2000 and still held those shares on June 16, 2000 and

17  exchanged those shares for shares issued by Peregrine in connection with Peregrine's acquisition

18  of Harbinger Corporation (the "Harbinger Subclass").

19       506.   This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley,

20  Noell, van den Berg and Watrous on behalf of the Harbinger Subclass, for violations of Section

21  14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9.  This Count

22  is based solely on defendants' negligent conduct.

23       507.   Each defendant named in this Count solicited proxies by means of the Joint Proxy

24  Statement and Prospectus filed on or about May 22, 2000 as part of Amendment No. 1 to

25  Peregrine's Form S-4 Registration Statement (the "Harbinger Joint Proxy").  The Harbinger Joint

26  Proxy was distributed by defendants named herein to Harbinger shareholders.  They each

27  permitted the use of their names in the Harbinger Joint Proxy.

28  //

508.   The Harbinger Joint Proxy was a "proxy solicitation" within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

509.   Each of the defendants named in this Count signed Amendment No. 1 to the Peregrine Registration Statement which contained the Harbinger Joint Proxy, thus allowing it to be filed with the SEC.  These defendants were members of Peregrine's Board of Directors at all relevant times.

510.   The Harbinger Joint Proxy contained or incorporated by reference Peregrine's audited financial statements for the fiscal year ending March 31, 2000.  These financial statements were materially false and misleading for the reasons set forth in Paragraphs 33 through 35 above.

511.   The Harbinger Joint Proxy was materially false and misleading, in that it contained the foregoing false and misleading statements of material fact and failed to disclose material facts necessary to make the statements made not false and misleading.

512.   The defendants named in this Count sought to secure Harbinger shareholder approval of the Peregrine/Harbinger merger by means of the materially false and misleading Harbinger Joint Proxy and permitted the use of their names to solicit proxies from the Harbinger Subclass.

513.   The following facts give rise to a strong inference that each of the defendants named in this Count acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or caused to be issued the Harbinger Joint Proxy and permitted the use of their names in the Harbinger Joint Proxy.  As detailed more fully above, these defendants were negligent in not knowing that the Harbinger Joint Proxy contained misstatements of material fact and that it omitted to state material facts necessary in order to make the statements made therein not false or misleading.

514.   The Merger required and received the affirmative vote of the Harbinger shareholders at the Special Meeting of Harbinger shareholders held on June 16, 2000. Accordingly, the materially false and misleading joint proxy statement was an essential link in the accomplishment of Peregrine's acquisition of Harbinger.

//

515.   Based on the foregoing, the defendants named in this Count have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

516.   As a direct and proximate result of defendants' wrongdoing, Plaintiff and other members of the Harbinger Subclass have sustained injury and damages by reason of defendants' misrepresentations contained in the Harbinger Joint Proxy in connection with the Peregrine's acquisition of Harbinger.

## COUNT III

### (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder - Harbinger Acquisition - Arthur Andersen)

517.   Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth herein, Paragraphs 504 through 516 above.

518.   This Count is asserted by Plaintiffs Waga and Sutliff on behalf of the Harbinger Subclass.

519.   This Count is asserted against Arthur Andersen on behalf of the Harbinger Subclass for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9.

520.   The Joint Proxy which was included in Peregrine's May 22, 2000 Amendment 1 to its S-4 Registration Statement filed with the SEC and distributed to Harbinger shareholders (the "Harbinger Joint Proxy") was a "proxy solicitation" within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder. This Count is based solely on defendants' negligent conduct.

521.   Arthur Andersen consented to the use of its name in the Harbinger Joint Proxy to solicit proxies from Plaintiff and other members of the Harbinger Subclass.

522.   Arthur Andersen also consented to the inclusion and/or the incorporation by reference, in the Harbinger Joint Proxy, of its unqualified audit report on Peregrine's fiscal year 2000 financial statements, as set forth in Peregrine's Form 10-K for the year ending March 31, 2000, and consented to all references to Arthur Andersen in the registration statement, which included a reference to it under the caption "Experts," and under the caption "Peregrine Selected

1   Consolidated Financial Data," where it was noted that the consolidated financial data was based

2   upon financial statements audited by Arthur Andersen.

3       523.   Arthur Andersen's audit report on Peregrine's financial statements for the year

4   ending March 31, 2000, which was included and/or incorporated by reference into the Harbinger

5   Joint Proxy, was materially false and misleading for the reasons set forth in Paragraphs 33 through

6   35 above.

7       524.   The following facts give rise to a strong inference that Arthur Andersen acted with

8   the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, in

9   permitting its name to be used in conjunction with the solicitation of proxies pursuant to a proxy

10  statement that contained material misrepresentations and omissions.  As detailed more fully above,

11  Arthur Andersen should have known at the time it consented to the use of its name in the

12  Harbinger Joint Proxy that its audit report on Peregrine's financial statements for the year ending

13  March 31, 2000, which were included and/or incorporated by reference to in the Harbinger Joint

14  Proxy, was materially false and misleading.

15      525.   The Merger required and received the affirmative vote of the Harbinger

16  shareholders at the Special Meeting of Harbinger shareholders held on June 16, 2000.

