















LMH    1/21/05    12:07
3:02-CV-00870   PEREGRINE SYS INC V.
*592*
*O.*

FILED

05 JAN 20  PM 2: 51

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

In re:

PEREGRINE SYSTEMS, INC.
SECURITIES LITIGATION

CASE NO. 02CV870-BEN (RBB)

**ORDER GRANTING IN PART
AND DENYING IN PART "KMPG"
DEFENDANTS' MOTIONS TO
DISMISS (Docket Nos. 441, 455 and
464)**

## I.

## INTRODUCTION.

This is a class action on behalf of all persons and entities who bought, or otherwise

acquired, the stock of Peregrine Systems, Inc. ("Peregrine") between July 22, 1999 and May 3,

2002 ("Class Period"). The class plaintiffs allege that Peregrine, its directors, and outside business

associates, with the knowledge of Peregrine's auditors, unlawfully created revenue through various

types of dubious transactions to prop up Peregrine's stock price. Plaintiffs claim that these

transactions, combined with improper accounting and the release of statements to the Securities

Exchange Commission ("SEC"), analysts, and the general public, perpetrated a fraud on

Peregrine's shareholders and the investing public in violation of securities statutes and regulations

promulgated thereunder.

Peregrine ultimately restated its financial results for the fiscal years 2000 and 2001, and the

first three (3) reporting quarters of fiscal year 2002. In the restatements, Peregrine admitted to

improperly recognizing over $500 million in revenue. Plaintiffs now seek damages based on the


ENTERED ON 1/21/05

02CV870-BEN (RBB)

1    dramatic fall of Peregrine's stock following Peregrine's public restatement.

2          The Class is divided into one main Class and two Sub-Classes.  The main Class is

3    represented by Lead Plaintiff the Loran Group.[1]  The Loran Group represents all persons or entities

4    who purchased or otherwise acquired Peregrine securities during the Class Period.  The Loran

5    Group seeks recovery under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15

6    U.S.C. §§ 78j(b) and 77l(a), and the regulation promulgated thereunder by the SEC--Rule 10b-5.

7          The two Sub-Classes are represented by Lead Plaintiff Heywood Waga ("Waga") and three

8    individual named Plaintiffs--John Sutliff, M. Clifford Balch, Jr., and Alan Hylton. The two Sub-

9    Classes represent those who obtained Peregrine's stock when it merged with Harbinger and

10   Remedy Corporations.  Specifically, the Waga Sub-Class represents all persons and entities who

11   held shares in Harbinger, but later acquired Peregrine's stock when Peregrine acquired Harbinger

12   on or about June 16, 2000.  The second Sub-Class consists of all persons and entities who held

13   shares of Remedy, but then acquired Peregrine stock when Peregrine acquired Remedy on or about

14   August 27, 2001. These Plaintiffs seek recovery under Sections 11, 14(a), and 15 of the Securities

15   Exchange Act of 1933 as well as Section 20(a) of the 1934 Act.

16          There were initially thirty one (31) related cases, which were consolidated.  The operative

17   Amended Consolidated Complaint will be referred to as "Complaint."  The Complaint names

18   twenty-one (21) Defendants who allegedly made false or misleading statements, or omissions,

19   and/or participated in a scheme, to defraud investors.  Defendants include Peregrine executives and

20   business associates who have pled guilty to criminal charges involving securities fraud and insider

21   trading.  "Thus, this case does not present the question of whether the fraud actually happened, but

22   rather who knew about it, who participated in it, and who can be held liable for it."  In re

23   Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1020 (C.D.Cal. 2003).

24          All Defendants separately and/or jointly move to dismiss.  This Order addresses only

25

26

27   _____

28   [1] The Loran Group consists of lead plaintiffs David Levy, Leighton Powell, David Schenkel,
     John Virden, Conrad Willemse, Bill Holman, Bob Benesko, Michael Slavitch, Richard Maheu, and
     Mark Rollins.  (See, Complaint ¶¶ 31(a)-(j).)

1   motions by Defendants KPMG LLP, BearingPoint Inc., and Larry Rodda.[2]   The Complaint alleges

2   one claim against these Defendants-- violation of Section 10(b) of the Exchange Act and the SEC

3   Rule 10b-5 promulgated thereunder.  (See, Complaint ¶¶ 659-660 and 664.)  These Defendants

4   were Peregrine's business associates in the alleged scheme to defraud.  They allegedly entered into

5   "bogus" arrangements with Peregrine, permitting it to report revenues which Peregrine did not

6   earn, but fabricated to meet its published earnings estimates.

7        Defendants now move to dismiss, asserting: (1) they were secondary actors, or aiders and

8   abetters to the alleged securities fraud, and thus are not liable under Section10(b) and Rule 10b-5;

9   and (2) Plaintiffs' claim is time barred.[3]  For the reasons that follow, Defendants' Motion is

10  Granted in part and Denied in part.  Specifically, the Court finds that Defendants were aiders and

11  abetters within the meaning of Section 10(b) and Rule 10b-5, and thus are not liable.  See, Central

12  Bank of Denver, N.A. v. First Interstate Bank of Denver ("Central Bank"), 511 U.S. 164, 191

13  (1994) ("[A] private plaintiff may not maintain an aiding and abetting suit under § 10(b).").  In this

14  regard, Defendants' Motion is granted.  Defendants' Motion is denied, however, in that they fail to

15  show that Plaintiffs' claim is time barred.

## II.

## FACTS.

18       The following facts are taken from the Complaint.  See, Pelletier v. Federal Home Loan

19  Bank of San Francisco, 968 F.2d 865, 872 (9th Cir. 1992) (Review "on a motion to dismiss is

20  limited to the contents of the complaint.").  The Complaint is over 250 pages.  Only allegations

21  concerning, or relating to, KPMG, BearingPoint, and Rodda's alleged unlawful activities are set

---

[2]   KPMG LLP will be referred to as "KPMG", BearingPoint Inc. will be referred to as "BearingPoint", and Larry Rodda will be referred to as "Rodda." Except when distinguishing among the individual Defendants, the Court uses "Defendants" to refer to all of these three Defendants collectively.

[3]   Defendants also move to dismiss, arguing that Plaintiffs fail to satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and Private Securities Litigation Reform Act of 1995 because Plaintiffs fail to allege "an actionable misstatement or omission by [Defendants]; that Defendants "acted with the requisite scienter; and . . . that they relied on anything [Defendants] said or did." (BearingPoint Motion at 14:9-11.)  These arguments are subsets of Plaintiffs' Section 10(b) and Rule 10b-5 claims and are substantially addressed in the Court's discussion of those claims. Thus, light of the Court's finding that Plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5, the Court will not separately address these arguments.

1 │ forth below.  When appropriate, direct citation to the Complaint will be provided.

2 │     At this stage, the Court is "required to presume all factual allegations of the complaint to be

3 │ true and draw all reasonable inferences in favor of the non-moving party"--the Plaintiffs.  U.S. v.

4 │ LSL Biotechnologies, 379 F.3d 672, 698 (9th Cir. 2004); see also, Wright v. Oregon Metallurgical

5 │ Corp., 360 F.3d 1090, 1096 (9th Cir. 2004) ("When ruling on a motion to dismiss, we accept all

6 │ material allegations of a complaint and view them in the light most favorable to the plaintiff.").

7 │ "However, the court is not required to accept legal conclusions cast in the form of factual

8 │ allegations if those conclusions cannot reasonably be drawn from the facts alleged." Clegg v. Cult

9 │ Awareness Network, 18 F.3d 752, 755 (9th Cir. 1994).  According to the Complaint:

10 │     Peregrine was incorporated in California in 1981, reincorporated in Delaware in 1994, and

11 │ went public in April 1997.  Peregrine's stock is traded on NASDAQ.  At all relevant times,

12 │ Peregrine developed and marketed software products that enabled business customers to reduce

13 │ infrastructure costs and increase efficiency.  Peregrine also developed and marketed business-to-

14 │ business and integration software to reduce the costs of electronic commerce.  Through

15 │ acquisitions, Peregrine later expanded its product menu for asset management, fleet management,

16 │ facilities management, rail management and telecommunication management.

17 │     KPMG is a firm of certified public accountants, and was one of Peregrine's principal

18 │ customers.  BearingPoint, formerly known as KPMG Consulting, Inc., is a large publicly held

19 │ business consulting, systems integration and managed services firm.  KPMG Consulting, Inc. was

20 │ one of Peregrine's principal customers.  Rodda is a certified public accountant who was at all

21 │ relevant times a principal of KPMG and KPMG Consulting Inc.  Rodda signed agreements with

22 │ Peregrine on behalf of KPMG and KPMG Consulting Inc.