17  Accordingly, the materially false and misleading joint proxy statement was an essential link in the

18  accomplishment of the Peregrine's acquisition of Harbinger.

19      526.   Based on the foregoing, Arthur Andersen violated Section 14(a) of the Exchange

20  Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

21      527.   As a direct and proximate result of Arthur Andersen's wrongful conduct, plaintiff

22  and other members of the Harbinger Subclass have sustained injury and damages by reason of

23  defendants' misrepresentations contained in the Harbinger Joint Proxy in connection with the

24  Peregrine's acquisition of Harbinger.

25  //

26  //

27  //

28  //

## COUNT IV

**(Violations Of Section 14(a) Of The Exchange Act And
Rule 14a-9 Promulgated Thereunder - Remedy Acquisition)**

528.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth herein, Paragraphs 1(b), 33-38, 39(l)-(o), 40-49 and 54-61 above.

529.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of all those who held Remedy common stock on July 23, 2001 and still held those shares on August 27, 2001 and exchanged those shares for shares issued by Peregrine in connection with Peregrine's acquisition of Remedy Corporation (the "Remedy Subclass").

530.    This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous on behalf of the Remedy Subclass, for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9.  This Count is based solely on defendants' negligent conduct.

531.    Each defendant named in this Count solicited proxies by means of the Joint Proxy Statement and Prospectus filed on or about July 23, 2001 as part of Amendment No. 1 to Peregrine's Form S-4 Registration Statement (the "Remedy Joint Proxy").  The Remedy Joint Proxy was distributed to Remedy shareholders by defendants named herein.  They each permitted the use of their names in the Remedy Joint Proxy.

532.    The Remedy Joint Proxy was a "proxy solicitation" within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

533.    Each of the defendants named in this Count signed Amendment No. 1 to the Peregrine Registration Statement which contained the Remedy Joint Proxy allowing it to be filed with the SEC.  These defendants were members of Peregrine's Board of Directors at all relevant times.

534.    The Remedy Joint Proxy contained or incorporated by reference Peregrine's audited financial statements for the fiscal years ending March 31, 2000 and March 31, 2001. Each of these financial statements were materially false and misleading for the reasons set forth in Paragraphs 33 through 35 above.

535.    The Remedy Joint Proxy was materially false and misleading in that it contained false and misleading statements of material fact and failed to disclose material facts necessary to make the statements made not false and misleading.

536.    The defendants named in this Count sought to secure Remedy shareholder approval of the Peregrine/Remedy merger by means of the materially false and misleading Remedy Joint Proxy and permitted the use of their names to solicit proxies from the Remedy Subclass.

537.    The following facts give rise to a strong inference that each of the defendants named in this Count acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or caused to be issued the Remedy Joint Proxy and permitted the use of their names in the Remedy Joint Proxy.  As detailed more fully above, these defendants were negligent in not knowing that the Remedy Joint Proxy contained misstatements of material fact and that it omitted to state material facts necessary in order to make the statements made therein not false or misleading.

538.    The Merger required and received the affirmative vote of the Remedy shareholders at the Special Meeting of Remedy shareholders held on August 27, 2001.  Accordingly, the materially false and misleading joint proxy statement was an essential link in the accomplishment of Peregrine's acquisition of Remedy.

539.    Based on the foregoing, the defendants named in this Count have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

540.    As a direct and proximate result of defendants' wrongdoing, plaintiff and other members of the Remedy Subclass have sustained injury and damages by reason of defendants' misrepresentations contained in the Remedy Joint Proxy in connection with Peregrine's acquisition of Remedy.

//
//
//
//
//

# COUNT V

## (Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder - Remedy Acquisition - Arthur Andersen)

541.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth herein, Paragraphs 528 through 540 above.

542.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of the Remedy Subclass.

543.    This Count is asserted against Arthur Andersen on behalf of the Remedy Subclass, for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9, 17 C.F.R. §240.14a-9. This Count is based solely on defendants' negligent conduct.

544.    The Joint Proxy which was included in Peregrine's July 23, 2001 Amendment 1 to its S-4 Registration Statement filed with the SEC and distributed to Remedy shareholders (the "Remedy Joint Proxy") was a "proxy solicitation" within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

545.    Arthur Andersen consented to the use of its name in the Remedy Joint Proxy to solicit proxies from Plaintiff and other members of the Remedy Subclass.