23 │     To best understand the alleged claims against these Defendants, a brief summary of

24 │ Peregrine's alleged overlap of business structure and accounting practices will be useful.

25 │     Peregrine had two kinds of software customers: end users and resellers.  Peregrine initially

26 │ sold software almost entirely to end users.  In or about 1996, Peregrine started partnering with

27 │ resellers to broaden the distribution of its products.

28 │

1    Generally Accepted Accounting Principles[4], or "GAAP", prohibits recognition of any

2   revenue from sales to channel partners unless specific criteria are met.  Peregrine represented in its

3   filings with the SEC that it recognized revenues consistent with GAAP.  In the Form 10-K

4   Peregrine filed with the SEC on or about June 29, 1999 (shortly before the Class Period), Peregrine

5   set forth its revenue recognition policy on sales of license agreements:

6            Revenues from license agreements are recognized currently,
         provided that all of the following conditions are met: a
7            noncancellable license agreement has been signed, the product has
         been delivered, there are no material uncertainties regarding
8            customer acceptance, collection of the resulting receivable is deemed
         probable and risk of concession is deemed remote, and no other
9            significant vendor obligations exist.

10    Peregrine made a similar representation about its revenue recognition policy in each of its

11   quarterly and annual reports filed with the SEC during the Class Period.  For example, the Form

12   10-K, it filed with the SEC on or about May 10, 2000 Peregrine represented the following revenue

13   recognition policy for its license agreements:

14            Revenues from direct and indirect license agreements are recognized currently, provided
         that all of the following conditions are met: a noncancellable license agreement has been
15            signed, the product has been delivered, there are no material uncertainties regarding
         customer acceptance, collection of the resulting receivable is deemed probable, risk of
16            concession is deemed remote, and we have no other significant obligations associated with
         the transaction.

17

18    The alleged scheme against Peregrine is based on the violation of its own revenue

19   recognition policies.  Specifically, according to the Complaint, Peregrine improperly recognized

20   revenue on transactions which were in reality product swaps or barter transactions with third

21   parties and entered into to allow Peregrine to meet publicly announced revenue goals.  Also, and

22   despite its public representations, on the vast majority of its reseller deals, Peregrine recognized

23   revenue right when it entered into an agreement with the reseller.  Under the agreements, however,

24   the reseller either had no obligation to pay Peregrine or the payment was contingent on a further

25   _____

26        [4] Generally Accepted Accounting Principles, or GAAP, are "a series of general principles
     followed by accountants."  United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir.
27   2001). More specifically, GAAP "are the official standards adopted by the American Institute of
     Certified Public Accountants (the 'AICPA'), a private professional association, through three successor
28   groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the
     'APB'), and the Financial Accounting Standards Board (the 'FASB')."  Ganino v. Citizens Utils. Co.,
     228 F.3d 154, 160 n. 4 (2d Cir.2000).

1   sale to end users.  In other words, Peregrine recognized revenue even when one or more conditions

2   under GAAP were never met--(i) the fee owed to Peregrine was not fixed and determinable; (ii)

3   collectability of the fee was not probable; or (iii) the resellers' obligation to pay for the product was

4   contingent upon subsequent sale of the product to an end user.  Further, Peregrine improperly

5   recognized revenue on "swap" transactions.  Swap transactions lack economic substance.  They

6   involve the contemporaneous buy and sale of a product, designed solely to increase reported

7   revenue.  A former Peregrine employee, who was a Director of the Alliance Group, stated her

8   understanding of swaps at Peregrine as follows:

9            . . . Peregrine would say to the customer, if you commit to x dollar
             amount of purchases — we will commit a comparable amount in
10           consulting services to you.  I knew that these type of swaps happened
             regarding PricewaterhouseCoopers, KPMG and Seibel, the latter was
11           a software swap. . .  Predictive was another company that was
             involved in a product for guaranteed software services swap with
12           Peregrine.

13          In midst of its alleged accounting fraud, Peregrine also faced difficulties in closing license

14   agreements with the resellers.  Purchase commitments from end users required approval at the top

15   echelons of management of extremely large corporations.  Without a purchase commitment from

16   an end user, the resellers were unwilling to enter into irrevocable, non-contingent software

17   licensing agreements and unconditionally obligate themselves to purchase product with uncertain

18   sell-through prospects.  Resellers thus required significant inducements such as discounts, rebates

19   and the like, to take on Peregrine products and to enter into contingent transactions.  In addition,

20   Peregrine provided certain resellers with side payments, deep discounts and rebates to induce them

21   into "purchasing" license agreements where no end user had committed to purchase the product.

22          Defendants' role in the alleged scheme to defraud began in late 1998 when KPMG, through

23   Rodda, entered into a series of transactions with Peregrine.  The transactions allowed Peregrine to

24   misrepresent its revenues which were later restated.  In late 1998, Peregrine's Vice President,

25   Spitzer, had several meetings with Rodda.  Rodda, Spitzer, and others at Peregrine negotiated an

26   "alliance" between Peregrine and KPMG.  Under the agreement, Peregrine would give KPMG

27   $500,000 to fund the hiring, training, and certification of staff to sell and install Peregrine software.

28   In return, KPMG agreed to "an up-front license commitment" of $2.5 million in Peregrine software

1  over a two year period.

2  After the "alliance" was in place, Peregrine frequently approached KPMG at the end of a

3  quarter to "park" software with it.[5]  Peregrine and KPMG would then enter into a deal for the

4  anticipated amount of the sale to the end user.  In return, KPMG would receive the service portion

5  of the contract, which often was worth hundreds of thousands of dollars.  Peregrine would also

6  assure KPMG that it would not enforce the payment terms against KPMG.  Peregrine would then

7  immediately book the revenue from the transaction with KPMG even though the deal with the end

8  user had not yet been completed.  Peregrine further knew it could not complete a direct sale in time

9  to record revenue for a particular quarter.  KPMG knew that Peregrine entered into these "parking"

10  arrangements so that it could falsely represent higher revenues to investors on unfinished deals.

11  The documents of various transactions between Peregrine and KPMG shows that the deals

12  between them had no commercial substance.  For example, in a transaction in which Sodexho

13  Marriott was identified as the intended end user, there were multiple sets of inconsistent

14  paperwork.  In its files, Peregrine had two different Schedule A attachments to the license

15  agreement and a Product Registration Agreement.  These documents reflected different dollar

16  amounts and deal structure.  One Schedule A, dated December 31, 1999, reflected the sale of $4

17  million in software to reseller KPMG.  The Product Registration Form, also dated December 31,

18  1999, reflected the sale of $6.5 million to reseller KPMG.  It appears that Peregrine was able to

19  complete its transaction directly with Sodexho Marriott in the following quarter because there is

20  also a Schedule A directly between Peregrine and Sodexho Marriott without using KPMG as a

21  reseller.  That document is dated March 31, 2000 and is for just $2 million in software.

22  Spitzer[6] has confirmed to investigators that the Sodexho Marriott transaction was a

23  "parking" transaction.  Spitzer said when he learned that the transaction would not be completed

24  

---

25  [5]  Examples of transactions where "parking" occurred included deals in which Sodexho Marriott, Citigroup Global Technology, Inc., Avnet, Inc., and Morgan Stanley Dean Witter were identified as the potential end users.

26  

27  [6]  On June 16, 2003, the SEC filed a complaint against Spitzer alleging that from at least December 1999, he knowingly or recklessly participated in a scheme by which Peregrine materially misrepresented its publicly reported financial results, including its revenue, in violation of

28  Section 10(b) of the Exchange Act.  That same day, a criminal information was filed against Spitzer charging securities fraud, to which he pled guilty.

1   by the end of December 1999, he called Rodda to see whether KPMG would participate in the

2   transaction in exchange for the service portion of the contract. Rodda told Spitzer that KPMG

3   would participate. Peregrine's Corporate Controller--Gless[7]--thus structured the deal so there

4   would be a Schedule A between Peregrine and KPMG dated December 31, 1999. When the deal

5   between Peregrine and Sodexho Marriott was eventually completed, KPMG's payment obligation

6   to Peregrine was to be offset by Sodexho Marriott's contract. Attached to a December 30, 1999 e-

7   mail from Spitzer to Rodda is a handwritten note stating: "Payments directly to PSI [Peregrine

8   Systems, Inc.] to clear KPMG payments."

9       In February 2000, KPMG received a letter from Peregrine asking KPMG to confirm to

10  Peregrine's auditors "the balance due us as of Dec. 31, 1999 and certain terms regarding your

11  recent purchase." Peregrine also asked KPMG to "describe any unfulfilled obligations or

12  contingencies under this contract at December 31, 1999." Attached was the Schedule A signed in

13  December 1999. Rodda wrote "no exceptions" on the letter and signed his name. He did so even

14  though he knew the December 31, 1999 Schedule A was phony and did not reflect a real

15  transaction.