546.    Arthur Andersen also consented the inclusion and/or to the incorporation by reference, in the Remedy Joint Proxy, of its unqualified audit reports on Peregrine's consolidated financial statements as of March 31, 2000 and March 31, 2001, and consented to all references to Arthur Andersen in the registration statement, which included a reference to it under the caption "Experts," and under the caption "Peregrine Selected Consolidated Financial Data," where it was noted that the consolidated financial data was audited by Arthur Andersen.

547.    Arthur Andersen's audit reports on Peregrine's financial statements for the years ending March 31, 2000 and March 31, 2001, which were included and/or incorporated by reference in the Remedy Joint Proxy, were materially false and misleading for the reasons set forth in Paragraphs 33 through 35 above.

548.    The following facts give rise to a strong inference that Arthur Andersen acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, in

permitting its name to be used in conjunction with the solicitation of proxies pursuant to a proxy statement that contained material misrepresentations and omissions. As detailed more fully above, Arthur Andersen should have known at the time it consented to the use of its name in the Remedy Joint Proxy that its audit reports on Peregrine's financial statements for the years ending March 31, 2000 and March 31, 2001, which were included and/or incorporated by reference in the Remedy Joint Proxy, were materially false and misleading.

549.   The Merger required and received the affirmative vote of the Remedy shareholders at the Special Meeting of Remedy shareholders held on August 27, 2001. Accordingly, the materially false and misleading joint proxy statement was an essential link in the accomplishment of Peregrine's acquisition of Remedy.

550.   Based on the foregoing, Arthur Andersen violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated by the SEC thereunder.

551.   As a direct and proximate result of Arthur Andersen's wrongdoing, plaintiff and other members of the Remedy Subclass have sustained injury and damages by reason of Arthur Andersen's misrepresentations in connection with the Peregrine's acquisition of Remedy.

## COUNT VI

### (Violations Of Section 20(a) Of The Exchange Act)

552.   Plaintiffs incorporate by reference, as though fully set forth herein, Paragraphs 1 through 551 above.

553.   This Count is asserted against the Peregrine Defendants and defendants Andersen Worldwide and Stulac.

554.   The Peregrine Defendants acted as controlling persons of Peregrine within the meaning of Section 20(a) of the Exchange Act. By virtue of their executive positions, Board membership, and stock ownership (as more specifically alleged above), these defendants had the power to influence and control (and did influence and control, directly or indirectly) the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are materially false and misleading. The Peregrine Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings and

1  other statements alleged by plaintiffs to be misleading prior to and/or shortly after these

2  statements were issued and had the ability to prevent the issuance of the false statements or cause

3  the false statements to be corrected.

4      555.    Peregrine violated Section 10(b) and Rule 10b-5 and Section 14(a) and Rule 14a-9

5  by the issuance materially false and misleading statements and proxies as alleged herein.  By virtue

6  of their positions as controlling persons of Peregrine, the Peregrine Defendants are liable to

7  plaintiffs and the Class pursuant to Section 20(a) of the Exchange Act.

8      556.    By virtue of Stulac's position within Arthur Andersen and Andersen Worldwide's

9  relationship to Arthur Andersen and Stulac with respect to accounting and auditing work

10  performed for Peregrine (as more fully alleged above), Defendants Andersen Worldwide and

11  Stulac acted as control persons of Arthur Andersen within the meaning of Section 20(a) of

12  Exchange Act.  These defendants had the power and influence to control (and did influence and

13  control, directly and indirectly) the contents of Arthur Andersen's audit reports and quarterly

14  review work both of which are alleged to have caused damage to the Class.

15      557.    Arthur Andersen violated Section 10(b) and Rule 10b-5 and Section 14(a) and

16  Rule 14a-9 by the issuance materially false and misleading statements and proxies as alleged

17  herein.  By virtue of their positions as controlling persons of Arthur Andersen, Andersen

18  Worldwide and Stulac are liable to plaintiffs and the Class pursuant to Section 20(a) of the

19  Exchange Act.

20      558.    As a direct and proximate cause of defendants' wrongful conduct, plaintiffs and

21  Class Members suffered damages in connection with their purchase or acquisition of Peregrine

22  securities.

23  **COUNT VII**

24  **(Violations Of Sections 11 And 15 Of
The Securities Act - The Harbinger Acquisition)**

25

26      559.    Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth

27  herein, Paragraphs 1(b), 33-38, 39(l)-(o), 40-49 and 54-61 above.

28  //

560.   This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley, Noell, van den Berg and Watrous and the Arthur Andersen Defendants.  This Count is based solely on defendants' negligent conduct.

561.   This Count is asserted by Plaintiffs Waga and Sutliff on behalf of a Subclass consisting of all persons and entities who acquired Peregrine registered common stock in connection with Peregrine's acquisition of Harbinger Corporation which was consummated on or about June 16, 2000 (the "Harbinger Subclass").