16      KPMG was also awarded a significant service contract for "assisting" Peregrine with a

17  transaction for intended end user Citigroup. KPMG knew that Peregrine was going to falsely

18  represent to investors that it had closed the deal in the June 2000 quarter even though it had not yet

19  been completed. As with the Sodexho Marriott transaction, Spitzer called Rodda to inquire

20  whether KPMG would sign the contract in the June quarter in exchange for receiving the $500,000

21  service portion of the contract. Rodda told Spitzer that KPMG would participate. KPMG knew

22  that the transaction was not completed by June 30, 2000. This is evidenced by an e-mail from Jim

23  Mowrer of KPMG to Spitzer dated August 30, 2000, two months after revenue was booked by

24  Peregrine, in which Mowrer inquired about when the deal with Citigroup would be completed.

25      KPMG and Rodda knew that there was never any intention for KPMG to pay for the

26  Citigroup deal. An e-mail dated September 26, 2000, apparently sent by Spitzer to the accounting

27  department, states:

28
_____

[7] Gless has pled guilty to federal criminal charges.

1    VM [voicemail] from Larry Rodda, this is a pass through invoice.
      KPMG has an identical invoice posted with Peregrine for 7,526,150.
2    This was arranged by Larry [sic] Spitzer for a sale with CitiGroup.
      Per Sch A Peregrine will act as KPMG's agent to invoice & and [sic]
3    collect with respect to all products.

4         Peregrine also improperly recorded $2,285,128 in revenue from a transaction where the end

5    user was identified as Avnet, Inc. in the first quarter of fiscal year 2000.  The money was never

6    paid.  Rodda signed the Schedule A on behalf of KPMG.  Spitzer confirmed to investigators that

7    the Avnet transaction was similar to the one involving Citigroup.  Toward the end of the first

8    quarter of fiscal year 2001, Bill Moore (Peregrine's Vice President of North American Sales) told

9    Spitzer that the Avnet contract was stuck in Avnet's purchasing or procurement department, and

10   that the deal would not get done by the end of the quarter.  Moore asked Spitzer to see if KPMG

11   would allow the software to be "parked" with KPMG in the meantime so that Peregrine could

12   recognize the revenue immediately.  As with the Citigroup arrangement, Moore said that Peregrine

13   would give KPMG part of the servicing revenue.  Spitzer recalled that the invoicing was to work as

14   it had in the Sodexho Marriott deal, i.e., when a contract was signed with Avnet it would offset the

15   KPMG deal.

16        KPMG's knowledge that the Avnet deal was a phony transaction is evidenced by a June 30,

17   2000 e-mail message Spitzer received from Shane Eliason (a Peregrine senior account

18   representative).  Eliason provided the following "Avnet Update:"

19   The site visit went as expected yesterday (Thursday) for Avnet. They
      have an offsite budget meeting today (the last day of their FY) and
20   due to the holidays, we will not get feedback until next Wednesday.
      Bill Moore has suggested an out clause and backdating that we are
21   aggressively pursuing.  The commitment is there to sign as soon as
      budgets are agreed to, but Avnet has to get their budget piece
22   finished.  I will keep you posted.

23        KPMG's knowledge that the Avnet deal was a sham is also evidenced by its own files.

24   Among KPMG's files was a letter dated August 1, 2000 from Kathlene Pizzoferrato (a contracts

25   administrator at Peregrine) to Rodda enclosing two Schedule As.  An undated handwritten Post-It

26   note attached to the letter states: "The Avnet transaction is paper only.  No cash flow.  No license

27   flow.  No revenue."  The handwriting on the Post-It is Rodda's.  Indeed, the Avnet deal had no

28   substance.  Peregrine wrote off the entire contract value of $2,285,128 in the second quarter of

fiscal year 2002 to "accrued liabilities" in connection with Peregrine's acquisition of Remedy.

Peregrine also entered into a transaction with KPMG wherein Morgan Stanley was identified as the end user. Peregrine's records contain a Schedule A dated September 29, 2000. It reflects a licensing fee of $10 million and maintenance fees of $1.5 million. The Schedule A was signed by Rodda for KPMG Consulting.

Spitzer received a call from Peregrine's Sales Manager--Powanda[8]-- who said he was negotiating a very large sale with Morgan Stanley. Powanda said he had a letter agreement with the company. Powanda told Spitzer that if KPMG could finalize the deal, KPMG would receive a large service contract. Spitzer then called Rodda, who said that KPMG would sign the agreement. Spitzer told investigators that Rodda's revenue target had been increased by KPMG and, therefore, Rodda wanted to structure the revenue flow the same way they had structured the Citigroup transaction, i.e., to flow the cash through KPMG. A copy of the Schedule A for the deal which came from KPMG's files has a Post-It note stating:

> Jim – Here is $11.5M revenue potential for you. You will need to
> work with Spitzer to flow the cash so you get credit for the revenue.

The Post-It note bears Rodda's initials. The entire $11.5 million was recognized as revenue by Peregrine. Rodda, as an experienced auditor, knew this was wrongful.

KPMG's role in Peregrine's misrepresentation of its financial condition is also evidenced by KPMG's payment history. KPMG entered into about nine software license agreements that amounted to more $30 million. But KPMG paid Peregrine for only one transaction in full and for only half of one other. No payments were ever made on any other transaction. But Peregrine recorded $32.1 million in license revenue from these transactions during fiscal years 2000-2002. It subsequently had to write off $30.8 million, or 96%, of this amount. In total, about $35 million of the estimated $100 million in improperly recognized revenue came from questionable transactions with Defendants.

KPMG was aware that Peregrine's conduct violated GAAP. Rodda worked in KPMG's Risk and Advisory Services practice, which advised KPMG clients regarding accounting and

---

[8] Powanda was recently indicted on numerous criminal charges.

02cv870-BEN (RBB)

1   auditing matters.  Further, in connection with at least some of the transactions, Rodda sought the

2   approval and consent of others at KPMG to enter into the "parking" transactions.

3          The Complaint next sets forth a number of public statements, including press releases,

4   analyst reports, news articles, and SEC filings that relate to or are based upon the above-described

5   transactions.  The Complaint does not allege that Defendants made any of these statements, or that

6   they were in a way involved in reviewing, drafting, preparing or filing them.  Indeed, the

7   Complaint expressly excludes Rodda from the individuals Plaintiffs claim were involved in the

8   alleged public statements.  (See, e.g., Complaint ¶ 662.)

9          Rather, the Complaint asserts

10   Defendants KPMG, BearingPoint, and Rodda ["KPMG Defendants"] directly participated
     in Peregrine's fraud.  They did so by engaging in transactions with Peregrine so Peregrine

11   could book revenue before deals with anticipated end users were completed.  In doing so,
     the KPMG Defendants deliberately chose to conceal the truth and played a significant role

12   in Peregrine's ability to misrepresent its financial condition to investors.  In exchange for
     its participation in the scheme, the KPMG Defendants were awarded lucrative services

13   contracts.  At the end of a quarter, the KPMG Defendants frequently agreed to have
     Peregrine software "parked" with them.  This occurred when Peregrine knew it could not

14   complete a direct sale in time to record revenue for that quarter but needed the revenue to
     meet its publicly announced revenue projections.  In such only one cause of action against

15   Defendants KPMG, BearingPoint.  In such instances, the KPMG Defendants would enter
     into a deal for the anticipated amount of the sale to the end user.  The KPMG Defendants

16   knew that Peregrine would immediately book revenue from such transactions even though a
     deal with the end user had not yet been completed.  The KPMG Defendants further knew

17   that Peregrine proposed the 'parking' arrangements so it could falsely represent to investors
     that it had obtained revenue from such incomplete transactions.

18

19   Based on these allegations, in Count I of the Complaint, Plaintiffs assert a claim under Section

20   10(b) of the 1934 Exchange Act as well as SEC Rule 10b-5 against Defendants KPMG, KPMG

21   Consulting Inc. or BearingPoint, and Rodda.

22          Plaintiffs also allege that as to Defendants KPMG, KPMG Consulting Inc., and Rodda, they

23   "were unaware of the facts supporting the allegations against these defendants until they had access

24   to and were able to review Peregrine's document production to the SEC and U.S. Department of

25   Justice beginning in December 2003."  (Complaint ¶ 655.)

26                         **III.**

27                 **STANDARD OF REVIEW.**

28   Defendants move to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims under

1   Fed.R.Civ.P. 12(b)(6). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." Navarro v.

2   Block, 250 F.3d 729, 732 (9th Cir. 2001); see also, Neitzke v. Williams, 490 U.S. 319, 326 (1989)

3   ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of dispositive issue of law."). "A

4   claim may be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts

5   in support of his claim which would entitle him to relief.'" Id. (Citations omitted).