562.   On or about May 22, 2000, the defendants named herein issued, caused the issuance, and/or signed Amendment No. 1 to its Form S-4/A Registration Statement that was filed with the SEC (the Harbinger Registration Statement) in connection with Peregrine's acquisition of Harbinger.  The Harbinger Registration Statement included a Proxy/Prospectus, which provided, *inter alia,* for special meetings to be held on June 16, 2000 in which shareholders of both Peregrine and Harbinger were solicited to vote to approve the consummation of the proposed merger between the two companies.  Under the terms of the proposed merger, each outstanding share of Harbinger common stock would be exchanged for 0.75 of a share of Peregrine common stock, and each option to purchase Harbinger common stock would be exchanged for an option to purchase Peregrine common stock at the same exchange ratio.

563.   Defendants Gardner, Gless, Moores, Cole, Hosley, Noell, Van Den Berg and Watrous signed the Harbinger Registration Statement.  The Harbinger Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

564.   In particular, the Proxy/Prospectus contained Peregrine financial statements for the Company's fiscal year ended March 31, 2000 along with an unqualified audit opinion on those financial statements issued by Peregrine's auditor, Arthur Andersen, dated April 25, 2000.  The Proxy/Prospectus included a "Consolidated Statements Of Operations" for Peregrine for its fiscal year ended March 31, 2000 which reported, among other things that Peregrine had achieved Total Revenues of $253,300,000 ($168,467,000 attributed to Licenses Revenues and $84,833,000

//

1   attributed to Services Revenues), and that Peregrine had a Net Loss of $25,070,000 for that fiscal

2   year.

3        565.    The Proxy/Prospectus included a section entitled "Notes To Consolidated

4   Financial Statements." Under the caption "Company Operations And Summary Of Significant

5   Accounting Policies" the Proxy/Prospectus provided Peregrine's revenue recognition policy and

6   stated:

7              REVENUE RECOGNITION

8                 We generate revenues from licensing the rights to use our
software products primarily to end users. We also generate

9   revenues from post-contract support (maintenance), consulting and
training services performed for customers who license our

10  products. We do not provide professional services unrelated to our
products.

11

12                <u>Revenues from direct and indirect license agreements are
recognized currently, provided that all of the following conditions</u>

13  <u>are met: a noncancellable license agreement has been signed, the
product has been delivered, there are no material uncertainties</u>

14  <u>regarding customer acceptance, collection of the resulting
receivable is deemed probable, risk of concession is deemed</u>

15  <u>remote, and we have no other significant obligations associated
with the transaction</u>. . .

16  [Emphasis added.]

17       566.    The "Management's Discussion And Analysis Of Financial Condition And Results

18  Of Operations" section of the Proxy/Prospectus stated with respect to revenue that:

19                Our revenues are derived from product licensing and services.
Services are comprised of maintenance, professional services, and

20  training. . .

21                <u>Revenues from license agreements are recognized currently,
provided that all of the following conditions are met: a</u>

22  <u>noncancelable license agreement has been signed, the product has
been delivered, there are no material uncertainties regarding</u>

23  <u>customer acceptance, collection of the resulting receivable is
deemed probable, the risk of concession is deemed remote, and no</u>

24  <u>other significant vendor obligations exist</u>. . .

25                   * * *
              REVENUES. Total revenues were $253.3 million, $138.1

26  million and $61.9 million for the fiscal years ended 2000, 1999 and
1998, representing period-to-period increases of 83% and 123% for

27  the fiscal 2000 and 1999 periods . . .

28  //

CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW –
Master File No. 02-CV-0870 J(RBB)

LICENSES.  License revenues were $168.4 million, $87.4 million and $38.8 million in fiscal 2000, 1999 and 1998, representing 67% of total revenues in fiscal 2000 and 63% in both fiscal 1999 and 1998.  Total license revenues increased 93% and 125% period-to-period for fiscal 2000 and 1999.  Domestic license revenues increased 73% in fiscal 2000 and 135% in fiscal 1999, while international license revenues increased 125% and 111% in fiscal 2000 and 1999.  The increases in license revenues are attributable to increased demand for new and additional licenses of our infrastructure resource management applications, from new and existing customers, larger transaction sizes, expansion of our domestic and international sales forces, and acquisitions.  We expect larger transaction sizes from a limited number of customers to account for a large percentage of license revenues for the foreseeable future.  Management believes these trends will fluctuate period to period in absolute dollars and as a percentage of total revenues.

During the past three years, we have increased the number of channels that we use to distribute our products.  The majority of our products are distributed through our direct sales organization.  The balance is derived through indirect sales channels and alliance partners, including value added resellers and systems integrators.  Revenues derived through indirect channels now comprise a significant portion of our total license revenues. . .