6          Under this standard, the Court's review is limited.  Even if the face of the pleadings

7   indicate that recovery is very remote and unlikely, Plaintiffs are still entitled to offer evidence to

8   support their claims.  See, United States v. City of Redwood City, 640 F.2d 963, 966 (1981)

9   ("[E]ven if the face of the pleadings indicate that recovery is very remote, the claimant is still

10  entitled to offer evidence to support its claims."); see also, Kwai Fun Wong v. U.S., 373 F.3d 952,

11  969 (9th Cir. 2004) ("Given the Federal Rules' simplified standard for pleading, a court may

12  dismiss a complaint only if it is clear that no relief could be granted under any set of facts that

13  could be proved consistent with the allegations."); Langford v. Atlantic City, 235 F.3d 845, 847

14  (3d Cir.2000) (The issue is not "whether the plaintiffs will ultimately prevail" but "whether they

15  are entitled to offer evidence to support their claims."); Phelps v. Kapnolas, 308 F.3d 180, 184-85

16  (2d Cir.2002) ("Indeed it may appear on the face of the pleading that a recovery is very remote and

17  unlikely but that is not the test.").  However, it is not "proper to assume that [a plaintiff] can prove

18  the facts it has not alleged or that the defendants have violated [laws] in ways that have not been

19  alleged." Associated General California, Inc. v. California State Council of Carpenters, 459 U.S.

20  519, 526, (1983).  Against this backdrop, for the reasons discussed below, Plaintiffs fail to state a

21  claim under Section 10(b) and Rule 10b-5.

22                                             **IV.**

23  **PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) and RULE 10b-5.**

24          Section 10(b) makes it unlawful for:

25          any person . . . to use or employ, in connection with the purchase or sale of any security
            registered on a national securities . . ., any manipulative or deceptive device or contrivance
26          in contravention of such rules and regulations as the [SEC] may prescribe as necessary . . . .

27

28

15 U.S.C. § 78j(b).[9]  "Rule 10b-5 is the regulation promulgated under Section 10(b)."  Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1229 (9th Cir. 2004).  It is codified at 17 C.F.R. § 240.10b-5 and prohibits fraudulent conduct, and misrepresentations and omissions of material facts in the purchase or sale of securities.  See, 17 C.F.R. § 240.10b-5(a)-(c).[10]  Specifically, the Rule prohibits three types of conduct.  First, under the Rule, "it is unlawful to use any facility of the national securities exchange '[t]o employ any device, scheme, or artifice to defraud.'"  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 932 (9th Cir. 2003), quoting 17 C.F.R. § 240.10b-5(a).  The Rule "further provides that it is unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  Id., quoting § 240.10b-5(b).  Lastly, the Rule prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).

Plaintiffs here do not charge Defendants with any false or misleading statements as proscribed under Rule 10b-5(b).  Rather, Plaintiffs allege Defendants violated subsections (a) and (c) of Rule 10b-5, which prohibit participation in a fraudulent scheme, even absent a fraudulent statement.  See, Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 152-53 (1972); SEC v. Zandford, 535 U.S. 813, 820 (2002) ( "[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."); In re Enron Corp. Securities, Derivative & ERISA Litigation, 235 F.Supp.2d 549, 577 ("Securities fraud actions under § 10(b) and Rule 10b-5 are not merely limited to the making of an untrue statement of material fact or omission to state a material fact.").  Thus, the question is whether Defendants employed a manipulative device, or participated in a fraudulent scheme, under

---

[9]  One objective underlying the enactment of § 10(b) following the 1929 stock market crash was "to insure honest securities markets and thereby promote investor confidence." United States v. O'Hagan, 521 U.S. 642, 658 (1997).

[10]  "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." In re Enron Corp. Securities, 235 F.Supp.2d 549, 569 (S.D. Tex. 2002); see also, United States v. O'Hagan, 521 U.S. 642, 651 (1997); SEC v. Zandford, 535 U.S. 813 (2002).

1    Section 10(b) and Rule 10b-5.  To that end, Defendants' liability must be primary; "a private

2    plaintiff may not maintain an aiding and abetting suit under § 10(b)." <u>Central Bank of Denver,</u>

3    <u>N.A. v. First Interstate Bank of Denver ("Central Bank")</u>, 511 U.S. 164, 191 (1994).[11]  Thus, the

4    question becomes: was Defendants' alleged conduct one of aiding and abetting Peregrine's

5    unlawful scheme, or did it cross the line into primary liability.  <u>See</u>, <u>id</u>.

6         Defendants' argue that their alleged conduct amounts to nothing more than aiding and

7    abetting Peregrine's violations, and that such a claim is prohibited under <u>Central Bank</u> and the

8    cases interpreting it.  The Court agrees.

9         In <u>Central Bank</u>, the Colorado Springs-Stetson Hills Public Building Authority (the

10   "Authority") issued $26 million in bonds to finance public improvements at Stetson Hills, a

11   planned commercial and residential development in Colorado Springs.  <u>See</u>, 511 U.S. at 167.  The

12   bonds were secured by landowner assessment liens, and the bond covenants required that the land

13   subject to the liens equal at least 160% of the bonds' outstanding principal and interest.  <u>See</u>, <u>id</u>.

14   The bond covenants also required the developer of Stetson Hills, AmWest, to give Central Bank an

15   annual appraisal verifying that the 160% test was met.  <u>See</u>, <u>id</u>.  In 1988, AmWest provided Central

16   Bank with an appraisal of the land securing the 1986 bonds and the land proposed to secure the

17   1988 bonds.  <u>See</u>, <u>id</u>.  According to the developer's 1988 appraisal, the land values remained

18   virtually unchanged from the 1986 appraisal, and thus the 160% test appeared to be met.

19        Soon afterwards, Central Bank received a letter from a senior underwriter for the 1986

20   bonds.  Noting that property values in Colorado Springs were declining and that the developer's

21   appraisal was over 16 months old, the underwriter expressed concern that the 160% test was not

22   being met.  <u>See</u>, <u>id</u>.  Because Central Bank was named as indenture trustee, it was concerned that

23   the 160% was not being met, and it asked its in-house appraiser to review the 1988 appraisal.

24   After determining that the 1988 appraisal appeared overly optimistic, the in-house appraiser

25   suggested that Central Bank retain an outside appraiser to conduct an independent review.  <u>See</u>, <u>id</u>.

26

27        [11] Prior to the Supreme Court's decision in <u>Central Bank</u>, federal courts allowed aiding and abetting liability under Section 10(b).  <u>See</u>, <u>Central Bank</u>, 511 U.S. at 169 (Listing cases); <u>see also</u>, <u>In</u>

28   <u>re Homestore.com, Inc. Securities Litigation</u>, 252 F.Supp.2d 1018,1038 (C.D.Cal. 2003) ("Prior to <u>Central Bank</u>, the lower federal courts had nearly uniformly recognized an implied right of action for aiding and abetting liability under Section 10(b) and Rule 10b-5.").

1    at 167-68.  But, after an exchange of letters between AmWest and Central Bank in early 1988,

2    Central Bank decided to delay any independent review of the appraisal until the end of the year,

3    approximately six months after the closing on the 1988 bond issue.  The Authority defaulted on the

4    1988 bonds before the independent review took place.  See, id. at 168.

5         After the default, the plaintiffs sought to hold Central Bank secondarily liable under § 10(b)

6    based on a claim that Central Bank had aided and abetted a § 10(b) violation.  See, id.  The district

7    court granted summary judgment to Central Bank, and the Tenth Circuit reversed, holding that the

8    plaintiffs had established a genuine issue of material fact regarding the recklessness element of

9    aiding and abetting liability and that a reasonable fact-finder could conclude that Central Bank had

10   rendered substantial assistance by delaying the independent review of the appraisal.  See, First

11   Interstate Bank of Denver, N.A. v. Pring, 969 F.2d 891 (10th Cir.1992).

12        The Supreme Court granted certiorari and considered the question of whether Section 10(b)

13   liability extends to those who do not commit a manipulative or deceptive act within the meaning of

14   Section 10(b) but who instead aid and abet the violation.  See, Central Bank, 511 U.S. at 167.

15   After examining the text of the statute, the Supreme Court held that "a private plaintiff may not

16   maintain an aiding and abetting suit under § 10(b)."  Id. at 191.  The Court rejected the argument

17   that the phrase "directly or indirectly" in Section 10(b) covers aiding and abetting liability, because

18   such an interpretation of the statute would extend liability to those "who do not engage in the

19   proscribed activities at all, but who give a degree of aid to those who do."  See, id. at 176.  "[T]he

20   text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation . . . .  [T]he

21   statute prohibits only the making of a material misstatement (or omission) or the commission of a

22   manipulative act."  Id. at 177.   Despite the language of § 10(b) prohibiting one from "directly or

23   indirectly" employing a deceptive device, "[t]he proscription does not include giving aid to a

24   person who commits a manipulative or deceptive act."  Id.