SERVICES.  Services revenues consist of support, consulting and training services.  Service revenues were $84.8 million, $50.7 million and $23.1 million for fiscal years 2000, 1999 and 1998, representing 33% of total revenues in fiscal 2000 and 37% in both fiscal 1999 and 1998.  Total services revenues increased 67% and 120% period-to-period for fiscal 2000 and 1999.  Domestic services increased 63% in fiscal 2000 and 111% in fiscal 1999, while international services revenues increased 78% and 140% in fiscal 2000 and 1999, respectively.  The dollar increases are attributable to maintenance agreements and related billings from our expanded installed base of customers and an increase in consulting and training revenues related to the implementation of our software from initial license agreements and related expansion . . .

[Emphasis added.]

567.   The above material statements of fact contained in the Harbinger Registration Statement were untrue for among other reasons:

(a)   Peregrine's fiscal 2000 financial statements were false as its reported revenue was materially overstated and its reported net loss was materially understated;

(b)   revenue was improperly recognized on software contracts that were subject to cancellation and therefore collection of that revenue was not probable;

1    (c) the rate of revenue growth was materially overstated due to, among other

2 things, improper recognition of revenue;

3    (d) the fiscal 2000 financial statements were not presented in accordance with

4 GAAP; and

5    (e) the fiscal 2000 financial statements were not audited in accordance with

6 GAAS.

7   568. On May 24, 2002, Arthur Andersen withdrew its audit opinion on Peregrine's

8 fiscal 2000 financial statements because that opinion could not be relied upon.

9   569. On February 28, 2003, Peregrine issued restated financial statements for, among

10 other periods, its fiscal year ended March 31, 2000.  The restated figures relative to those

11 contained in the Harbinger Registration Statement are as follows (in thousands):

|  | As Contained in Registration Statement<br>(In $000) | As Restated<br>(In $000) |
|---|---|---|
| License Revenue | $168,467 | $53,329 |
| Services Revenue | $ 84,833 | $78,303 |
| Total Revenue | $253,300 | $131,632 |
| Net Loss | ($ 25,070) | ($217,418) |

17   570. Defendants' false statements, misrepresentations, and omissions caused the

18 market price of Peregrine securities to be artificially inflated at the time of the merger with

19 Harbinger.  On June 16, 2000, the date of the merger with Harbinger, the market price of

20 Peregrine common stock closed at $25.56 per share.

21   571. The defendants named herein from Peregrine's board each had a duty to make a

22 reasonable and diligent investigation of the truthfulness and accuracy of the statements contained

23 in the Harbinger Registration Statement.  They had a duty to ensure that such statements were

24 true and accurate and that there were no omissions of material facts that would make the

25 statements made misleading.  These defendants failed to do so.

26   572. The Arthur Andersen Defendants each had a duty to make a reasonable and

27 diligent investigation of the truthfulness and accuracy of the Peregrine financial statements

28 contained in the Harbinger Registration Statement.  They had a duty to ensure such statements

1  were true and there were no omissions of material facts that would make the statements made

2  misleading. The Arthur Andersen Defendants failed to do so. Instead, Arthur Andersen

3  consented to the inclusion of its materially false and misleading audit report on Peregrine's fiscal

4  year 2000 financial statements. The Arthur Andersen audit report was contained in the Harbinger

5  Registration Statement with the knowledge and consent of Arthur Andersen, Stulac and Andersen

6  Worldwide.

7       573.   None of the defendants named herein made a reasonable investigation or possessed

8  reasonable grounds for the belief that the statements contained in the Harbinger Registration

9  Statement were true and without omissions of any material facts and were not misleading. The

10  defendants named herein, in the exercise of reasonable care, should have known of the

11  misstatements and omissions contained in the Registration Statement and Prospectus as set forth

12  above.

13       574.   Plaintiffs and the Subclass Members who acquired Peregrine common stock

14  pursuant to the Harbinger Registration Statement did so without knowledge of the materially

15  untrue statements or omissions in the Registration Statement. As a direct and proximate result of

16  the defendants' wrongdoing, the Harbinger Subclass Members have suffered substantial damages.

17  **COUNT VIII**

18  **(Violations Of Sections 12(2) And 15 Of**
**The Securities Act - The Harbinger Acquisition)**

19

20       575.   Plaintiffs Waga and Sutliff incorporate by reference, as though fully set forth

21  herein, Paragraphs 559 through 574 above.

22       576.   This Count is asserted by Plaintiffs Waga and Sutliff on behalf of the Harbinger

23  Subclass.

24       577.   This Count is asserted against defendants Gardner, Gless, Moores, Cole, Hosley,

25  Noell, van den Berg and Watrous. This Count is based solely on defendants' negligent conduct.

26       578.   The defendants named herein issued, caused to be issued, and/or signed the

27  Registration Statement filed with the SEC on or about May 22, 2000 in connection with

28  Peregrine's acquisition of Harbinger Corporation (the "Harbinger Registration Statement").

1   When it became effective, the Harbinger Registration Statement contained untrue statements of

2   material fact and/or omitted to state material facts required to be stated therein which were

3   necessary to make the statements therein not misleading in violation of §12(2) of the Securities