25        The Court then observed that "Congress did not overlook secondary liability when it

26   created the private rights of action in the 1934 Act," id. at 184, citing the "controlling person"

27   liability provided for by Section 20 of the Securities Exchange Act.  "The fact that Congress chose

28   to impose some forms of secondary liability, but not others," the Court concluded, "indicates a

- 15 -

1  deliberate congressional choice with which the courts should not interfere." Id. at 184.

2       The Court also recognized that, if it were to allow recovery for aiding and abetting under

3  Section 10(b), a plaintiff could create liability "when at least one element critical for recovery

4  under Section 10(b) is absent: reliance." Id. at 180. The Court said:

5       A plaintiff must show reliance on the defendant's misstatement or omission to recover
        under 10b-5. Were we to allow the aiding and abetting action proposed in this case, the
6       defendant could be liable without any showing that the plaintiff relied upon the aider and
        abettor's statements or actions. Allowing plaintiffs to circumvent the reliance requirement
7       would disregard the careful limits on 10b-5 recovery mandated by our earlier cases.

8  Id. at 180 (Citations omitted).

9       Though the Court held that a private plaintiff may not maintain an aiding and abetting suit

10 under Section 10(b), it recognized that:

11      The absence of 10(b) aiding and abetting liability does not mean that secondary actors in
        the securities markets are always free from liability under the securities Acts. Any person or
12      entity . . . who employs a manipulative device . . . on which a purchaser or seller of
        securities relies may be liable as a primary violator under 10b-5, assuming all of the
13      requirements for primary liability are met.

14 Id. at 190; see also, U.S. v. O'Hagan, 521 U.S. 642, 664 (1997) ("Central Bank held that 'a private

15 plaintiff may not maintain an aiding and abetting suit under § 10(b).' We immediately cautioned

16 in Central Bank that secondary actors in the securities markets may sometimes be chargeable under

17 the securities Acts.").

18      The Court's holding was limited, however, in that it "examined only the aiding and abetting

19 claim pled against the bank and did not address the question whether the bank might be a primary

20 violator, since the plaintiffs had not alleged such a claim." In re Enron Corp. Securities, Derivative

21 & ERISA Litigation, 235 F.Supp.2d 549, 583 (S.D.Tex. 2002). The Court thus "left it to the lower

22 courts to determine when the conduct of a secondary actor makes it a primary violator under the

23 statute." Id.

24      After Central Bank, courts have reached varying conclusions as to when a secondary actor

25 is primarily liable under Section 10(b).[12]  Compare, In re Software Toolworks, Inc., 50 F.3d 615,

26

27      [12]In 1995, a about a year after the Central Bank, the Congress enacted the PSLRA. In so doing,
        "Congress declined to create an express private right of action for aiding and abetting securities fraud,
28      but expressly granted authority to the SEC to bring civil enforcement actions seeking damages and
        injunctive relief for aiders and abettors in enacting what is now Section 20(f) of the Securities

- 16 -                                                                    02cv870-BEN (RBB)

628 n. 3 (9th Cir.1994) (Holding that accountants may be primarily liable for statements made by others where the accountants reviewed the statements and played a significant role in the drafting and editing of the statements); Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F.Supp.2d 1324, 1334 (N.D.Ga. 1998) (Holding that "a secondary actor can be primarily liable when it, acting alone or with others, creates a misrepresentation even if the misrepresentation is not publicly attributed to it"); In re ZZZZ Best Sec. Litig., 864 F.Supp. 960, 970 (C.D.Cal. 1994) (Concluding that primary liability attaches to accounting firm that was "intimately involved" in the creation of false documents) with Anixter v. Home-Stake Prod. Co., 77 F.3d 1215 (10th Cir.1996) (Rejecting "a rule allowing liability to attach to an accountant or other outside professional who provided 'significant' or 'substantial assistance' to the representations of others" and holding that, to be liable, secondary actors "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors"); Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.1998) (Holding that "a secondary actor cannot incur primary liability under the [Securities] Act for a statement not attributed to that actor at the time of its dissemination").

Two tests have emerged--the"bright line" test and the "substantial participation" test. Under the "bright line" test, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.1998). The defendant need not have communicated the statement to investors so long as it knew or had reason to know that its representation would be communicated to investors and "the misrepresentation must be attributed to the specific actor at the time of public dissemination," i.e., in advance of the investment decision, so as not to undermine the element of reliance under Section 10(b). Id. "Anything short of such conduct is merely aiding and abetting and no matter how substantial that aid may be, it is not enough to trigger liability." Id; see also, Shapiro v.

---

Exchange Act." In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1038 (C.D.Cal. 2003). Thus, the "SEC is authorized under § 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), to bring enforcement actions for equitable relief and seek monetary penalties against those who aid and abet violations of § 10(b); moreover section 104 of the PSLRA, amended 15 U.S.C. § 78t to authorize SEC injunctive actions for aiding and abetting of violators, thereby 'revers [ing] any impact Central Bank might have had on the SECs power to enjoin the aiding and abetting of these securities provisions.'"In re Enron Corp. Securities, 310 F.Supp.2d 819, 827 (S.D. Tex. 2004), quoting in part, U.S. S.E.C. v. Fehn, 97 F.3d 1276, 1282-83 (9th Cir. 1996).

1   Cantor, 123 F.3d 717, 720 (2d Cir.1997) ("If Central Bank is to have any real meaning, a defendant

2   must actually make a false or misleading statement in order to be held liable under Section 10(b).

3   Anything short of such conduct is merely aiding and abetting, and no matter how substantial that

4   aid may be it is not enough to trigger liability under Section 10(b)." ); Ziemba v. Cascade Intern'l,

5   Inc., 256 F.3d 1194, 1205, 1207 (11th Cir. 2001) ("[I]n order for [a secondary actor] to be

6   primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a

7   plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's

8   investment decision was made"; for an omission there must be a duty to disclose as determined by

9   a multi-factor test); Anixter v. Home-Stake Prod. Co., 77 F.3d at 1225 ("[T]he critical element

10   separating primary from aiding and abetting violations is the existence of a representation, either

11   by statement or omission, made by the defendant, that is relied upon by the plaintiff.").

12       Under the "substantial participation"test--the test endorsed by the Ninth Circuit-- a

13   secondary actor is primary liable when they have "substantial participation or intricate

14   involvement" in the preparation of fraudulent statements "even though that participation might not

15   lead to the actor's actual making of the statements." Howard v. Everex Systems, Inc., 228 F.3d

16   1057, 1061 n.5 (9th Cir. 2000); see also, In re Software Toolworks, 50 F.3d 615, 628-629 n.3 (9th

17   Cir. 1994) (Accountant may become a primary violator under antifraud provision of Section 10(b)

18   where it reviews and plays a "significant role in drafting and editing" two letters, one not

19   identifying the accounting firm, sent by the issuer client to the SEC; a reasonable factfinder could

20   find that the accountants "as members of the drafting group, . . . had access to all information that

21   was available and deliberately chose to conceal the truth"), In re ZZZZ Best Securities Litigation,

22   864 F.Supp. 960, 970 (C.D.Cal. 1994) (Where accounting firm was "intricately involved" in the

23   creation of false and misleading documents and the "resulting deception," it may be liable as a

24   primary violator of Section 10(b)); Cashman v. Coopers & Lybrand, 877 F.Supp. 425, 432-34

25   (N.D.Ill. 1995) (Primary liability may be established against accountants "centrally involved" in

26   preparation of alleged false or misstated information for prospectuses or promotional material

27   issued to investors that the accounting firm certified, audited, prepared or reported.); McNamara v.

28   Bre-X Minerals Ltd., 57 F.Supp.2d 396, 426 (E.D.Tex. 1999) ("[I]f a defendant played a

1  'significant role' in preparing a false statement actually uttered by another, primary liability will

2  lie"); In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d 1018, 1039 (C.D.Cal. 2003)

3  ("[P]ersons 'outside' a corporation have been held liable as primary violators in private actions

4  brought by shareholders of that corporation if those persons substantially and directly participated

5  in the creation of false or misleading statements to the investing public.").

6         As the above cases reflect, in finding a secondary actor subject to primary liability, the

7  "bright line" and the "substantial participation" tests either require the making, or a substantial role

8  in the preparation or creation, of a fraudulent statement.  These tests, therefore, seem to be more

9  helpful in analyzing claims under Rule 10b-5(b), which requires a false statement or omission.