4   Act. The Harbinger Registration Statement contained a prospectus which was used to induce

5   Harbinger shareholders to approve Peregrine's acquisition of Harbinger Corporation. As a result

6   of the materially false and misleading information contained in the Harbinger Registration

7   Statement, the Harbinger shareholders voted to approve Peregrine's acquisition of Harbinger

8   Corporation on or about June 16, 2000.

9       579.   The defendants named herein each had a duty to make a reasonable and diligent

10   investigation of the truthfulness and accuracy of the statements contained in the Harbinger

11   Registration Statement and prospectus. They had a duty to ensure that such statements were true

12   and that there were no omissions of material facts that would make the statements made therein

13   misleading. The defendants named herein failed to do so. The defendants named herein signed

14   the Harbinger Registration Statement. The defendants named herein were sellers and offerors of

15   the shares offered pursuant to the Harbinger Registration Statement and Prospectus.

16       580.   Plaintiffs and the Subclass Members who acquired Peregrine common stock

17   pursuant to the Harbinger Registration Statement and prospectus did so without knowledge of the

18   materially untrue statements or omissions in the Harbinger Registration Statement. As a direct

19   and proximate result of the defendants' wrongdoing, the Harbinger Subclass Members have

20   suffered substantial damages.

21       581.   By reason of the conduct alleged herein, the defendants named herein violated

22   Section 12(a)(2) of the Securities Act. Plaintiffs, individually and on behalf of the other members

23   of the Harbinger Subclass, hereby offer to tender to defendants named herein those Peregrine

24   securities which plaintiffs and the other Harbinger Subclass members continue to own, in return

25   for the consideration provided for those securities together with interest thereon. The Harbinger

26   Subclass members who have sold their Peregrine securities are entitled to rescissory and

27   compensatory damages.

28   //

## COUNT IX

### (Violations Of Sections 11 And 15 Of
### The Securities Act - The Remedy Acquisition)

582.   Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth herein, Paragraphs 1(b), 33-38, 39(l)-(o), 40-49 and 54-61 above.

583.   This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous and the Arthur Andersen Defendants.  This Count is based solely on defendants' negligent conduct.

584.   This Count is asserted by Plaintiffs Balch and Hylton on behalf of a Subclass consisting of all persons and entities who acquired Peregrine registered common stock in connection with Peregrine's acquisition of Remedy Corporation which was consummated on or about August 27, 2001 (the "Remedy Subclass").

585.   On or about July 23, 2001, the defendants issued, caused the issuance, and/or signed Amendment No. 1 to a Form S-4 Registration Statement that was filed with the SEC (the "Remedy Registration Statement") in connection with Peregrine's acquisition of Remedy.  The Remedy Registration Statement included a Proxy/Prospectus which provided, *inter alia*, for a special meeting of Remedy stockholders to be held on August 27, 2001 in which shareholders of Remedy were solicited to vote to approve the consummation of the proposed merger of Peregrine and Remedy.  Under the terms of the proposed merger, each outstanding share of Remedy common stock would be exchanged for $9.00 in cash and 0.9065 of a share of Peregrine common stock, and each option to purchase Remedy common stock would be exchanged for an equivalent amount of Peregrine common stock based on the value of stock and cash which each share of Remedy common stock was to receive in the merger.

586.   Defendants Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous signed the Remedy Registration Statement.  The Remedy Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

//

1      587.  In particular, the Proxy/Prospectus, under the heading "Peregrine Selected

2  Consolidated Financial Data," contained consolidated operating results for, *inter alia*, the

3  Company's fiscal years ended March 31, 2001 and March 31, 2000.  The financial dated included

4  the following:

5  YEAR ENDED MARCH 31,

| | 2001<br>(in 000s) | 2000<br>(in 000s) |
|---|---|---|
| **STATEMENT OF OPERATIONS DATA:** | | |
| Revenues: Licenses | $ 354,610 | $168,467 |
|       Services | $ 210,073 | $ 84,833 |
| Total revenues | $ 564,683 | $ 253,300 |
| Total costs and expenses | $1,378,090 | $ 261,956 |
| Income (loss) from operations | $ (813,407) | $ (8,656) |
| Net income (loss) | $ (852,241) | $ (25,070) |
| Net income (loss) per share diluted | $ (6.16) | $ (0.24) |

11      588.  The Remedy Registration Statement also incorporated by reference Peregrine's

12  Annual Report on Form 10-K for the fiscal year ended March 31, 2001, which contained, *inter*

13  *alia*, Peregrine's consolidated financial statements as of March 31, 2000 and as of March 31,

14  2001, including an unqualified audit opinion of Arthur Andersen on those financial statements.