10  See, § 240.10b-5(b).  In contrast, the "tests" offer little guidance where, as here, the plaintiffs

11  allege that a group of defendants, namely outside business entities, participated in a scheme or a

12  course of business to defraud investors under Rule 10b-5(a) and (c).

13         But, it is clear that under the two tests, Plaintiffs fail to state a claim under Section 10(b) or

14  Rule 10b-5.  According to the Complaint, Peregrine and its executives were the only ones

15  primarily responsible for communications with investors, and to have personally drafted many of

16  the misleading communications alleged with specificity in the Complaint.  Conversely, the

17  Complaint does not allege that Defendants made any statements, or had any role or were in a way

18  involved in reviewing, drafting, preparing or filing any statements.  Indeed, the Complaint

19  expressly excludes Rodda from the individuals Plaintiffs claim were involved in the alleged false

20  or misleading statements.  (See, e.g., Complaint ¶ 662.)  To be sure, the Complaint does allege

21  that, on Peregrine's direction, Rodda wrote "no exceptions" to Peregrine's auditors about "the

22  balance due [KPMG] as of Dec. 31, 1999 and certain terms regarding [KPMG] recent purchase",

23  even though he knew the December 31, 1999 Schedule A was phony and did not reflect a real

24  transaction.  However, as Defendants note, the Complaint does not allege that the audit

25  confirmation, or any part thereof, was ever disclosed to the public.  Giving it the benefit of doubt,

26  at most, the Complaint alleges Defendants knew that Peregrine would make misrepresentations to

27  the public about its revenue and accounting policies.  What the Complaint fails to allege is that the

28  misrepresentations communicated to the public were Defendants' misrepresentations.

1    Nevertheless, <u>Central Bank</u> did not prohibit Section 10(b) suits against anyone other than

2    those who personally speak, write or disseminate, or have substantial participation or intricate

3    involvement in preparation of, false or misleading statements. <u>See</u>, <u>In re Salomon Analyst Level 3</u>

4    <u>Litigation</u>, 2004 WL 2757398 at *15 (S.D.N.Y. 2004). "In the wake of <u>Central Bank</u>, courts have

5    not been reluctant to find fraud allegations sufficient under . . . subsections [(a) and (c) of Rule

6    10b-5], provided that the other requirements for establishing a primary violation have been met."

7    <u>In re Global Crossing, Ltd. Securities Litigation</u>, 322 F.Supp.2d 319, 335 (S.D.N.Y. 2004). As set

8    forth below, Plaintiffs fail to meet these requirements.

9        Claims for engaging in a fraudulent scheme under 10b-5(a) and (c) and for making a

10   fraudulent statement or omission are distinct claims, with distinct elements. Unlike 10b-5(b),

11   which requires a false statement or omission, claims under 10b-5(a) and (c) "are not so restricted."

12   <u>Affiliated Ute Citizens of Utah v. U.S.</u>, 406 U.S. 128, 153 (1972); <u>See also</u>, <u>In re Splash</u>

13   <u>Technology Holdings, Inc. Sec. Litig.</u>, 2000 WL 1727377 at *13 (N.D.Cal. 2000) ("Whereas 10b-

14   5(b) focuses on fraudulent statements, 10b-5(a) and (c) are not by their terms restricted to

15   statements. In this case, plaintiffs allege both fraudulent statements and acts as their requisite

16   manipulative or deceptive practices."); <u>Superintendent of Ins. v. Bankers Life & Cas. Co.</u>, 404 U.S.

17   6, 11 n.7 (1971) ("[I]t [is not] sound to dismiss a complaint merely because the alleged scheme

18   does not involve the type of fraud that is 'usually associated with the sale or purchase of

19   securities.' We believe that § 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection

20   with the purchase or sale of securities . . . ."); <u>Zandford</u>, 535 U.S. at 818 (Broker's "continuous

21   series of unauthorized" sales of securities and personal retention of the proceeds without his

22   client's knowledge to further his fraudulent scheme "are properly viewed" as a "'course of

23   business' that operated as a fraud or deceit on a stockbroker's customer" in connection with the

24   sale of securities).[13]  Subsections (a) and (c) under Rule 10b-5 are far broader and "encompass

25

---

26       [13] In <u>Zandford</u>, leaving aside the misrepresentation and omission language since it was not
     relevant to the case, the Court focused on Section 10(b)'s alternative basis for liability, "unlawful for
27   any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any
     manipulative or deceptive device or contrivance in contravention of such rules and regulations as the
28   [SEC] may prescribe" and Rule 10b-5's ban on the use, "in connection with the purchase or sale of any
     security," of "any device scheme, or artifice to defraud" or any other "act, practice, or course of

much more than illegal trading activity: they encompass the use of 'any device, scheme or artifice,' or 'any act, practice, or course of business' used to perpetuate a fraud on investors."   In re Global Crossing, 322 F.Supp.2d at 336-37 ("Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of section 10(b) and its broad purpose, to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded").

Turning to Plaintiffs' claim--Defendants participated in a scheme or a course of business to defraud investors under Rule 10b-5(a) and (c)--at the outset, it is clear that Central Bank foreclosed a claim for conspiracy to violate Rule 10b-5, in addition to aiding and abetting.  See, e.g., McGann v. Ernst & Young, 95 F.3d 821, 823 (9th Cir. 1996) ("[T]he rationale of Central Bank precludes a private right of action under § 10(b) for 'conspiracy' liability."); In re GlenFed, Inc. Securities Litigation, 60 F.3d 591, 592 (9th Cir. 1995) (Same).

Yet, "Central Bank does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997) ("[C]orporate defendants may be directly liable for [intentionally] providing false or misleading information to third-party securities analysts" and using them as conduits "to disseminate false information to the investing public").

In Cooper v. Pickett, 137 F.3d 616 (9th Cir.1998), the Ninth Circuit held that corporate defendants may be directly liable under 10b-5 for providing false or misleading information to third-party securities analysts where the corporate defendant intentionally used these third parties to disseminate false information to the investing public.  In such a case, the court held, the defendants are not charged with aiding and abetting or secondary liability, but rather with primary

business" that "operates . . . as a fraud or deceit." 122 S.Ct. at 1903.  The Court held that allegations of a stock broker's fraudulent scheme of "selling his customer's securities and using the proceeds for his own benefit without the customer's knowledge or consent" constituted "fraudulent conduct 'in connection with the purchase or sale of any security' " within the meaning of § 10(b) and Rule 10b-5. 122 S.Ct. at 1900-01.  The Court emphasized that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." 122 S.Ct. at 1903.

1  liability. Id. at 624 ("Merisel is alleged to have made misleading statements to the analysts with

2  the intent that the analysts communicate those statements to the market. This is not aiding and

3  abetting or secondary liability; the complaint alleges that Merisel is liable for its own false

4  statements to the analysts."). In Cooper, Defendants made misleading statements to an analyst,

5  who then made statements to the investing public based on those statements. Id. at 619.

6  Defendants argued they were not liable because they merely aided the fraudulent act. Id. at 624.

7  The court rejected that argument, holding the corporation and its officers had committed their own

8  independent fraudulent act in furtherance of the scheme--they "made misleading statements to

9  analysts with the intent that the analysts communicate those statements to the market." Id. Thus,

10  the court held, the company or its officers may be held directly liable under Section 10(b) and Rule

11  10b-5. Id. The court specifically held that plaintiff was not alleging a "conspiracy" claim, but

12  rather a claim of an independent act as part of a scheme to defraud. Id.

13       In some sense Cooper appears to be follow the two tests formulated after Central Bank--the

14  "bright line" test and the Ninth Circuit's "substantial participation" test--under both of which

15  Plaintiffs' claims are barred. In Cooper, defendants actually made the false statements in question

16  and simply used the analysts as conduits "to disseminate false information to the investing public."

17  Cooper v. Pickett, 137 F.3d at 624. At the very least, the defendants in Cooper had "substantial

18  participation" in the steps leading to the publication of the allegedly fraudulent statements. Here,

19  the Complaint fails to allege, nor can any inference be drawn, that Defendants intended to use

20  Peregrine to disseminate any statements to the investing public. In fact, and as previously noted,

21  the Complaint alleges no facts showing that Defendants made any statements or had any role in the

22  alleged public statements. Cooper thus stands for the proposition that where the defendant has

23  made a misstatement but used another actor to deliver the message, the defendant still may be

24  liable as a primary violator. "In such circumstances, it was the defendant's original statement

25  which misled investors--the person who communicated the statement to investors served as a mere

26  conduit for [the] defendant's statement." Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,

27  940 F.Supp. 1101, 1120 (W.D.Mich. 1996).