15      589.  Peregrine's Form 10-K for the fiscal year ended March 31, 2001 stated as follows

16  in connection with the Company's revenue recognition:

> Revenues from direct and indirect license agreements are
> recognized currently, provided that all of the following conditions
> are met: a noncancellable license agreement has been signed, the
> product has been delivered, there are no material uncertainties
> regarding customer acceptance, collection of the resulting
> receivable is deemed probable, risk of concession is deemed
> remote, and we have no other significant obligations associated
> with the transaction. Revenues from post-contract support services
> are recognized ratably over the term of the maintenance period,
> generally one year. Maintenance revenues which are bundled with
> license agreements, are unbundled using vendor specific objective
> evidence. Professional services revenues are primarily related to
> implementation services most often performed on a time and
> material basis under separate service agreements for the installation
> of our products. Revenues from professional services and customer
> training are recognized as the respective services are performed.

[Emphasis added.]

27      590.  The Remedy Registration Statement also included a Consent of Independent

28  Public Accountants signed by Arthur Andersen which stated:

1        As independent public accountants, we hereby consent to the

incorporation by reference in this registration statement of our

2        report dated April 26, 2001 included in Peregrine Systems, Inc.

Form 10-K for the year ended March 31, 2001 and to all references

3        to our Firm included in this registration statement.

4       591.   The above material statements of fact contained in the Remedy Registration

5  Statement were untrue for among other reasons:

6        (a)    Peregrine's fiscal 2000 and 2001 financial statements were each false as its

7  reported revenue was materially overstated and its reported net loss was materially understated;

8        (b)    revenue was improperly recognized on software contracts that were subject

9  to cancellation and therefore collection of that revenue was not probable;

10       (c)    the rate of revenue growth reflected in the fiscal 2000 and 2001 data was

11  materially overstated due to, among other things, improper recognition of revenue;

12       (d)    the fiscal 2000 and 2001 financial statements were not presented in

13  accordance with GAAP; and

14       (e)    the fiscal 2000 and 2001 financial statements were not audited in

15  accordance with GAAS.

16      592.   On May 24, 2002, Arthur Andersen withdrew its audit opinion on Peregrine's

17  fiscal 2000 and 2001 financial statements as its opinions with respect to those financial statements

18  could not be relied upon.

19      593.   On February 28, 2003, Peregrine issued restated financial statements for, among

20  other periods, its fiscal years ended March 31, 2000 and March 31, 2001.  The restated figures

21  relative to those contained in the Remedy Registration Statement are as follows (in thousands):

| | As Contained in Registration Statement (in $000) | | As Restated (in $000) | |
|---|---|---|---|---|
| | Fiscal 2000 | Fiscal 2001 | Fiscal 2000 | Fiscal 2001 |
| License Revenue | $168,467 | $ 354,610 | $53,329 | $   94,918 |
| Services Revenue | $ 84,833 | $ 210,073 | $78,303 | $  118,435 |
| Total Revenue | $253,300 | $ 564,683 | $131,632 | $  213,353 |
| Net Loss | $(25,070) | $(852,241) | $(217,418) | $(1,844,517) |

27      594.   As a result of the defendants' false statements, misrepresentations, and omissions,

28  the price of Peregrine securities was artificially inflated at the time of the merger with Remedy.

1   On August 27, 2001, the date of the merger with Remedy, the market price of Peregrine stock

2   closed at $23.01 per share.

3       595.   The defendants who were members of Peregrine's board of directors named herein

4   each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of

5   the statements contained in the Remedy Registration Statement. They had a duty to ensure that

6   such statements were true and that there were no omissions of material facts that would make the

7   statements made misleading. These defendants failed to do so. These defendants signed the

8   Remedy Registration Statement.

9       596.   The Arthur Andersen Defendants each had a duty to make a reasonable and

10   diligent investigation of the truthfulness and accuracy of the Peregrine financial statements

11   contained in the Remedy Registration Statement. They had a duty to ensure such statements were

12   true and there were no omissions of material facts that would make the statements made

13   misleading. The Arthur Andersen Defendants failed to do so. Instead, Arthur Andersen

14   consented to the inclusion of its materially false and misleading audit reports on Peregrine's fiscal

15   year 2000 and fiscal year 2001 financial statements. The Arthur Andersen audit reports were

16   contained in the Remedy Registration Statement with the knowledge and consent or the

17   acquiescence of defendants Arthur Andersen, Stulac and Andersen Worldwide.

18       597.   None of the defendants named herein made a reasonable investigation or possessed

19   reasonable grounds for the belief that the statements contained in the Remedy Registration

20   Statement were true and without omissions of any material facts and were not misleading.

21       598.   The defendants named herein, in the exercise of reasonable care, should have

22   known of the misstatements and omissions contained in the Remedy Registration Statement as set

23   forth above.

24       599.   Plaintiffs and the Remedy Subclass Members who acquired Peregrine common

25   stock pursuant to the Remedy Registration Statement did so without knowledge of the materially

26   untrue statements or omissions in the Registration Statement. As a direct and proximate result of

27   the defendants' wrongdoing, the Remedy Subclass Members have suffered substantial damages.