28       While under Cooper "one may be held liable for securities fraud for participation in a

- 22 -

02cv870-BEN (RBB)

1   'scheme to defraud' even after Central Bank", such liability is limited to "corporate insiders" who

2   directly participated in a scheme to defraud, **not secondary actors or outside business associates**.

3   In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d at 1038; see also, In re Salomon

4   Analyst Level 3 Litigation, 2004 WL 2757398 at *15 (S.D.N.Y. 2004).

5         Accordingly, Plaintiffs also fail to state a claim under Rule 10b-5(a) and (c).  Defendants

6   are not corporate insiders, but outside business entities and Peregrine's principal customers.  No

7   doubt Defendants were intricately involved in the Peregrine's scheme to defraud investors.

8   Defendants allegedly entered into a number of bogus transactions with Peregrine so that Peregrine

9   could book increasing revenue.  But no "case since Central Bank has ever held that outside

10  business partners, no matter how involved they were in fraudulent transactions with a corporation,

11  can be held liable in a private action brought by the shareholders of that company." Id.  Rather,

12  after Central Bank, courts have routinely dismissed "claims against outside professionals who

13  provided necessary services to the fraudsters." In re Salomon Analyst Level 3 Litigation, 2004 WL

14  2757398 at *15 (Citing cases).  Holding otherwise, the courts have held, "would broaden the

15  scope of the securities acts so as to haul into court anyone doing business with a publicly traded

16  company." In re Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d at 1039.

17        Even more fundamental, Plaintiffs' claim fails because they fail to allege Defendants were

18  the primary participants in the alleged scheme.  "[A] 'scheme' within the meaning of the Securities

19  Exchange Act . . . involves one or more participants acting together to violate securities laws.

20  Those participants may have differing degrees of culpability depending on their role in the scheme.

21  In light of Central Bank, only those participants who are 'primary violators' of Section 10(b) may

22  be held liable in a private action for securities fraud." In re Homestore.com, Inc. Securities

23  Litigation, 252 F.Supp.2d at1040; see also, In re Enron Corp. Securities, 235 F.Supp.2d at 591

24  ("[T]o survive a motion to dismiss, a complaint alleging that more than one defendant participated

25  in a 'scheme' to defraud must allege a primary violation of § 10(b) by each defendant.").  That is,

26  "Central Bank requires a plaintiff to allege that each and every defendant committed its own

27  independent primary violation of securities laws in order to state a claim." In re Homestore.com,

28  Inc. Securities Litigation, 252 F.Supp.2d at 1040; Cooper v. Pickett, 137 F.3d at 624; Pegasus

- 23 -

02cv870-BEN (RBB)

1   <u>Holdings v. Veterinary Centers of America, Inc.</u>, 38 F.Supp.2d 1158, 1165 (C.D.Cal.1998)

2   ("<u>Cooper</u> is entirely consistent . . . with <u>Central Bank</u>'s requirement that wrongful conduct be

3   alleged against each defendant."). Here, the Complaint uses words such as "assisting",

4   "participation" or "participated in" when describing Defendants' conduct. (Complaint ¶ 490:

5   Defendants were "awarded a significant services contract for **assisting** Peregrine" in the fraudulent

6   scheme; "Rodda told Spitzer that KPMG would **participate**."; "Defendants KPMG, BearingPoint,

7   and Rodda directly **participated** in Peregrine's fraud."; ¶ 664: "In exchange for its **participation**

8   **in the scheme**, the KPMG Defendants were awarded lucrative services contracts.) (Emphasis

9   added). "Allegations of 'assisting,' 'participating in,' . . . and similar synonyms used throughout

10  the complaint all fall within the prohibitive bar of <u>Central Bank</u>." <u>Shapiro v. Cantor</u>, 123 F.3d at

11  720.

12        Put differently, "[t]hose who actually 'employ' the scheme to defraud investors are primary

13  violators, while those who merely **participate** in or facilitate the scheme are secondary violators."

14  <u>In re Homestore.com, Inc. Securities Litigation</u>, 252 F.Supp.2d at 1040; 17 <u>C.F.R.</u> § 240.10b-5(a).

15  <u>See</u> <u>also</u>, <u>cf.</u> <u>Mishkin v. Ageloff</u>, 1998 WL 651065, at *18-*19 (S.D.N.Y. 1998) (Finding primary

16  liability where defendant allegedly "'initiated, approved, directed, and carried out the entire

17  scheme'"). While Defendants allegedly played a significant role in Peregrine's ability to

18  misrepresent its financial condition to investors, the Complaint makes clear that Peregrine and its

19  executives were the "architects of the scheme . . . who designed and carried out the schemes to

20  defraud." <u>Id.</u> (<u>See</u> <u>e.g.</u>, Complaint ¶ 2: "Peregrine was a house of cards, propped up by books and

21  records that had been 'cooked' by senior officers of the [Peregrine] with the knowledge and/or

22  deliberate recklessness of members of Peregrine's Board of Directors."; ¶ 24: "Revenue was

23  recognized by Peregrine despite the existence of both oral and written agreements and side letters

24  with resellers under which they had no obligation to pay Peregrine for product until it was sold-

25  through to an end user."; "Peregrine improperly recognized revenue on transactions which were in

26  reality product swaps or barter transactions with third parties, entered into to allow Peregrine to

27  meet publicly announced revenue goals."; "Peregrine materially misrepresented its balance sheet

28  and statement of liabilities by failing to include significant obligations to financial institutions.

1   These obligations arose out of Peregrine's undisclosed business practice of factoring substantial

2   portions of its accounts receivable and treating those borrowings as sales of receivables, in

3   violation of GAAP.";¶ 25: "The foregoing accounting manipulations were engaged in by high level

4   executive officers of [Peregrine], and were known to or, with deliberate recklessness, disregarded

5   by the individually named defendants who served as members of Peregrine's Board of Directors.").

6   Moreover, Peregrine was the original and knowing source of the alleged misrepresentations of its

7   earnings, which were conveyed to investors in the public filings, reports and press releases.

8           Similarly, that "Defendants knew" of Peregrine's alleged accounting fraud is irrelevant;

9   "whether a defendant was a primary violator rather than an aider and abettor turns on the nature of

10  his acts, not on his state of mind when he performed them." See, In re Global Crossing, Ltd.

11  Securities Litigation, 322 F.Supp.2d at 330.  Nor does Defendants' knowledge, absent a duty to

12  disclose, lead to liability.  See, Central Bank, 511 U.S. at 174 ("When an allegation of fraud is

13  based upon nondisclosure, there can be no fraud absent a duty to speak.").  Such a duty to disclose

14  under the federal securities laws "arises from the relationship between parties." Dirks v. SEC, 463

15  U.S. 646, 657-58 (1983).  Plaintiffs must be "entitled to know because of a fiduciary or other

16  similar relation of trust and confidence between them." Chiarella v. United States, 445 U.S. 222,

17  226, 228, 230 n. 12 (1980).  The Complaint makes no such allegations.  See also, In re

18  Homestore.com, Inc. Securities Litigation, 252 F.Supp.2d at 1039 ("[A] business partner with no

19  special relationship with a corporation, let alone its shareholders, can[not] be held liable . . . .").

20          For all the reasons set forth above, Plaintiffs fail to adequately state a claim under Section

21  10(b) and Rule 10b-5.  Such finding, however, only limits Defendants' exposure to civil liability.

22  While the Supreme Court in Central Bank abolished private causes of action for aiding and

23  abetting liability under Rule 10b-5, the SEC still may bring civil enforcement actions against those

24  who aid and abet violations of federal securities laws, including Section 10(b) and Rule 10b-5.

25  See, 15 U.S.C. § 78t(e) (Authorizing the SEC to seek injunctive relief and money damages against

26  those who aid and abet violations of federal securities laws); SEC v. Lybrand, 200 F.Supp.2d 384,

27  398 (S.D.N.Y. 2002) (Explaining that Congress passed 15 U.S.C. § 78t(e) to clarify that the SEC

28  retained the authority to bring aiding and abetting actions after the Central Bank decision).  Indeed,

1 | Defendant Rodda was indicted and pled guilty to criminal conspiracy on November 16, 2004.

2 | V.

3 | ### PLAINTIFFS' CLAIM UNDER § 10(b) and RULE 10b-5 IS NOT TIME BARRED.

4 | Defendants contend Plaintiffs' claims under the Section 10(b) and Rule 10b-5 are time

5 | barred. The Court disagrees.

6 | "Private causes of action under Section 10(b) . . . and Rule 10b-5 . . . have no statutorily-

7 | specified limitations period." Berry v. Valence Technology, Inc.,175 F.3d 699, 703 (9th Cir.