28   //

# COUNT X

## (Violations Of Sections 12(2) And 15 Of
## The Securities Act - Remedy Acquisition)

600.    Plaintiffs Balch and Hylton incorporate by reference, as though fully set forth herein, Paragraphs 582 through 599 above.

601.    This Count is asserted by Plaintiffs Balch and Hylton on behalf of the Remedy Subclass.

602.    This Count is asserted against defendants Gardner, Gless, Moores, Savoy, Cole, Noell and Watrous.  This Count is based solely on defendants' negligent conduct.

603.    The defendants named herein issued, caused to be issued, and/or signed the Registration Statement filed with the SEC on or about July 23, 2001 in connection with Peregrine's acquisition of Remedy Corporation (the "Remedy Registration Statement").  When it became effective, the Remedy Registration Statement contained untrue statements of material fact and/or omitted to state material facts required to be stated therein which were necessary to make the statements therein not misleading in violation of §12(2) of the Securities Act.  The Remedy Registration Statement contained a prospectus which was used to induce Remedy shareholders to approve Peregrine's acquisition of Remedy Corporation.  As a result of the materially false and misleading information contained in the Remedy Registration Statement, Remedy shareholders voted to approve Peregrine's acquisition of Remedy Corporation on or about August 27, 2001

604.    The defendants named herein each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Remedy Registration Statement and prospectus.  They had a duty to ensure that such statements were true and that there were no omissions of material facts that would make the statements made therein misleading.  The defendants named herein failed to do so.  The defendants named herein signed the Remedy Registration Statement. The defendants named herein were sellers and offerors of the shares offered pursuant to the Remedy Registration Statement and Prospectus.

605.    The Remedy Subclass Members who acquired Peregrine common stock pursuant to the Remedy Registration Statement and prospectus did so without knowledge of the materially

1  untrue statements or omissions in the Remedy Registration Statement.  As a direct and proximate

2  result of the defendants' wrongdoing,  the Remedy Subclass Members have suffered substantial

3  damages.

4       606.  By reason of the conduct alleged herein, the defendants named herein violated

5  Section 12(a)(2) of the Securities Act.  Plaintiffs, individually and on behalf of the other members

6  of the Remedy Subclass, hereby offer to tender to defendants named herein those Peregrine

7  securities which plaintiffs and the other Remedy Subclass Members continue to own, in return for

8  the consideration provided for those securities together with interest thereon.  The Remedy

9  Subclass Members who have sold their Peregrine securities are entitled to rescissory and

10  compensatory damages.

11  **<u>PRAYER FOR RELIEF</u>**

12      WHEREFORE Plaintiffs, on behalf of themselves and the Class, demand judgment against

13  defendants, and each of them, as follows:

14      A.  Determining that this action is properly maintainable as a class action pursuant to

15  Rule 23 of the Federal Rules of Civil Procedure;

16      B.  Declaring and determining that the defendants violated the federal securities laws

17  by reason of their conduct alleged herein;

18      C.  Awarding monetary damages against all of the defendants, jointly and severally, in

19  favor of plaintiffs and the Class for the damages suffered as a result of the wrongdoing

20  complained of herein together with prejudgment interest from the date of the wrongdoing to the

21  date of the entry of judgment;

22      D.  Awarding the Class, including the Harbinger Subclass and the Remedy Subclass,

23  rescissory damages under plaintiffs' claims;

24      E.  Awarding plaintiffs their costs, expenses, and disbursements incurred in this action,

25  including reasonable attorneys' and experts' fees and costs;

26      F.  Granting extraordinary equitable and/or injunctive relief as permitted by law,

27  equity and federal and state statutory provisions sued on hereunder, including attaching,

28  impounding, imposing a constructive trust upon or otherwise restricting the proceeds of

1  Defendants' trading activities or their other assets so as to assure that plaintiffs and the Class have

2  an effective remedy; and

3      G.    Awarding plaintiffs and the Class such other relief as the Court may deem just and

4  proper.

1

## JURY DEMAND

2          Plaintiffs hereby demand a trial by jury.

3   Dated: March 14, 2003                GOLD BENNETT CERA & SIDENER LLP

4                                        By: _____

5                                           Paul F. Bennett

6                                        By: _____

7                                           Solomon B. Cera

8                                        Attorneys for Section 10(b) Lead Plaintiff The
                                         Loran Group And All Others Similarly Situated
9
                                                     - and -
10
                                         STULL, STULL & BRODY
11
12                                       By: _____
                                            Howard Longman
13
                                         ABRAHAM & ASSOCIATES
14
15                                       By: _____
                                            Lawrence D. Levit
16
17                                       Attorneys for Section 11 Lead Plaintiff
                                         Heywood Waga And All Others Similarly
18                                       Situated

19

20

21

22

23

24

25

26

27

28