8 | 1999). "Thus, 'litigation instituted pursuant to § 10(b) and Rule 10b-5 must be commenced within

9 | one year after the discovery of the facts constituting the violation . . . .'" Id. (Citations omitted);

10 | see also, In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1411 (9th Cir. 1996) ("Section

11 | 10(b) and Rule 10b-5 complaints must be filed within one year after the discovery of facts

12 | constituting the violation and within three years after such violation.").

13 | "The Ninth Circuit has declined to decide whether the . . . statute of limitations is triggered

14 | by actual discovery or inquiry notice." In re Infonet Services Corp. Securities Litigation, 310

15 | F.Supp.2d 1106, 1114 (C.D.Cal. 2003); see also, Berry v.Valence Technology, Inc., 175 F.3d at

16 | 704 (" . . . [W]e need not decide whether actual discovery or inquiry notice applies."). However,

17 | the Ninth Circuit has implied that the inquiry notice is the appropriate standard, and expressed a

18 | preference for the Tenth Circuit's formulation of that standard in Sterlin v. Biomune Sys., Inc., 154

19 | F.3d 1191 (10th Cir.1998).[14] See, Berry v. Valence Technology, Inc., 175 F.3d at 704 ("If we were

20 | to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard.").

21 | "Sterlin directs courts to focus on two questions." In re Infonet Services Corp. Securities

22 | Litigation, 310 F.Supp.2d at 1114.

23 | First, when did the duty to investigate arise? See, Berry v. Valence Technology, Inc., 175

24 | F.3d at 704 ("First, did the. . . article raise sufficient suspicion of fraud to cause a reasonable

25 |

---

26 | [14] "Because 'courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in public,' it is likely irrelevant

27 | whether a court employs the actual knowledge or notice inquiry standard." In re Infonet Services Corp. Securities Litigation, supra, 310 F.Supp.2d at 1114, quoting, Berry v.Valence Technology, Inc.,

28 | supra, 175 F.3d fn.4. In any event, "every circuit to have addressed the issue . . . has held that inquiry notice is the appropriate standard." Berry v. Valence Technology, Inc., 175 F.3d at 704 (Citing cases). The Court likewise finds inquiry notice appropriate.

1   investor to investigate the matter further?").  In other words, did any of the alleged false or

2   misleading statements, or fraudulent conduct, "put Plaintiff[s] on inquiry notice . . . ." Sterlin v.

3   Biomune Sys., Inc., 154 F.3d at 1204.  The focus here is whether the alleged conduct amounted to

4   "storm warnings" sufficient to trigger a duty to investigate on Plaintiffs' part.  Id.  See also, Berry

5   v. Valence Technology, Inc., 175 F.3d at 705 ("While an investor need not have full knowledge of

6   fraud in order reasonably to be expected to investigate worrisome allegations concerning his

7   investments, he will not be presumed to have done so unless the allegations are sufficient to 'excite

8   inquiry' into the possibility of fraudulent conduct.").

9          "Second, when should a reasonably diligent investor have discovered the facts underlying

10   the alleged fraudulent activity?"  Id.  This is a factual question.  See, Sterlin v. Biomune Systems,

11   154 F.3d at 1205 ("[R]emand[ing] to the district court to determine . . .whether, in the exercise of

12   reasonable diligence, Plaintiff should have discovered the facts underlying the alleged fraudulent

13   activity prior to October 12, 1994, one year before he filed suit."); Berry v. Valence Technology,

14   Inc., 175 F.3d at 706 (Noting that it would have needed to "remand the case to the district court to

15   determine when, if ever, a reasonably diligent investor should have discovered the facts underlying

16   the alleged fraud.").

17          "[T]he answer to the second question would determine when the statute of limitations

18   began to run."  Berry v. Valence Technology, Inc., 175 F.3d at 704.[15]  Thus, "inquiry notice . . .

19   triggers an investor's duty to exercise reasonable diligence and . . . the one-year statute of

20   limitations period begins to run once the investor, in the exercise of reasonable diligence, should

21   have discovered the facts underlying the alleged fraud." Sterlin v. Biomune Systems,154 F.3d at

22   1201.

23

24          [15] "The objective of encouraging investors to file suit as soon as possible is not undermined
    by delaying the accrual of the statute of limitations until the plaintiffs, in the exercise of reasonable
25   diligence, should have discovered the facts underlying the alleged fraud.  Delaying the accrual of the
    one-year limitations period until this time does, however, ensure that plaintiffs are given the
26   opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus
    giving meaning to the term 'inquiry.'" Sterlin v. Biomune Systems, 154 F.3d at 1202; see also, id
27   ("While we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they
    are put on notice of their claims, the applicable statute of limitations should not precipitate groundless
28   or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of
    reasonable diligence the necessary facts to support their claims.").

1      "A defendant raising the statute of limitations . . . has the burden of proving the action is

2   time barred." <u>California Sansome Co. v. U.S. Gypsum</u>, 55 F.3d 1402, 1406 (9th Cir. 1995).

3   Defendants here have failed to meet that burden.   Their failure is conceptual.  They assert

4   "Plaintiffs were unquestionably were aware of the facts supporting their allegations against

5   [Defendants] well more than one year before [Plaintiffs] filed" the Complaint. (BearingPoint

6   Motion at 11:18-19; <u>see also</u>, BearingPoint Reply at 8:5-7: "The statute began to run when

7   Plaintiffs knew (or should have known) that a fraudulent misrepresentation had been made . . . .")

8   Defendants' position equates the arousal of suspicion with the commencing of the statute of

9   limitations.  The statute begins running, not on the date of the inquiry notice, but on the date

10  Plaintiffs should have discovered the facts underlying the fraud.  <u>See</u>, <u>Berry v. Valence</u>

11  <u>Technology, Inc.</u>, 175 F.3d at 704; <u>see also</u>, <u>Sterlin v. Bioimmune Sys.</u>, 154 F.3d at 1201 (". . .

12  [T]he one-year statute of limitations period begins to run once the investor, in the exercise of

13  reasonable diligence, should have discovered the facts underlying the alleged fraud."); <u>New</u>

14  <u>England Health Care Employees Pension Fund v. Ernst & Young, LLP</u>, 336 F.3d 495, 501 (6th

15  Cir. 2003) ( "[T]he limitation period begins to run only when a reasonably diligent investigation

16  would have discovered the fraud."); <u>Marks v. CDW Computer Centers, Inc.</u>,122 F.3d 363, 367 (7th

17  Cir.1997) (For limitations period to run, "not only must the investor be on notice of the need to

18  conduct further inquiry, but the investor also must be able to learn the facts underlying the claim

19  with the exercise of reasonable diligence.").  Thus, Defendants fail to address the second question:

20  when a reasonable investors, armed with the triggering information, should have uncovered the

21  alleged fraud.  As such, they have failed to meet their burden.

22      Moreover, Plaintiffs have offered sufficient evidence to create a triable issue of when they

23  should have uncovered Defendants' alleged fraud.  <u>See</u>, <u>Sterlin v. Biomune Systems</u>, 154 F.3d at

24  1205.  In the Complaint, Plaintiffs allege they "were unaware of the facts supporting the allegations

25  against . . . [D]efendants until they had access to and were able to review Peregrine's document

26  production to the SEC and U.S. Department of Justice beginning in December 2003." (Complaint

27  ¶ 655. <u>See also</u>, Complaint ¶¶ 228-229, 642-643, 646-648.)  For this reason, and the reasons stated

28  above, Defendants have failed to show that Plaintiffs' claim is time-barred.  Accordingly, their

1  motion on this basis is denied.

## VI.

## CONCLUSION.

Defendants, acting as Peregrine's business partners, participated and assisted Peregrine's accounting frauds by entering into a number of bogus transactions, which artificially inflated the price of Peregrine's stock.  However, Defendants' conduct amounts to nothing more than aiding and abetting Peregrine's primary violation of Section 10(b) and Rule 10b-5.  There is no liability for aiding and abetting primary violators under Section 10(b) and Rule 10b-5.  Defendants are not corporate insiders, but Peregrine's business partners.  No post-Central Bank case has ever held such Defendants liable to the shareholders of a publicly-traded company.  Moreover, Plaintiffs fail to allege Defendants made, or had any role in drafting, editing, or dissemination of,  any statements or material omissions.  For these reasons, and all the reasons set forth above, the Loran Group Plaintiffs fail to adequately state a claim under Section 10(b) and Rule 10b-5.  As this is the only claim the Loran Group Plaintiffs allege against Defendants KPMG, BearingPoint and Rodda, the Complaint against these Defendants is dismissed with prejudice.

**IT IS SO ORDERED.**

DATED:  _1/19/05_

_____
ROGER T. BENITEZ
United States District Judge

cc: All parties and respective counsel